**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE HECKMAN CORPORATION SECURITIES LITIGATION | Case No. 1:10-cv-00378-LPS-MPT<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## Table of Contents

Page

I.     NATURE OF ACTION ............................................................................. 3

       A.     The Company .............................................................................. 3

       B.     The Ill-Fated Merger ................................................................... 4

       C.     Post-Merger Revelations ............................................................ 6

       D.     The Write-Downs ........................................................................ 8

       E.     The Delaware Litigation ............................................................. 8

II.    JURISDICTION AND VENUE ............................................................ 12

III.   PARTIES ............................................................................................... 13

       A.     Lead Plaintiff ............................................................................ 13

       B.     Defendants ................................................................................ 13

IV.    SUBSTANTIVE ALLEGATIONS ...................................................... 15

       A.     Mr. Heckmann Uses The Success of U.S. Filter to Raise Over
              $400 Million For A "Blank Check" Company .......................... 15

       B.     China Water's Reported Operating Results .............................. 18

       C.     The Merger ................................................................................ 19

       D.     Heckmann Becomes Aware of Intentional Tax Evasion and Other
              Serious Irregularities During the Due Diligence Process .................... 22

       E.     Heckmann and China Water Renegotiate the Merger But
              Misrepresent the Reasons to Investors .................................... 27

       F.     China Water Restates Its Financial Statements .................... 31

       G.     Heckmann and China Water Issue the Materially False and
              Misleading Proxy ...................................................................... 32

       H.     Heckmann Shareholders Approve the Merger........................ 34

       I.     Defendants Conceal Additional Evidence of Malfeasance at China
              Water ........................................................................................ 35

V.      THE TRUTH BEGINS TO EMERGE ........................................................ 40

        A.     The Heckmann Defendants First Disclose Intentional Wrongdoing
               on the Part of the China Water Defendants ........................................ 40

        B.     Heckmann Releases IPO Proceeds From Escrow .................................. 41

        C.     Post-Class Period Events ..................................................................... 41

               1.     Heckmann Files the Counterclaim ............................................ 41

               2.     The Company Reports Disappointing Results and Records
                      Additional Goodwill Impairments of China Water ................... 42

               3.     Additional Details Regarding Heckmann's Goodwill Write-
                      Downs of China Water ............................................................. 43

VI.     MATERIALLY FALSE AND MISLEADING STATEMENTS ..................... 45

        A.     Materially False and Misleading Proxy Solicitations .......................... 45

               1.     May 20, 2008 Conference Call and Investor Presentation ........ 45

               2.     The Merger Agreement and Related Agreements ..................... 48

               3.     June 5, 2008 Conference Call ................................................... 50

               4.     August 14, 2008 Press Release and Form 10-Q ...................... 51

               5.     September 29, 2008 Press Release and September 30, 2008
                      Conference Call Regarding Merger Renegotiation.................... 52

               6.     China Water's September 29, 2008 Restated Forms 10-Q
                      and 10-K................................................................................... 54

               7.     The Joint Proxy ....................................................................... 56

        B.     Additional False and Misleading Statements In Violation Of
               Section 10(b) and Rule 10b-5 ............................................................ 60

               1.     November 21, 2008 Presentation .............................................. 60

               2.     March 16, 2009 Form 10-K and Conference Call ..................... 61

               3.     March 16, 2009 Press Release .................................................. 65

VII.    ALLEGATIONS OF SCIENTER IN SUPPORT OF SECTION 10(b)
        AND RULE 10b-5 CLAIMS ................................................................... 67

ii

A.      Direct Evidence of Defendants' Scienter.......................................... 67

B.      Additional Scienter Allegations ...................................................... 69

    1.      The Heckmann Defendants' Motivation to Conceal
    Material Facts About the Merger ............................................. 69

    2.      Defendants' Renegotiation Of The Merger Price ..................... 71

    3.      Defendant Xu's Departure from Heckmann ............................ 72

    4.      The Magnitude of Heckmann's Goodwill Impairments
    Related to China Water .......................................................... 73

VIII.   LOSS CAUSATION ................................................................................ 73

IX.     APPLICABILITY OF THE FRAUD-ON-THE-MARKET
    PRESUMPTION OF RELIANCE ........................................................... 76

X.      INAPPLICABILITY OF SAFE HARBOR ........................................... 77

XI.     CLASS ACTION ALLEGATIONS ...................................................... 79

XII.    CLAIMS BROUGHT PURSUANT TO SECTIONS 14(a) AND 20(a) OF
    THE EXCHANGE ACT ......................................................................... 81

COUNT I ........................................................................................................... 88

COUNT II .......................................................................................................... 90

COUNT III ......................................................................................................... 92

XIII.   CLAIMS BROUGHT PURSUANT TO SECTIONS 10(B) AND 20(a) OF
    THE EXCHANGE ACT ......................................................................... 94

COUNT IV ......................................................................................................... 94

COUNT V ........................................................................................................... 98

COUNT VI ........................................................................................................ 101

1.        Court-appointed Lead Plaintiff, Matthew Haberkorn ("Lead Plaintiff")[1], brings this action individually and on behalf of all persons and entities who (i) held Heckmann Corporation ("Heckmann" or the "Company") common stock as of September 15, 2008 and were entitled to vote on the merger between Heckmann and China Water and Drinks, Inc. ("China Water") consummated on October 30, 2008 (the "Merger"); or (ii) purchased or otherwise acquired the securities of Heckmann between May 20, 2008 and May 8, 2009 (the "Class Period"), asserting claims for violations of the Securities Exchange Act of 1934 (the "Exchange Act").  The gravamen of the claims asserted herein is that:

a)        Heckmann and the members of its board of directors (the "Heckmann Defendants") obtained shareholder approval of the Merger by means of a proxy statement that grossly distorted China Water's operations, financial condition and prospects, and which mischaracterized and/or omitted other information of critical importance to Heckmann shareholders in determining whether to vote their shares in favor of the Merger.  The material misstatements and omissions in the proxy statement were made by the Heckmann Defendants at least negligently in violation of Section 14 of the Exchange Act ("Section 14"), and Rule 14a-9 promulgated thereunder ("Rule 14a-9").  The Section 14 and Rule 14a-9 claims against the Heckmann Defendants allege simple negligence and do not sound in fraud.

b)        In certain public statements following the announcement of the Merger, the Heckmann Defendants recklessly and/or intentionally made false and misleading statements concerning China Water and the Merger in violation of Section 10 of

---

[1]   Lead Plaintiff brings these claims individually and as trustee of the M. H. Haberkorn 2006 Trust U/A Dtd. 10/27/2006 ("M.H. Haberkorn Trust").

the Exchange Act, and Rule 10b-5 promulgated thereunder.  The Section 10(b)

and Rule 10b-5 claims asserted against the Heckmann Defendants sound in fraud.

c)    China Water and its former Chief Executive Officer, Chairman and founder, Xu

Hong Bin ("Xu") (the "China Water Defendants") committed what the Company

itself now admits was a "massive" and "wide-ranging" fraud – including brazen

embezzlement, criminal tax evasion, and the falsification of China Water's results

of operations and financial results – and made numerous public statements about

China Water in the merger agreement and proxy statement and throughout  the

Class Period that were false and/or omitted material information in violation of

Section 14 and Rule  14a-9, as well as Section 10 and Rule 10b-5.  Plaintiff's

Section 14 claims against the China Water Defendants sound in negligence, and

its Section 10 claims against the China Water Defendants sound in fraud.

2.    Lead Plaintiff alleges the following based upon personal knowledge as to himself

and his own acts and upon information and belief as to all other matters.  Lead Plaintiff's

information and belief is based on, *inter alia*, the investigation of Court-appointed Co-Lead

Counsel, Barroway Topaz Kessler Meltzer & Check, LLP and Rosenthal Monhait & Goddess,

P.A.  This investigation included, but was not limited to, a review and analysis of: (i) public

filings with the Securities and Exchange Commission ("SEC") by Heckmann and China Water;

(ii) research reports issued by securities and financial analysts; (iii) transcripts of investor

conference calls; (iv) publicly available presentations by Heckmann and China Water; (v) press

releases and media reports; and (vi) publicly available legal actions involving both companies

and their officers and directors, including a review of the Delaware Court of Chancery filings in

the actions titled *Xu v. Heckmann Corp.*, C.A. No. 4637-CC and *Kau v. Heckmann Corp.*, C.A.

No. 5524-CC.[2]  Co-Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants named herein, or are exclusively within their custody or control.   Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF ACTION

### A.      <u>The Company</u>

3.      Heckmann is a holding company which was organized under the laws of the State of Delaware on May 29, 2007 as a blank check development stage company, to acquire or acquire control of one or more operating businesses through a business combination.   The Company's organizational documents required it to complete an initial business combination with a value of least 80% of the Company's net assets (a "qualifying business combination") within 24 months from the date it commenced its initial public offering ("IPO").

4.      As part of Heckmann's organization, its founders – including entrepreneur Richard Heckmann, former Vice President Dan Quayle and Notre Dame football coach Lou Holtz (together with defendant Alfred E. Osborne, Jr., the "Founders") – awarded themselves 14,375,000 units in the Company at $0.05 per unit, each consisting of one share of common stock and one warrant to purchase one share of common stock at a price of $6.00 per share (each a "Unit") for $.005 per Unit.  In this manner, the Founders obtained Heckmann securities worth more than $100 million – almost 20% of the Company – for a mere $71,875.  In the event

---

[2]    Lead Plaintiff primarily relies upon (1) Xu's Complaint against Heckmann, (2) Heckmann's Answer and Counterclaim against Xu, (3) Heckmann's Answer and Counterclaim against Wu, (4) the Answering Brief of Defendants and Counterclaim Plaintiffs in Opposition to Motion to Dismiss Counterclaim and in Opposition to Plaintiffs' Motion for Partial Summary Judgment on the Pleadings, filed by Heckmann in the Xu Action (defined herein), and (5) a June 8, 2009 letter brief sent from counsel for Heckmann to the Honorable William B. Chandler, III in connection with the Xu Action (defined herein).

Heckmann failed to consummate a qualifying business combination before November 2009, it was required to dissolve and distribute an escrow fund containing its IPO proceeds and funds invested by the Founders, to its shareholders. The Founders were not entitled to any proceeds from such dissolution; in that scenario, their securities would become worthless.

5.      The Company completed its IPO on November 16, 2007 generating gross proceeds of approximately $432.9 million, making it the second largest initial public offering by a special purpose acquisition company ("SPAC") at the time.

### B.      The Ill-Fated Merger

6.      Approximately six months after completing its IPO, Heckmann announced, on May 20, 2008, that it had struck a deal to acquire China Water, a Nevada corporation engaged in the manufacture and distribution of bottled water products in the People's Republic of China, for an estimated $625.0 million in cash and stock.

7.      In soliciting shareholders' approval for the Merger, the Heckmann Defendants and China Water Defendants (collectively, "Defendants") repeatedly praised China Water's operations, growth potential, and management.  In a presentation to investors regarding the Merger, Defendants touted it as a "compelling" and "special opportunity" to capitalize on a highly fragmented bottled water market in the People's Republic of China that was ripe for consolidation.  Mr. Heckmann stated that China Water possessed a proven history of organic growth, with a historic organic growth rate in the range of 40% to 50% per year, and stated that the company was on track for $220 million in revenues and $70 million in net income for fiscal year 2008.  Defendants also credited China Water's CEO, Defendant Xu, with China Water's proven success and significant growth.

8.      Similarly a May 20, 2008 investor presentation that accompanied the announcement of the Merger stated:

The acquisition of China Water & Drinks ("CWDK") represents a special opportunity to provide the platform to invest in China's Water Industry. CWDK's well-established bottled water platform, combined with China's economic growth, favorable demographic characteristics and highly fragmented market provides for a compelling growth story with significant upside potential.

9.    In the presentation discussing China Water, which Heckmann identified as the fifth largest bottled water company in China, the Company touted, *inter alia*, the following attributes:

a)    "Well recognized branded, OEM and private label product offerings";

b)    "Key supplier of bottled water to Coca-Cola in China since 1996";

c)    "Six first-rate facilities across China serving 14 provinces and regions";

d)    "Successful history of acquisitive growth and established platform for growth";

e)    "Established distribution and sales force with access to over 3,600 distributors and retailers"; and

f)    "Experienced management team with extensive long-term relationships throughout China."

10.    Defendants solicited votes from stockholders necessary to complete the Merger by means of a joint proxy and information statement/prospectus ("Joint Proxy") dated October 2, 2008 and other public statements, in which they touted China Water's financial performance and operations, as well as the "extensive" due diligence Heckmann purportedly conducted on China Water.

11.    While the Joint Proxy noted certain deficiencies in China Water's internal controls over financial reporting, the Company stated in the Joint Proxy that it had become "comfortable" with these issues.  Furthermore, while the Joint Proxy recited potential risks that could arise in connection with the Merger, it provided shareholders no reason to suspect that Heckmann had failed to reasonably investigate such risks, or that the Company had already

identified serious discrepancies and intentional malfeasance.   Without such information, Heckmann's shareholders had no reason to doubt the Joint Proxy's characterization of China Water as a successful, rapidly growing and valuable enterprise with demonstrated growth potential.

12.     Indeed, when the Joint Proxy was finalized on October 2, 2008 it reiterated that "Heckmann believes that its projection of $70.0 million in pro forma annualized net income and $220.0 million in pro forma annualized revenue remain achievable." The Company's board of directors recommended therein that shareholders should approve the Merger based on the experience of China Water's management team and the results of the Board's "extensive due diligence review," which included a review of China Water's operating results, financial condition and growth prospects.

13.     In reliance upon the information contained in the Joint Proxy, the Company's stockholders overwhelmingly approved the Merger at an October 30, 2008 special meeting of stockholders.  The Merger was consummated that same day and Xu joined Heckmann's board of directors.

**C.**     **Post-Merger Revelations**

14.     In the year following their approval of the Merger, Heckmann shareholders would belatedly learn that China Water's troubles extended well beyond its internal controls over financial reporting.   In reality, China Water's reported operating results and value were a complete sham and the company was worth only a small fraction of the price Heckmann paid in the Merger.

15.     After the market closed on March 16, 2009, the Company filed its annual report on Form 10-K and issued a press release (filed with the SEC on Form 8-K the following day) in which it announced that it had "[s]ignificantly strengthened operational control of China Water

with the appointment of J. John Cheng as President of the Company's China Division and additional finance and accounting staff."   In addition, the Company disclosed that Xu and Heckmann had entered into an Escrow Resolution and Transition Agreement ("ERTA"), pursuant to which Xu would resign as an officer and director of the Company and Heckmann would: (i) return to Xu 3,500,000 shares of Heckmann common stock he had placed in escrow to secure various representations, warranties and covenants made in connection with the acquisition of China Water, (ii) pay Xu $14 million for his remaining 13,032,100 shares in escrow, (iii) ease transfer restrictions on Xu's remaining 5.3 million shares so as to permit Xu to publicly sell such shares (subject to a monthly 600,000 share volume limitation), and (iv) terminate Xu's remaining escrow obligations.

16.     In the press release, Heckmann spun this announcement as an exceedingly positive development:

> "By virtue of the acquisition of China Water at more favorable terms, we are in the unique position to grow in the largely fragmented bottled water and beverage market in China," said Mr. Richard J. Heckmann, Chairman and CEO of Heckmann Corporation. "Operationally, we are expanding our seasoned management team at China Water, which in concert with the implementation of updated financial controls and systems, will allow us to prudently expand capacity to capture market share. Furthermore, by reducing the purchase price for China Water and our outstanding share count via the settlement of the escrow, we believe we have adjusted to the new market reality and can now use our strong balance sheet to take advantage of opportunities and increase shareholder value."

17.     However, the March 16, 2009 disclosures fundamentally misrepresented the facts surrounding Xu's departure and China Water and concealed a host of disturbing material facts. On May 8, 2009, the Company's stockholders were blindsided by: (i) financial results for the first full quarter following the Merger which were completely inconsistent with the historical and projected financial data presented in the Joint Proxy; (ii) a massive write-down of the Company's China Water assets; and (iii) the Company's announcement that it had purportedly just

discovered financial misconduct by former management of China Water and believed "that China Water's prior management misrepresented the strength of the China Water business, and may have diverted corporate assets."   The market price of the Company's stock, which had reached $5.14 per share on May 7, 2009, dropped sharply to a low of $4.09 per share overnight, and eventually dropped to as low as $3.30 per share, in the wake of such disturbing revelations.

### D.   The Write-Downs

18.    In the ensuing months, the Company continued to extensively write-down the value of assets and goodwill acquired in the Merger.   On February 23, 2010, Heckmann filed with the SEC on Form 8-K, a public investor presentation that stated that "*[i]n 2009, China Water was written down to $21 million dollars*."   This enormous write-off (a 96% reduction from the initial $625 million deal price announced to shareholders on May 20, 2008) evidenced that, contrary to the representations Defendants made prior to the shareholder vote on the Merger and throughout the Class Period, China Water possessed little, if any, value as a going concern. Further, in 2009 the Company effectively jettisoned its objective of "build[ing] a global water company" and radically shifted its focus to managing subsequently-acquired, smaller scale businesses focused on supplying water to companies engaged in oil and gas production operations in the United States.

### E.   The Delaware Litigation

19.    Additional, previously concealed facts regarding Xu's fraudulent conduct, and Heckmann's awareness of the same, have subsequently been revealed in litigation between the Company and former officers of China Water.   After the Company announced, on May 8, 2008, that it had "cancelled" Xu's remaining shares in the Company, Xu commenced an action against Heckmann and certain of its officers and directors in the Delaware Court of Chancery on June 1, 2009 (*Xu v. Heckmann Corp.*, C.A. No. 4637-CC) (the "Xu Action").   Another action was later

filed in the Delaware Court of Chancery on May 28, 2010 by Ng Tak Kau, China Water's former Chief Operating Officer who Heckmann Corp. refers to as "Mr. Wu" in its filings in that action (*Kau v. Heckmann Corp.*, C.A. No. 5524-CC) (hereafter the "Wu Action"). The Xu Action and Wu Action are collectively referred to herein as the "Delaware Litigation."

20. To support counterclaims it filed against Xu and Wu, Heckmann effectively admitted that during its due diligence review of China Water, it uncovered evidence of intentional criminal misconduct and other glaring red flags which demonstrated that information reported in the Joint Proxy about China Water's operations and financial results was false and misleading.

21. The pleadings in the Delaware Litigation belatedly revealed numerous disturbing material facts that had been previously concealed from investors, including, *inter alia*:

a) During the pre-Merger due diligence process, Heckmann's auditor, Ernst & Young LLP ("E&Y"), discovered that value-added tax ("VAT") payments made by China Water did not match the reported revenue figures in China Water's books. When confronted about the discrepancy, Xu attempted to justify the non-payment of VAT by indicating that it was a common practice among Chinese companies; however, E&Y "did not accept Mr. Xu's 'Everybody does it' explanation for the non-payment of VAT and so informed Heckmann." Thereafter, even though Xu's proffered excuse was tantamount to an admission of intentional (and therefore criminal) tax evasion and was not accepted by E&Y, Heckmann failed to verify and reconcile the reported revenue and actual VAT liabilities.[3]   Heckmann instead simply required China Water to reserve for

---

[3] Indeed, in the counterclaim Heckmann filed against Xu, it asserted that VAT tax fraud is a capital offense in China.

additional VAT payments.  In reality, the discrepancy between China Water's revenues and VAT payments was because China Water's "revenues were dramatically overstated."

b)    While China Water was reporting financial results in filings with the SEC, China Water's former Chief Operating Officer, Mr. Wu, "was reporting a separate set of numbers to Chinese officials at the same time that these reports were made to the SEC."

c)    Xu Hong Bin is not Xu's real name.  Xu's educational and employment history was completely fabricated and so was the college he supposedly attended and the transportation company for which he had worked; in fact, they do not even exist. Xu "had no background in running a legitimate company" and is, in fact, a convicted felon with ties to criminal organizations.

d)    Heckmann had secretly promised to reimburse Xu for 7,600,000 shares of China Water stock that Xu agreed to transfer to certain China Water shareholders immediately prior to the Merger in order to induce such shareholders to agree, in September 2008, to amendments to the terms of the Merger that reduced the amount of cash Heckmann had to pay such shareholders for their China Water shares.

e)    According to the counterclaim Heckmann filed in the Xu Action, in December 2008, after reviewing flash reports for China Water's first post-closing month's operating results, the Company "discovered China Water's receivables were not being collected and sales figures were plummeting."  In its counterclaim, Heckmann further states that in January 2009, after "extremely disappointing

10

preliminary year-end operating results for China Water became available, Heckmann representatives sought an explanation from Mr. Xu."

f)    In February 2009, in a meeting in Hong Kong, Richard Heckmann accused Mr. Xu of allegedly misrepresenting the true financial condition of China Water prior to the Merger.

g)    Xu did not simply "retire from the Company." He was ousted from the Company in March 2009 amidst accusations by Heckmann of fraud and other misconduct.

h)    Heckmann purchased China Water "at a price grossly inflated by [Xu's] accounting fraud."

22.    While the parties in the Delaware Litigation continue to point fingers at one another, the foregoing startling revelations – derived from sworn pleadings – amply illustrate that the Joint Proxy contained material, false and misleading information about China Water and the Merger, and that Defendants disseminated such information to Heckmann's shareholders.

23.    Heckmann's own pleadings in the Delaware Litigation establish that it possessed, prior to the publication of the Joint Proxy and shareholder vote, evidence of criminal wrongdoing directly related to the fraud of which it now complains. The pleadings also establish that the Heckmann Defendants failed to take reasonable actions to ensure that the information they disseminated to the Company's shareholders was accurate; instead they made a gamble to proceed with the Merger and to rely on escrow provisions in the underlying Merger agreements – and thereby deprived its shareholders the opportunity to make their own informed decision on the Merger. Undoubtedly, this ill-fated decision was influenced by the Founders' need to consummate a qualifying business combination to avoid forfeiting more than $100 million dollars worth of Heckmann securities.

24.     Facts revealed in the Delaware Litigation also demonstrate that, after the Merger closed, Heckmann carefully manipulated its public disclosures to conceal the true facts regarding its acquisition of China Water from investors – who purchased Heckmann stock in ignorance of such facts and were damaged thereby.

25.     Finally, by Heckmann's own admission, the China Water Defendants committed actionable securities fraud in connection with the Joint Proxy and virtually every other public statement during the Class Period.  Among other things, Heckmann has asserted that the China Water defendants "victimized Heckmann and its shareholders through an intricate pattern of criminal activity," engaged in intentional fraud, "dramatically inflated" China Water's revenues, embezzled millions from the company, materially misrepresented pending acquisitions, lied about China Water's management, and completely misrepresented the true facts regarding China Water, its financial statements, operating results and future prospects.

## II.     JURISDICTION AND VENUE

26.     The claims asserted herein arise under Sections 10(b), 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9.

27.     This court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §§ 78a-78jj, and 28 U.S.C. § 1367.

28.     Venue in this case is proper in the District of Delaware pursuant to Section 27 of the Exchange Act [15  U.S.C. § 78aa], and 28 U.S.C. § 1391(b) and (c).  Acts giving rise to the violations of law complained of herein, including the dissemination to the investing public of false and misleading information, occurred in the District of Delaware.  In addition, Heckmann is incorporated in the State of Delaware.

29.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

III.    PARTIES

A.    **Lead Plaintiff**

30.     Lead Plaintiff Matthew Haberkorn is an individual who resides in Los Gatos, California.   Mr. Haberkorn is the sole trustee of M. H. Haberkorn 2006 Trust U/A Dtd. 10/27/2006.  As set forth in his certification previously filed in this matter and incorporated by reference herein, in his individual capacity for the account of his minor daughter, and as the trustee of the M.H. Haberkorn Trust, Mr. Haberkorn purchased shares of Heckmann at artificially inflated prices during the Class Period and held shares of Heckman as of September 15, 2008, which were eligible to vote in the merger of Heckmann and China Water, and has been damaged thereby.

B.    **Defendants**

31.     Heckmann Corporation is a Delaware corporation, with its principal executive offices at 75080 Frank Sinatra Dr., Palm Desert, CA 92211.  Heckmann conducts its business throughout the United States and abroad.  Heckmann's common stock is listed and traded on the New York Stock Exchange under the ticker symbol "HEK."  Heckmann's warrants are traded on the NASDAQ under ticker symbol "HEK.WS."

32.     China Water and Drinks, Inc. is a Delaware corporation and wholly owned subsidiary of Heckmann with principal executive offices at Unit 607, 6/F Concordia Plaza, 1 Science Museum Road, Tsimshatsui East, Kowloon, Hong Kong, Peoples' Republic of China. China Water is the successor-in-interest to China Water and Drinks, Inc., a Nevada Corporation

of the same name that traded on the OTC Bulletin Board under the symbol "CWDK" prior to being merged into China Water (Delaware). As used herein, the term "China Water" refers both to the existing Delaware corporation and its Nevada predecessor-in-interest as the context requires (*i.e.*, references to China Water concerning acts or events alleged to have taken place subsequent to the Merger refer to the Delaware corporation and references to China Water concerning acts or events alleged to have taken place prior to the Merger refer to its refer to its predecessor, a Nevada corporation).

33.    Defendant Richard J. Heckmann ("Richard Heckmann" or "Mr. Heckmann") is Heckmann's Chief Executive Officer, and Chairman, and a founder of the Company. Defendant Mr. Heckmann signed the Company's quarterly and annual reports filed with the SEC, and Joint Proxy issued in connection with the Merger.

34.    Defendant Donald G. Ezzell ("Ezzell") was Heckmann's Vice President, General Counsel, and Corporate Secretary during the Class Period, a position he occupied until his resignation on October 1, 2010.

35.    Defendant Lou L. Holtz ("Holtz") is a director of Heckmann, a position he has occupied since May 2007 and is a founder of the Company.

36.    Defendant Alfred E. Osborne, Jr. ("Osborne") is a director of Heckmann, a position he has occupied since May 2007 and is a founder of the Company.

37.    Defendant James Danforth Quayle ("Quayle") is a director of Heckmann, a position he has occupied since May 2007, and is a founder of the Company.

38.    Defendant Xu Hong Bin ("Xu") was Chief Executive Officer and President of China Water, the 100% owned subsidiary of Heckmann, and a director of Heckmann from October 30, 2008 until his resignation on or about March 14, 2009. Prior to the Merger,

Defendant Xu had been a director and president of China Water since June 2007.  Defendant Xu signed the Joint Proxy issued in connection with the Merger.

39.     Defendants Mr. Heckmann, Ezzell, Holtz, Osborne and Quayle (collectively, the "Heckmann Board") participated in Heckmann Board meetings and conference calls, voted to approve the Merger, signed the October 2, 2008 amended Registration Statement filed by Heckmann on Form S-4/A (the "Registration Statement"), which registered the shares of Heckmann stock that would be used to complete the Merger, approved the Joint Proxy, solicited approval of the Merger through the Heckmann Board's recommendation to vote in favor of the Merger, which repeatedly appeared throughout the Joint Proxy, and permitted the use of their names in connection with the solicitation of proxies from Heckmann shareholders.  In their capacities as signatories of the documents set forth above, as well as by virtue of their authority to approve the Merger and formally recommend in the Joint Proxy that Heckmann's shareholders approve the Merger, the Heckmann Board possessed the power and authority to control the contents of the Joint Proxy, as well as Heckmann's press releases, investor and media presentations, and other SEC filings.

40.     Defendants Heckmann and the Heckmann Board are collectively referred to as the "Heckmann Defendants."  Defendants China Water and Xu are collectively referred to as the "China Water Defendants."   Collectively, the Heckmann Defendants and China Water Defendants are hereinafter referred to as "Defendants."

IV.   **SUBSTANTIVE ALLEGATIONS**

A.     **Mr. Heckmann Uses The Success of U.S. Filter to Raise Over $400 Million For A "Blank Check" Company**

41.     Heckmann is a holding company organized on May 29, 2007 under the laws of the State of Delaware as a so-called "blank check company" (also commonly known as a

"special-purpose acquisition company" or "SPAC"). According to Heckmann's November 13, 2007 prospectus, SPACs are organized for the purpose of "acquiring or acquiring control of one or more operating businesses through a merger, capital stock exchange, asset or stock acquisition, exchangeable share transaction or other similar business combination." Essentially, SPAC investments constitute an investment in the deal-making abilities of their founders.[4]

42.     SPACs raise their capital through the issuance of equity to investors, typically in an initial public offering. In exchange for the "blank check" provided to the management of the SPAC, management promises to acquire an operating business within a certain time frame. If management fails to do so, it is required to return the principal investment in the SPAC to the SPAC's shareholders. Management is compensated for their intellectual capital and successes in acquiring an operating company through the receipt of equity in the SPAC.

43.     Heckmann is named for its co-founder, Chairman and Chief Executive Officer ("CEO"), Richard Heckmann. The SPAC was largely marketed on Mr. Heckman's reputation as a veteran in the field of mergers and acquisitions. Mr. Heckman is credited with transforming – through over 250 mergers and acquisitions – United States Filter Corporation ("U.S. Filter"), a small water treatment equipment and services provider, into the largest provider of such services in the country. Mr. Heckmann founded Heckmann on the implicit promise to recreate the success of U.S. Filter for investors in his new SPAC.

44.     On November 16, 2007, the Company completed its initial public offering of 54.1 million units at a price of $8.00 per unit. Each unit consisted of one share of the Company's common stock with a par value of $0.001 and a warrant to purchase one share of common stock

---

[4] Thomas Heath, *The New Way To Make Deals: Blank Checks*, THE WASHINGTON POST, Feb. 18, 2008, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2008/02/17/AR2008021701837.html.

at $6.00 per share.  Heckmann's IPO generated gross proceeds of approximately $432.9 million, making it the second largest initial public offering by a SPAC at the time.

45.     The Company's certificate of incorporation provided that the IPO proceeds were to be held in a trust account maintained by an independent trustee (the "IPO Escrow Fund") until such time that the Company entered into an "initial business combination."  Further, according to the prospectus issued in connection with Heckmann's IPO, if, within 24 months of the date of the IPO, Heckmann failed to enter into an initial business combination "with one or more target businesses whose fair market value, individually or collectively, is equal to at least 80% of [Heckmann's] net assets . . . at the time of such business combination," it would automatically dissolve and promptly distribute the trust proceeds (minus certain expenses) to the Company's shareholders.  This 24-month period could not be extended, "even if [Heckmann] entered into a letter of intent but [did not consummate] a business combination before the expiration of the 24 months."

46.     The Founders – including Defendants Heckmann, Quayle, Holtz and Osborne – awarded themselves 14,375,000 units in the Company as part of the IPO at a price of $.005 per Unit.  Each Unit included one share of common stock and one warrant to purchase one share of common stock at a price of $6.00 per share.  As a result, the Founders obtained Heckmann securities worth more than $100 million – almost 20% of the Company – as of the date of the IPO, for a mere $71,875 investment.  By the time of the shareholder vote, these securities were valued at approximately $280 million.  However, in the event Heckmann failed to consummate a qualifying business combination before November 2009, they were not entitled to receive any distribution of the Company's assets, in which case their common shares and warrants would be rendered worthless.

47.     Also, in connection with the IPO, the Founders agreed to purchase, at $1 each, 7,000,000 warrants to purchase one share of common stock at a price of $6.00 per share.  The $7,000,000 paid by the Founders for these warrants was escrowed along with the proceeds of the IPO for distribution to Heckmann's shareholders if a qualifying business combination was not consummated before November 2009.  Thus, the Founders also stood to lose this investment if Heckmann failed to consummate a qualifying transaction by November 2009.

**B.     China Water's Reported Operating Results**

48.     China Water holds itself out to be a licensed bottled water producer and operator of bottled water production plants in China.  During the Class Period, China Water reportedly produced a variety of bottled water products (primarily under the brand name "Darcunk") including purified water, mineralized water and oxygenated water.  China Water represented that it supplies bottled water products to globally recognized beverage companies, including Coca-Cola and Uni-President, under their own brand names.

49.     China Water became a U.S. company through a 2006 reverse merger with UGODs, a publicly traded Nevada-based shell corporation.  Through the reverse merger, China Water was able to list its securities on the U.S. over-the-counter ("OTC") market and obtain $30 million in financing from institutional investors without having to go through the regulatory processes that typically accompany an initial public offering.

50.     According to its pre-merger SEC filings, many of which were incorporated into the Joint Proxy, China Water produced 844 million liters of bottled water in 2007, constituting "approximately 6.3% of the total estimated bottled water consumption in China."  China Water reported revenues for 2007 of $56.8 million, a 59% increase from $35.7 million in 2006.  It also reported net income of $19.4 million in 2007, up 114% from $9.1 million in 2006.  As represented to shareholders and investors throughout the proxy solicitation process and in the

Joint Proxy, Heckmann projected China Water's revenue in 2008 to be approximately $220.0 million, and net income to be approximately $70.0 million.

### C.     **The Merger**

51.     According to the Joint Proxy, Richard Heckmann was introduced to China Water in February 2008 at the "20th Annual Roth Capital Growth Conference" hosted by Roth Capital Partners ("Roth Capital"), an investment bank that had represented China Water in connection with a prior financing transaction.    During the conference, Mr. Heckmann, Xu and a representative of Roth Capital met to discuss a possible business combination.    Discussions between China Water and Heckmann continued in March of 2008.    On March 11, 2008, Heckmann sent China Water an initial due diligence request list, and purportedly commenced an investigation into China Water's operations.

52.     On May 19, 2008, Heckmann and China Water finalized the terms of the Merger and executed the merger agreement ("the Merger Agreement").    The next day, Heckmann publicly announced the Merger and filed a copy of the Merger Agreement with the SEC.

53.     According to the terms of the Merger Agreement, upon consummation of the deal, each share of China Water's common stock would be converted into the right to receive (i) 0.8 shares of common stock, par value $0.01 per share of Heckmann, or (ii) at the election of the holders of China Water common stock, a cash payment of $5 per share.    The total consideration Heckmann was expected to pay in connection with the Merger was $625 million, consisting of approximately $455 million in Heckmann common stock and $170 million in cash.    In addition, the Merger Agreement provided for an additional $150 million payment to China Water shareholders in the event China Water's net income reached $90 million in fiscal year 2009.

54.     The Merger Agreement contemplated that China Water would merge into Heckmann Acquisition II Corporation (a newly-formed subsidiary of Heckmann) and become a

wholly-owned subsidiary of the Company, and that Defendant Xu, China Water's founder, would serve as the CEO of China Water and would become a director of Heckmann.

55.     The Merger Agreement also contained a series of representations and warranties made by China Water to Heckmann.  Specifically, in Section 2.4(b) of the Merger Agreement, China Water represented that:

> Each of the Company SEC Reports filed on or after May 14, 2007, as of the date of the filing of such report (or, if amended or superseded by a subsequent filing prior to the date hereof, on the date of such filing), (i) complied as to form in all material respects with the requirements of the Securities Act and the Exchange Act, as the case may be, and, to the extent then applicable, SOX, including in each case, the rules and regulations thereunder, and (ii) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.
>
> To the Company's Knowledge, each of the Company SEC Reports filed prior to May 14, 2007, as of the date of the filing of such report (or, if amended or superseded by a subsequent filing prior to the date hereof, on the date of such filing), (i) complied as to form in all material respects with the requirements of the Securities Act and the Exchange Act, as the case may be, and, to the extent then applicable, SOX, including in each case, the rules and regulations thereunder, and (ii) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

56.     In Section 2.4(f) of the Merger Agreement, China Water further warranted that, except as set forth in Item 9A of China Water's 2007 Form 10-K, it has "implemented and maintain[ed] a system of internal control over financial reporting . . . sufficient to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements . . . in accordance with GAAP."  Further, China Water warranted that "all 'significant deficiencies' and 'material weaknesses'" had been disclosed to China Water's outside auditors and its audit committee.

57.     Regarding the accuracy of its financial statements, China Water represented in Section 2.5 of the Merger Agreement that:

> Each of the financial statements (including, in each case, any notes thereto) contained or incorporated by reference in the Company SEC Reports . . . complied with the rules and regulations of the SEC (including Regulation S-X) as of the date of the filing of such reports, . . . was prepared in accordance with GAAP, . . . [and] fairly presents in all material respects the financial condition and the results of operations.

58.     China Water also represented in Section 2.9 of the Merger Agreement that it possessed no undisclosed liabilities.

59.     Section 2.10 of the Merger Agreement contained representations from China Water regarding its payment of tax obligations and compliance with laws.  Section 2.10 stated, *inter alia*, that China Water and its subsidiaries "paid . . . all taxes that are due and payable," and that all tax returns filed by China Water were "in all material respects true, complete and correct and filed on a timely basis."  Finally, in Section 2.12(a) of the Merger Agreement, China Water warranted that from May 14, 2007 to the date of the Merger Agreement, it was:

> in compliance with each Legal Requirement that is or was applicable to any of them or to the conduct or operation of their business or the ownership or use of any of their assets, except to the extent that any non-compliance could not be reasonably be expected to have a Material Adverse Effect.

60.     In reality, as Heckmann has admitted in its counterclaims in the Delaware Litigation, China Water's SEC filings contained vastly overstated operating results and materially misleading statements regarding its financial position.  Moreover, the Heckmann Defendants themselves claim they discovered during the Company's due diligence process that China Water **had not** paid taxes due and payable based on its reported revenues; therefore, at a minimum, China Water **was not** complying with its tax obligations.  Furthermore, according to Heckmann, the non-payment of VAT was intentional—the excuse Xu offered was "[e]verybody does it."   Therefore, not only did the Heckmann Defendants possess actual knowledge that

China Water *was not* in compliance with applicable law, they knew that Xu and China Water had intentionally violated the law.  These material facts were not disclosed to Heckmann shareholders prior to the shareholder vote, nor did Defendants update the representations contained in the Merger Agreement to reflect these facts.

61.    Concurrently with the execution of the Merger Agreement, Defendant Xu and Chen Xing Hua, China Water's then-CEO, each entered into a Majority Stockholder Written Consent Agreement (the "Consent Agreement") with Heckmann.  In each respective Consent Agreement, Xu and Chen agreed to approve the Merger Agreement and vote in favor of the Merger.  In addition, as consideration for their China Water shares, Chen agreed to receive 100% cash proceeds, while Xu agreed to receive 15% cash and 85% Heckmann common stock.

62.    Defendant Xu also permitted Heckmann to hold in escrow certificates evidencing 90% of the Heckmann common shares he received in connection with the Merger.  Heckmann agreed that it would release 80% of the escrowed shares to Xu on March 31, 2010, with the remaining shares being released on the two-year anniversary of the Merger's consummation.

### D.    Heckmann Becomes Aware of Intentional Tax Evasion and Other Serious Irregularities During the Due Diligence Process

63.    According to the Joint Proxy, Heckmann conducted "extensive" due diligence in connection with its pending acquisition of China Water, "covering a broad range of business and legal issues at China Water."  However, Heckmann's own admissions in the Delaware Litigation demonstrate that the Heckmann Defendants did not even bother to confirm Xu's (entirely contrived) credentials.  *After* the Class Period, in its pleadings in the Delaware Litigation, Heckmann readily confirmed that the college from which Xu had purportedly graduated and the company for which he had purportedly worked *did not even exist*, that Xu "had *no* background conducting a legitimate enterprise," that Xu Hong Bin was not even Xu's real name, and that Xu

was in fact a convicted felon with ties to criminal organizations. Heckmann negligently failed to confirm *any* of these basic facts prior to the Merger.

64. In China Water's May 1, 2008 annual report for the fiscal year ended December 31, 2007 – which was filed with the SEC prior to the execution of the Merger Agreement, China Water disclosed material deficiencies in accounting function oversight and internal controls, including that it "did not maintain effective controls over the financial closing process to ensure the accurate and timely preparation of local financial statements and financial data which is necessary for preparation of consolidated financial statements." In addition, China Water reported that it was required to increase its 2006 VAT liability by $2.6 million due to "errors in the recording of VAT deductions as well as VAT liabilities."

65. However, according to its own counterclaims in the Delaware Litigation, what Heckmann encountered regarding China Water's VAT during its due diligence was not an internal control weakness or recording error. Heckman in fact learned that China Water was simply not paying the correct amount of VAT based on its reported revenues – and its failure to do so was intentional.

66. As part of its due diligence into China Water, Heckmann retained accounting firm E&Y to audit China Water's books, including its reported VAT payments and accruals.[5]

67. According to China's Ministry of Finance, VAT is administered by the State Administration of Taxation, and the revenue from it is shared between the central government and local governments. VAT is the major source of fiscal revenue for the Government of China, particularly the central government.[6] VAT must be paid by all entities who sell merchandise,

---

[5] In fact, there is no mention of E&Y performing any due diligence in the Joint Proxy, but Heckmann alleges this in the Delaware Litigation.

[6] http://www.china.org.cn/english/LivinginChina/202770.htm.

provide processing, repairing, or assembling service, or import goods within China on the added value derived from their production, selling merchandise, providing industrial repairing or assembling service.[7]   There is necessarily a positive correlation between sales revenues and VAT liability such that the more one sells, the more VAT it must pay.   Conversely, the less one sells, the less VAT it must pay.

68.     When E&Y discovered and reported to the Heckmann Defendants that there was a material discrepancy in the amount of VAT payments reflected in China Water's financial statements, there were only a few possible explanations: (1) the VAT liability had been incorrectly calculated and recorded; (2) China Water had paid the correct amount of VAT based on its actual revenues, but its reported revenues were overstated; or (3) China Water was intentionally not paying its VAT taxes.   While E&Y may have initially suspected the first possibility, Xu himself quickly disabused them of that notion.

69.     According to Heckmann's pleadings in the Delaware Litigation, the "excuse" Xu offered was that "many small businesses in China do not pay all the VAT they owe, because they would not otherwise be profitable," that is, that China Water was intentionally not paying VAT. In the face of this extraordinary acknowledgement from Defendant Xu, according to Heckmann's counterclaim in the Xu Action, *"E&Y did not accept Mr. Xu's 'Everybody does it' explanation for the non-payment of VAT"* and so informed Heckmann.

70.     Xu's "explanation" amounted to an admission that China Water had been evading its tax obligations in violation of applicable laws and constituted a clear breach of the warranties by China Water in the Merger Agreement.   This was material information that Heckmann was required to disclose in the Joint Proxy.   But not only did Heckmann fail to

---

[7] *Id.*

disclose this information, it inexplicably failed to investigate the issue to determine the actual cause of the VAT discrepancy which, according to Heckmann's counterclaims in the Delaware Litigation, is that China Water's revenues had been "***dramatically overstated***."   Instead, Heckmann merely assumed that "additional VAT should have been paid," so "Heckmann insisted that China Water reserve for the additional VAT payments" and "China Water's auditors, GHP Horwath, P.C., caused China Water to restate 2007 VAT and increase the VAT accrual."

71.    As noted in Heckmann's counterclaim in the Delaware Litigation, in reality, the discrepancy in China Water's VAT figures resulted from Defendant Xu's dramatic and fraudulent overstatement of China Water's reported operating results.  By failing to investigate the VAT issue further or undertake to confirm the veracity of China Water's reported operating results and financial position – even after Xu admitted to criminal tax evasion – the Heckmann Defendants ignored what amounted to the obvious.

72.    Moreover, while Heckmann now claims that it required China Water to restate 2007 VAT, the amended Form 10-K China Water filed with the SEC on September 30, 2008, (discussed more fully below) to correct certain deficiencies in China Water's prior SEC filings, only corrected matters of technical GAAP compliance, including the revaluation and reclassification of certain shares issued in connection with a separate business combination. China Water's amended 2007 Form 10-K is notably silent as to any restatement of 2007 VAT liabilities.

73.    Even a cursory investigation would have undoubtedly uncovered Defendant Xu's widespread fraudulent conduct and drastic overstatement of China Water's financial position. Indeed, as Heckmann admitted in its filings in the Delaware Litigation, Defendant Xu overstated

China Water's receivables by millions of dollars, and China Water executives maintained a separate set of financial statements and were "reporting a separate set of numbers to Chinese officials" at the time they were providing false and misleading financial information to Heckmann and the SEC.

74.    Further, even after Defendant Xu effectively admitted to Heckmann and E&Y that he caused China Water to criminally evade its VAT obligations, the Heckmann Defendants neglected to disclose this fact to Heckmann shareholders.   Instead, Heckmann continued to characterize China Water as an attractive acquisition.   During a June 5, 2008 conference call for analysts and investors, Mr. Heckmann again praised China Water's financial position and growth prospects, reaffirming its 50% organic growth rate.   Mr. Heckmann went on to state:

> As you have seen from the public filings, and -- the revenues have grown from 27 million to $57 million, from '05 to '07, but you have to remember, that the '07 number does not include the two acquisitions from -- that were made towards the end of the year. There is no debt on the balance sheet. The Company over the last several years has grown at 43% compounded annually on revenues, 67 on EPS. If you take same-store sales for the first quarter and adjust backwards to 2007 as if the Company has owned the acquisitions in the first quarter, you would have an organic growth rate in the first quarter over last first quarter of 65% in revenues and doubling of -- of net income subject to adjustments of some charges that were part of this transaction.

75.    In addition, Mr. Heckmann continued to publicly praise Defendant Xu, highlighting his "[experience] with the bottle[d] water business."   At no point prior to the Delaware Litigation did the Heckmann Defendants disclose the VAT-related discrepancies they uncovered in China Water's financial statements, nor did they disclose Defendant Xu's admission that the company had been engaged in intentional violations of law, and had breached it warranties under the Merger Agreement.   Further, the Heckmann Defendants lacked a reasonable basis for making statements in proxy solicitations and throughout the Class Period regarding Defendant Xu and China Water's financial condition, given that the Company failed to

confirm the accuracy of China Water's reported financial condition after uncovering material discrepancies in China Water's books, and that the Company's purported background check of Defendant Xu was wholly inadequate.

76.     In fact, prior to the Delaware Litigation, the Company never disclosed Defendant Xu's admission that China Water had been engaged in tax fraud in China.

**E.     Heckmann and China Water Renegotiate the Merger But Misrepresent the Reasons to Investors**

77.     In September 2008, Heckmann approached China Water's shareholders to discuss renegotiating the terms of the Merger.  When the Company disclosed the renegotiation to shareholders, Heckmann represented that it was spawned by the recent downturns in the broader financial markets.  Specifically, the Company stated that "in light of recent instability in the credit and capital markets, Heckmann determined that it would be prudent to preserve more of its cash to fulfill its acquisition strategy and, conversely, to reduce its potential dependence on credit arrangements to finance planned growth."

78.     The terms of the Merger Agreement and related agreements were thus amended to reduce the cash consideration payable to the holders of 33 million shares of China Water common stock.  Specifically, Defendant Xu, in connection with 5.4 million of his China Water shares, agreed to reduce the cash proceeds he received from $5 per share to $2.77 per share. Chen and the parties to the Undertaking Agreement also agreed to sell a total of 23.2 million shares of China Water stock to Heckmann at an average price of only $1.04 per share.   In addition, two other members of China Water's management team agreed to sell 4.4 million shares of China Water stock to Heckmann at a reduced average price of $1.35 per share.

79.     Additionally, in a Form 8-K Heckmann filed with the SEC on September 29, 2008 announcing the renegotiation, Heckmann represented that Defendant Xu agreed to transfer

7.6 million of his China Water shares to other China Water shareholders "for the benefit of all of China Water's and Heckmann's stockholders," in order to induce those individuals to accept less than the $5 per share guaranteed by the Merger Agreement.  Unbeknownst to shareholders, however, the Company had agreed to reimburse Defendant Xu for his transfer of such shares.

80.     As a result of these renegotiations, Heckmann represented that it had reduced the cash consideration it would pay in the Merger from $165 million to $45 million.  Heckmann reported that it would not issue additional shares of Company stock to compensate for the cash reduction, partially in light of Defendant Xu's agreement to transfer shares to certain China Water shareholders.  As a result, the renegotiation allegedly reduced the purchase price of China Water by $120 million.

81.     That same day, China Water also filed a current report on Form 8-K with the SEC to announce the renegotiation of the Merger.  In addition to discussing the amendments to the Merger terms, China Water also cautioned investors not to rely upon its most recent financial statements:

> **ITEM 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> The Company is filing amendments (1) to its Quarterly Reports on Form 10-Q for the periods ended March 31, 2008 and June 30, 2008 to record a beneficial conversion feature related to the Company's sale of its Notes, (2) to those reports and its Annual Report on Form 10-K for the fiscal year ended December 31, 2007 to (a) reflect a change in the valuation of shares it issued in connection with its acquisition of Pilpol (HK) Biological Limited ("Pilpol"), and (b) reflect a change in the valuation of the shares issued in connection with the Company's investment in China Bottles, Inc. (formerly Hutton Holdings Corporation) ("China Bottles"), and (3) to all of those reports to record compensation charge relating to Xu Hong Bin's obligations under the make good escrow agreement with certain investors that was entered into in connection with the Company's May 2007 equity financing transaction.
>
> On September 28, 2008, the Company's board of directors concluded that its consolidated financial statements as of and for the year ended December 31, 2007, which were included in the Company's annual report on Form 10-K for the year

ended December 31, 2007, as well as its unaudited condensed financial statements as of and for the quarterly periods ended March 31, 2008 and June 30, 2008, which were included in the Company's quarterly reports on Form 10-Q for the same quarterly periods, could no longer be relied upon due to the need to make the adjustments discussed herein.  Upon authorization by the Company's board of directors, the Company's authorized officers discussed with the Company's independent accountant the matters disclosed in this Current Report on Form 8-K pursuant to Item 4.02.

82.    In setting forth the nature of its required restatement, China Water's September 29, 2008 Form 8-K did not reference the additional VAT liabilities that Heckmann allegedly required China Water to recognize during the summer of 2008.

83.    The parties amended Section 2.4 of the Merger Agreement to account for China Water's need to restate its financial reports, and to release Heckmann's claims against China Water and Defendant Xu in connection with the restatement:

> **2.4**  <u>Disclosure.</u>  Parent and Merger Sub acknowledge and agree that the restatements more fully described in the Company's current report on Form 8-K dated on or about the date hereof and reflected in the Company's Form 10-K/A and Form 10-Qs dated the date hereof (the "***Restatements***"), will be deemed to be disclosed on **Part 2.4** and **Part 2.5(a)** of the Company Disclosure Schedule. Without limiting the generality of the foregoing, the Parent and Merger Sub agree that: (a) neither Parent nor Merger Sub shall be entitled to exercise any termination rights under Section 7.1 of the Merger Agreement or otherwise due to, or as a result of, the Restatements; (b) neither Parent nor Merger Sub shall allege a breach of, or seek damages under, the Merger Agreement due to, or as a result of, the Restatement; and (c) neither Parent nor Merger Sub shall make an indemnification claim against, or be entitled to recover any damages from, Xu Hong Bin and Cheng Xing Hua, under the Majority Stockholder Written Consent Agreements or otherwise due to, or as a result of, the Restatement. Notwithstanding anything to the contrary contained herein or in Section 7.4 of the Majority Stockholder Consent Agreements, this **Section 2.4** is intended for the benefit of, and shall be enforceable by, Xu Hong Bin and Cheng Xing Hua and shall be construed both independently and as if it were contained in the Majority Stockholder Consent Agreements.

(Emphases in original).

84.    The following day, September 30, 2008, Heckmann issued another press release related to the renegotiation and held a conference call for analysts and investors.  The press

release reiterated the reduction in Merger cash consideration from $165 million to $45 million, thus "preserving $120 million in additional cash to fund future planned growth."  Mr. Heckmann again spoke highly of China Water's executives in the press release, including Defendant Xu, stating:

> "Obviously the financial landscape has changed since we contemplated this transaction in April and May of this year," said Richard J Heckmann, Chairman and CEO of Heckmann Corporation.  "Mr. Xu, the CEO of China Water, and I, are completely focused on our ability to grow our company both organically and through attractive acquisitions in a market where debt is very difficult to obtain. To the great credit of the founders of China Water, we together concluded that the longer term value to the company could be significantly enhanced by the strengthening of our balance sheet by preserving an additional $120 million in cash.  With approximately $360 million in cash and no debt, we are uniquely positioned in the current environment to be aggressive in expanding the business."

85.     Defendant Xu also touted the renegotiation and China Water's financial position in the press release:

> Since 1996, my team and I have grown and expanded China Water with the goal of being a leader in the bottled water business in China . . . With our significantly expanded cash position, we are looking forward to the opportunities that lie ahead.  The future growth and value of the business is more important to our team than today's valuation, and we hope our actions demonstrate our enthusiasm for our business in China.

86.     During the conference call, Mr. Heckmann reported that Defendant Xu's shares would still be escrowed for a period of two years, and that, in renegotiating the Merger terms, he encountered "absolutely no issues with the [China Water] insiders, none."  He also highlighted the need to renegotiate the terms of the Merger Agreement to account for China Water's need to restate its financial statements, stating that "given the one-time non-cash charges that were determined that [China Water] had to make in [its] filings, my position was that, in the very sensitive markets that we are in, I wanted something for my shareholders to compensate for the losses."  The non-cash charges Defendant Mr. Heckmann spoke of did not include the VAT discrepancies that the Company and E&Y uncovered during the due diligence process.

87.     Mr. Heckmann also addressed his decision not to seek termination of the Merger and instead to renegotiate the Merger terms:

> Notwithstanding that [China Water's charges] were non-cash and non-recurring, the merger agreement required me to waive our right to terminate under the material adverse change clause. . . . But suffice it to say that, if I terminated, it created some problems with [certain China Water agreements].   Also, China Water would have had to pay all of our expenses and their expenses, which are very substantial.  Again, the change in the market would make a broken deal a lot tougher to deal with in the marketplace for them.

88.     At no point, in discussing the renegotiation of the Merger terms, did the Heckmann Defendants disclose to Heckmann shareholders and investors (i) Defendant Xu's admission that China Water had been knowingly evading its tax obligations prior to the Merger; or (ii) the additional material deficiencies they uncovered during their due diligence process, including material discrepancies related to China Water's VAT payments and accruals.

### F.     China Water Restates Its Financial Statements

89.     On September 29, 2008, China Water filed restated financial statements for the fiscal year ended December 1, 2007, and for each of the first two quarters of 2008.

90.     China Water purportedly amended its 2007 Form 10-K to: (i) restate the fair value of common stock shares issued to China Bottles, one of China Water's subsidiaries, in connection with its acquisition by China Water; (ii) reclassify certain shares issued in connection with China Water's acquisition of Pilpol valued at $12,188,624 from acquisition consideration to stockholders' equity; and (iii) recognize a charge to income (as stock-based compensation) in connection with Defendant Xu's agreement to transfer certain China Water common shares to preferred stock investors on a pro rata basis in the event China Water failed to meet its performance targets for the years-ended December 31, 2007 and 2008, and to classify this agreement as a separate compensatory arrangement between China Water and Defendant Xu.

91.     In addition, the amended 2007 Form 10-K stated that China Water was "in the process of developing detailed policies and procedures regarding value added tax (VAT) processing to obtain appropriate supporting documents to properly recognize VAT deductions and maintaining appropriate records to support the VAT calculations."

92.     The amended 2007 Form 10-K again referenced China Water's restatement of its 2006 VAT liability.  However, it did not reflect any restatement of its **2007** VAT and did not otherwise report a discrepancy between China Water's reported revenues and its VAT payments, notwithstanding the fact that Heckmann had uncovered such a discrepancy and had allegedly required a restatement of 2007 VAT several months earlier.

93.     Further, the amended 2007 Form 10-K contained operating results and financial information that were materially false and misleading due to Defendant Xu's gross inflation of China Water's revenues.

### G.      Heckmann and China Water Issue the Materially False and Misleading Proxy

94.     On October 2, 2008, three days after announcing the renegotiation of the Merger, Heckmann and China Water filed the Joint Proxy with the SEC on Form 424B3.  The Joint Proxy was issued pursuant to the Registration Statement, which registered the shares of Heckmann stock that would be used to complete the Merger.

95.     The Joint Proxy incorporated by reference, and included as Annex A, the Merger Agreement, and "urge[d] [investors] to read the merger agreement carefully in its entirety, as well as the Proxy Statement, before making any decisions regarding the merger."

96.     The Joint Proxy disclosed the terms of the Merger to Heckmann shareholders, and included a recommendation from the Heckmann Board that the holders of Heckmann common

stock vote for the Merger.   The Joint Proxy set forth the reasons why the Heckmann Board recommended approval of the Merger.

97.     According to the Joint Proxy, the Heckmann Board's recommendation was based upon, *inter alia*, their purported belief that "China Water has an experienced management team with extensive inside knowledge of the bottled water industry in China and valuable relationships with customers and vendors."   The Heckmann Board also allegedly considered "information concerning China Water's historic business, financial results, and prospects, including the result of Heckmann's extensive due diligence review of China Water and its business and operations" and the "material deficiencies uncovered in China Water's prior financial statements" in reaching its decision to recommend the Merger.   Finally, the Heckmann Board considered "the fact that, based on its valuation of China Water, the transaction would exceed the 80% test requirement to be a qualifying business combination under Heckmann's certificate of incorporation."

98.     The Joint Proxy included recent financial data for China Water, and pro forma financial statements for the combined company.   In addition, the Joint Proxy incorporated by reference China Water's restated financial statements and discussed material deficiencies in China Water's internal controls over financial reporting, including those related to VAT accounting.   However, the Joint Proxy failed to disclose the additional issues related to VAT that the Company discovered during its due diligence – namely, the discrepancies in China Water's 2007 VAT payments and Defendant Xu's admission that China Water knowingly and fraudulently underpaid its VAT.   Further, while the Joint Proxy discussed China Water's 2006 VAT restatement, it failed to disclose a restated VAT for 2007, notwithstanding that Heckmann purportedly required such a restatement prior to the issuance of the Joint Proxy.

99.     The Joint Proxy stated that a special meeting and shareholder vote in connection with the Merger was scheduled for October 30, 2008.

**H.      Heckmann Shareholders Approve the Merger**

100.     On October 30, 2008, Heckmann held a special meeting for its shareholders, who overwhelmingly approved the Merger.  More than 95% of the Heckmann common shares voted in favor of the Merger, with less than 5% electing to convert their Heckmann shares into cash. Heckmann shareholders also approved an amendment to Heckmann's amended and restated certificate of incorporation to provide for the Company's perpetual existence.  This amended the prior requirement that Heckmann dissolve and return to shareholders their initial investment in the Company in the event it failed to enter into a qualifying business combination within 24-months of the IPO.  The Merger closed on the same day, and China Water became a wholly-owned subsidiary of Heckmann.

101.     Heckmann shareholders consented to the deal on the basis of, *inter alia*, the materially misleading Joint Proxy, China Water's materially false and misleading SEC filings that were incorporated by reference into the Joint Proxy, and the materially false and misleading statements made to shareholders and investors in the Company's press releases and conference calls related to the Merger.

102.     Specifically, Heckmann shareholders were denied their right to cast an informed vote on the Merger because Defendants' proxy solicitations, *inter alia*:

a)      Reported materially false and misleading financial information and operating results for China Water;

b)      Reported a materially false and misleading going concern value for China Water when, in fact, China Water had little, if any, value as a going concern;

c)      Falsely stated that China Water's value exceeded 80% of Heckmann's net assets;

34

d)     Failed to disclose accounting discrepancies that Heckmann uncovered related to China Water's 2007 VAT payments and accruals;

e)     Failed to disclose that Defendant Xu admitted to intentionally causing China Water to evade its tax obligations;

f)     Failed to disclose internal misgivings at Heckmann regarding the integrity of Defendant Xu, the legality of his conduct, and the accuracy of the information he provided to Heckmann;

g)     Failed to investigate further the cause of China Water's accounting and VAT-related discrepancies, particularly in light of China Water's admission that it had material deficiencies in its internal control over financial reporting;

h)     Failure to disclose China Water's additional VAT liabilities, and thus reported materially false and misleading VAT amounts for fiscal year 2007;

i)     Failed to disclose that the Company did not perform an appropriate background check on Defendant Xu;

j)     Failed to independently verify China Water's reported financial information, particularly in light of China Water's admission that it had material deficiencies in its internal control over financial reporting; and

k)     Failed to disclose that China Water's reported revenue figures were dramatically overstated due to Defendant Xu's fraudulent conduct.

**I.     <u>Defendants Conceal Additional Evidence of Malfeasance at China Water</u>**

103.   When the Merger closed, Defendant Xu received $15 million in cash, the right to share in an additional payment of $15 million in cash or stock, and 18,369,000 restricted Heckmann common shares.

104.    After the Merger closed on October 30, 2008, the Heckmann Defendants uncovered – and concealed from Heckmann's shareholders – additional evidence of wrongdoing by China Water and Defendant Xu.  Heckmann later admitted these facts and their knowledge of them in the Delaware Litigation.

105.    For example, the Heckmann Defendants learned that the money China Water purportedly reserved for additional 2007 VAT payments had been paid to Defendant Xu in September 2008.  According to Heckmann in its counterclaim in the Delaware Litigation, Defendant Xu either "defrauded the Chinese government out of tax payments owed to it, thereby breaching his fiduciary duties by knowingly violating the law and enriching himself, or he simply stole the money out of the reserves to enrich himself and avoid the detection of his fraud."  When Heckmann uncovered this illicit payment, it requested China Water's tax records, but Defendant Xu refused to provide them to the Heckmann Defendants.

106.    In addition, after reviewing flash reports related to China Water's November 2008 operating results, Heckmann discovered the poor collectability of China Water's receivables, and that its revenues were plummeting.

107.    Furthermore, in early 2009, the Heckmann Defendants learned that Defendant Xu had siphoned approximately $12 million out of China Water in connection with its acquisition of Harbin Taoda Drinks, Ltd. ("Harbin").  Heckmann announced the acquisition price of Harbin as $13.9 million, but later admitted in the Delaware Litigation that the true purchase price was "instead in the $2-3 million range" and that the $12.3 million deposit Heckmann allegedly paid to Harbin had been transferred to entities controlled by Defendant Xu.

108.    According to Heckmann's counterclaim in the Delaware Litigation, Defendant Xu employed "dozens of individuals at a center in southern China, none of whom were on China

Water's payroll, whose responsibility was to intercept operating results from the field for China Water and 'filter' them, before passing on artificially inflated results to China Water's Hong Kong headquarters for reporting purposes." Further, Heckmann also stated in the counterclaim that Xu had booked "phantom" receivables at China Water's two largest plants, which had the effect of overstating China Water's receivables by millions of dollars.

109.    Additionally, in the Delaware Litigation, Heckmann admitted that immediately following the Merger, it recognized that China Water's receivables were not being collected and that its sales figures were rapidly plummeting. The Heckmann Defendants further confronted Defendant Xu regarding China Water's financial position in January 2009, after its "extremely disappointing" preliminary operating results became available. According to the complaint Defendant Xu filed in the Delaware Litigation, during a February 2009 meeting in Hong Kong, "Richard Heckmann accused Mr. Xu of misrepresenting the true financial condition of China Water prior to the Merger and blamed Mr. Xu for China Water's failure to meet the expected revenue and profit targets for fiscal 2008."

110.    Despite uncovering blatant evidence of wrongdoing and fraudulent conduct on the part of Defendant Xu and the China Water Defendants, the Heckmann Defendants failed to disclose these material facts to the market or its shareholders during the Class Period. Instead, the Heckmann Defendants continued to portray China Water and Defendant Xu in glowing terms.

111.    For example, on November 21, 2008, Defendant Mr. Heckmann presented at the Roth Capital Partners China Conference in Las Vegas, Nevada. Mr. Heckmann's presentation slides, which were filed with the SEC on November 24, 2008, stated that China Water experienced a period of significant growth in the first half of 2008, and possessed a strong

balance sheet to fund further expansion.  In addition, Mr. Heckmann's slides included false and misleading financial information for China Water, listed Defendant Xu's experience in the bottled water industry as a valuable asset to the Company, and concluded by characterizing the Merger as a unique and compelling opportunity.

112.    On March 13, 2009, Heckmann orchestrated a quiet resignation of Defendant Xu while continuing to misrepresent to its investors the truth about China Water.  In the face of mounting evidence of Defendant Xu's wrongdoing, the Company entered into an Escrow Resolution and Transition Agreement (the "ERTA") with Defendant Xu.  Pursuant to the ERTA, Xu resigned as chief executive officer and president of China Water, and as a director of Heckmann.  In exchange, the Company agreed to return to Defendant Xu 3,500,000 shares placed in escrow.  Additionally, Defendant Xu released the remaining 13,032,100 shares in escrow to the Company in exchange for only $1.07 per share – totaling $14 million – and the termination of his escrow obligations.  Defendant Xu also received approximately $6 million in reimbursements for purported equipment purchases.

113.    The Company disclosed the ERTA to investors on March 16, 2009 when it filed its annual report for fiscal year 2008.  In a conference call held for analysts and investors to discuss the Company's 2008 financial performance, Defendant Mr. Heckmann addressed the ERTA and vaguely discussed certain of the issues Heckmann had encountered in connection with the Merger.  Defendant Mr. Heckmann stated that after the Merger had closed, China Water's accounting systems "were found to be inadequate to manage the kind of growth that they dealt with in '08 with 69% growth."  He went on to state that Heckmann "found significant balance sheet and integration issues in costs" and, as a result, "decided to settle the escrow."

114.    Defendant Mr. Heckmann also suggested that the Heckmann Defendants had anticipated encountering such issues in connection with China Water.  Specifically, Defendant Mr. Heckmann stated:

> Now, for those of you that didn't familiarize yourself with the shareholders' agreement, approximately 22 million shares of HEK indemnify our shareholders against a very complete list of undisclosed liabilities and issues.  We have now released 3.5 million shares to Xu Hongbin, the CEO, and paid $14 million for 13 million shares in the escrow in settlement against claims against him, which worked out to be about $1.08 a share.  We will make a claim this week to recover the balance of the shares from the other guarantors, and I believe we'll recover them.
>
> We obviously are concerned, we're concerned about the issues at the time of the acquisition, and that's why we demanded and got fairly unusual indemnities from the principals.  We've always believed we had enough protection to warrant the transaction in case we ran into these weaknesses, and of course, we were right.  Xu is retiring from the company with a noncompete clause, and the remaining shares in the indemnity are held by people not involved in the business.

115.    Defendant Mr. Heckmann went on to state that the Company would be notifying additional individuals related to China Water that "their shares are forfeited based on the facts that we know."  Defendant Mr. Heckmann never disclosed what those facts were, nor did he disclose that the Company discovered overwhelming direct evidence of fraudulent conduct on the part of the China Water Defendants, and in fact believed that Defendant Xu had been misrepresenting China Water's financial position.  Thus, despite calling Defendant Xu's departure a "retirement," in reality, Xu was "ousted" from the Company, according to Heckmann's counterclaim in the Delaware Litigation.  The Heckmann Defendants would continue to conceal material information regarding China Water until at least May 8, 2009, and even then, the truth only trickled out.

## V.     THE TRUTH BEGINS TO EMERGE

### A.     The Heckmann Defendants First Disclose Intentional Wrongdoing on the Part of the China Water Defendants

116.     On May 8, 2009, the Company reported its financial results for the first full quarter following the Merger.  The Company filed a quarterly report with the SEC on Form 10-Q that reported net sales of only $7.8 million, a staggering reduction of 49% year-over-year.

117.     In addition, the Heckmann Defendants shocked investors by disclosing for the first time in the May 8, 2009 Form 10-Q their belief "that prior management misrepresented the strength of the China Water business, and may have diverted corporate assets."  As a result, Heckmann recorded a massive $184 million goodwill write-down in connection with the acquisition of China Water, and disclosed that China Water's operations "appear[] to be less robust than anticipated and continue[] to present accounting and related problems."

118.     Heckmann further reported that, due to Defendant Xu's misrepresentations and fraudulent misconduct, it "cancelled 15,527,900 common shares that were issued to former China Water management and insiders, and approximately 1.5 million shares underlying warrants issuable to them in connection with the acquisition of China Water."

119.     During a conference call held on the same day, Defendant Mr. Heckmann stated that the share cancellations would result in a 23% reduction in Heckmann's overall share count, and vaguely asserted that China Water's woes resulted from "what we believe was management misconduct and the diversion of cash deposits, but I will tell you that our recovery is complete."

120.     Mr. Heckmann also confirmed that, after accounting for the $184 million goodwill impairment, the China Water transaction – which was initially valued at approximately $625 million – was now valued at "less than [$]200 million."

121.    As the market digested this news, the price of Heckmann common shares declined precipitously, falling 13.2% from its May 7, 2009 closing price of $4.99 to close at $4.33 on May 8, 2009.

**B.**     **Heckmann Releases IPO Proceeds From Escrow**

122.    In the May 8, 2009 Form 10-Q, Heckmann also revealed that it had released the IPO Escrow Fund, which was being held in trust pending the Company's completion of a qualifying acquisition.  According to Heckman, "We used approximately $45.2 million of the funds held in trust in to acquire shares of China Water's common stock and we used approximately $55.6 million to pay closing costs, deferred underwriting fees and other transaction related costs in connection with the acquisition. The balance of funds in the trust account of approximately $329 million dollars was released to the Company for general corporate purposes."

123.    As set forth herein, before Heckmann could release the IPO Escrow Fund, the terms of the IPO required Heckmann to complete a qualifying business transaction having a fair market value of at least 80% of the Company's net assets at the time of such acquisition.  The fair market value of China Water failed to satisfy this 80% threshold.

**C.**     **Post-Class Period Events**

**1.**     **Heckmann Files the Counterclaim**

124.    As set forth above, in June of 2009, Defendant Xu brought claims against the Heckmann Defendants in connection with their cancellation of his Heckmann common shares. On June 22, 2009, in response to Defendant Xu's allegations, the Heckmann Defendants filed the Counterclaim, which disclosed – for the first time – the material information set forth herein related to Defendant Xu's fraudulent conduct, Heckmann's knowledge of Defendant Xu's fraudulent conduct, and the patent insufficiency of Heckmann's due diligence investigation.

### 2.     The Company Reports Disappointing Results and Records Additional Goodwill Impairments of China Water

125.    On August 10, 2009, the Company reported a net loss of $3.2 million for the three months ended June 30, 2008, compared to a net income of $1.5 million for the same period in 2007.  The Company reiterated a goodwill impairment of $184 million in connection with the China Water transaction, which, according to the Company, still represented its best estimate of a probable impairment to goodwill.  Additionally, Heckmann reported that the Harbin acquisition was complete, and reduced the initial purchase price from approximately $13 million to $1.3 million without discussion, and without disclosing Defendant Xu's misappropriation of $12 million in connection with the Harbin transaction.

126.    On November 9, 2009, the Company released its third quarter results.  The quarterly report Heckmann filed with the SEC on Form 10-Q stated that the Company had "finalized the assumptions and calculations used in the [China Water] preliminary purchase price allocation," after considering "further declines in projected sales volume and cash flow projections, a revised lower outlook for China Water operating results, and pending litigation between the Company and Xu Hong Bin."  The Company determined that its "initial purchase price allocation for certain acquired assets and assumed liabilities[] were not recoverable at the date of acquisition."  As a result, the Company recognized an additional $178 million non-cash impairment charge to goodwill, and reduced the carrying value of the goodwill associated with China Water to *a mere $6.3 million*.

127.    Thereafter, on February 23, 2010, Heckmann filed a current report with the SEC on Form 8-K which attached a presentation created by the Company in connection with Credit Suisse's 12th Annual Global Services Conference.  Heckmann disclosed in the presentation that China Water insiders were involved in "serious accounting irregularities" and that the total value

42

of China Water had been written down to **$21 million**.  Thus, by February of 2010 the value of China Water had been written down by **96%**, compared to the initial purchase price of $625 million.

128.    Finally, on March 11, 2010, the Company filed its annual report with the SEC on Form 10-K for fiscal year 2009.  The 2009 Form 10-K reported goodwill of only $6.3 million, and stated that the Company "[did] not believe that the estimates provided to [it] by China Water in connection with [the Merger] will be achieved in 2010."

### 3.    Additional Details Regarding Heckmann's Goodwill Write-Downs of China Water

129.    Heckmann defined goodwill in the Joint Proxy simply as the "difference between the purchase price and the fair value of the identifiable net assets."  Conceptually, however, goodwill represents the going concern value of a corporation such as China Water, and takes into account intangible factors such as brand name, customer relations and employee relations.  In essence, goodwill can be viewed as the total value of a company's future profit-making potential.

130.    In accounting for its acquisition of China Water, Heckmann was required to allocate the total purchase price across China Water's various tangible and intangible assets.  Accordingly, in the Joint Proxy, Heckmann reported that the total purchase price for China Water (including certain costs related to the transaction) was $572.69 million.  Heckmann allocated $187.97 million of the purchase price to China Water's various assets.  The remaining $384.72 million was accounted for as goodwill.  This number was later revised to $315.02 million at December 31, 2008.

131.    Here, Heckmann allocated over 67% of the total China Water purchase price to goodwill, meaning that more than two-thirds of the consideration paid to China Water was in

exchange for the right to China Water's future profits (whereas the remaining one-third was in exchange for China Water's property, plant, equipment, and other tangible assets).

132.    When the Company filed its Form 10-Q for the period ended March 31, 2008, it reported only $41.34 million in goodwill.  In a single three-month period following the closing of the Merger, Heckmann recorded $184 million in goodwill impairments related to China Water, and an additional $100 million write-down in connection with the cancellation of Defendant Xu's shares.

133.    By the end of the third quarter of 2009 – less than a year after the Merger closed – the goodwill associated with China Water had been written down to only $6.3 million.  This constituted a 98% reduction in the total goodwill associated with China Water, and reflected the fact that – notwithstanding Defendants' representations that China Water revenues would exceed $90 million in 2009 and would grow at a rate of 40% to 50% annually – as of August 31, 2009, China Water possessed little, if any, economic value above and beyond the fair value of its tangible assets.

134.    The extent of Heckmann's goodwill write-down related to China Water thus reflects the startling extent to which China Water's financial statements and operating results had been overstated, and further reflects the fact that the Heckmann Defendants were at least negligent in failing to discover and/or disclose China Water's false and misleading operating results and financial position to Heckmann's shareholders prior to the shareholder vote.

## VI.   MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.   <u>Materially False and Misleading Proxy Solicitations</u>

#### 1.   <u>May 20, 2008 Conference Call and Investor Presentation</u>

135.   On May 20, 2008, Heckmann held a conference call with investors and analysts to announce the Merger, during which Defendant Mr. Heckmann made materially false and misleading statements about the circumstances surrounding the Merger.

136.   For example, on the conference call, Defendant Mr. Heckmann touted the opportunities created by a merger with China Water based on the company's market position and future earnings potential:

> With respect to the company, ***we believe that China Water at the end of '08 will be China's fifth-largest bottled water Company***.   The company made two acquisitions in the second half of last year, and as we have announced, has five additional acquisitions, either under agreement or LOI which will close this year. Given the close of those five acquisitions, ***we expect a run rate by the end of the year this year of '08 to be approximately $220 million in revenues with a net income of approximately $70 million.***
>
> * * *
>
> So what we have is what we think is a very strong platform to grow from.  In a market in China with over 250 bottled water companies it's ripe for consolidation.

137.   When asked by one analyst about China Water's growth prospects, Defendant Mr. Heckmann further stated:  "***The organic growth at China Water over the last couple years has been in the 40% to 50% range***."

138.   The foregoing statements were materially false and misleading when made.  The statement that China Water's organic growth rate was in the range of 40% to 50% was false because, in fact, Heckmann has admitted that China Water's revenues and operating results were grossly and materially overstated prior to the Merger, and that Defendant Xu misappropriated large sums of money from China Water's treasury.  Specifically, Defendant Xu employed certain

individuals in southern China who "filter[ed]" China Water's operating results before passing along artificially inflated results to China Water's Hong Kong headquarters.   According to Heckmann's pleadings in the Delaware Litigation, due to Defendant Xu's fraud, China Water's receivables were overstated by millions of dollars and "revenues were dramatically overstated." Heckmann has further admitted that in December 2008, within one month of the Merger closing, China Water's plummeting revenues and the poor collectability of its receivables were apparent. Indeed, less than a year after the Merger closed, Heckmann recorded massive goodwill write-downs to China Water reflecting the fact that China Water had little, if any, value as a going concern.

139.    In addition, the statements regarding China Water's anticipated performance and operating results for fiscal year 2008 were materially misleading because Heckmann failed to confirm the accuracy of China Water's reported financial position, and thus Defendant Mr. Heckmann lacked a reasonable basis for making such statements.   Given the extent of the fraudulent overstatement of China Water's financial results, even a cursory attempt to confirm the accuracy of China Water's financial figures would have revealed their falsity.   Defendants failed to confirm the accuracy of China Water's financial results despite the fact that, during the course of Heckmann's due diligence investigation, E&Y informed Heckmann of material discrepancies in China Water's prior SEC filings and financial statements regarding China Water's VAT payments and accruals, which were less than expected based on China Water's reported operating results.   The discrepancies suggested that China Water was either underpaying its taxes or inflating its revenues.   In either case, the discrepancies alerted Heckmann to the fact that China Water's financial statements contained material inaccuracies. Furthermore, when questioned about these discrepancies, Defendant Xu's excuse was that such

non-payment was intentional.  Despite these glaring red flags, the Heckmann Defendants failed to investigate this discrepancy further and likewise failed to assess the accuracy of China Water's revenues and operating results.  In light of the Company's failure to investigate and address China Water's misstated financial reports, Defendant Mr. Heckmann's statements touting China Water's financial position and growth potential were made without any reasonable basis.

140.    Also on May 20, 2008, the Company filed a current report with the SEC on Form 8-K that included slides associated with a Heckmann investor presentation related to the Merger. The presentation slides cited China Water's "experienced management team" as one of its key assets, and represented that Defendant Xu possessed "[m]ore than 10 years of experience in the bottled water industry" after graduating from the "Water Resource Institute of QingHai Province."

141.    This statement was materially false and misleading when made.  The Delaware Litigation has revealed that Heckmann's background check of Defendant Xu prior to the Merger closing was wholly inadequate and, as a result, Defendants lacked a reasonable basis for making representations regarding Defendant Xu's experience and educational background.  Indeed, when the Heckmann Defendants finally performed such a background check, they readily determined that Defendant Xu had completely fabricated his educational and professional background.  Such statements regarding Defendant Xu's professional and educational experience were plainly material to investors, particularly since he was to continue his role as President of China Water and be named to Heckmann's board of directors following the Merger.

142.    The May 20, 2008 investor presentation also contained selected China Water financial information, including its reported operating results and financial statements for fiscal years 2005, 2006 and 2007.  Further, the presentation discussed China Water's "Rapid Revenue

Growth and Improving Profitability," reflecting annual growth rates of 43% and 67% in China Water's net income and revenues over the 2005-2007 period.

143.    The financial information included in Heckmann's May 20, 2008 investor presentation, and the statements regarding the company's increased revenue growth and profitability, were materially false and misleading because, as set forth above, Heckmann has admitted China Water's revenues and operating results were grossly and materially overstated prior to the Merger, and that Defendant Xu misappropriated large sums of money from China Water's treasury.  Specifically, Defendant Xu employed certain individuals in southern China who "filter[ed]" China Water's operating results before passing along artificially inflated results to China Water's Hong Kong headquarters.  According to Heckmann's pleadings in the Delaware Litigation, due to Defendant Xu's fraud, China Water's receivables were overstated by millions of dollars.  Heckmann has further admitted that in December 2008, within one month of the Merger closing, China Water's plummeting revenues and the poor collectability of its receivables were apparent.  Indeed, less than a year after the Merger closed, Heckmann recorded massive goodwill write-downs to China Water reflecting the fact that China Water had little, if any, value as a going concern.

### 2.        The Merger Agreement and Related Agreements

144.    Also on May 20, 2008, the Company filed a current report with the SEC on Form 8-K that included a copy of the executed Merger Agreement.  Defendants Mr. Heckmann and Xu signed the Merger Agreement.

145.    Section 2.4(b) of the Merger Agreement contained a representation by China Water that "[e]ach of the Company SEC Reports filed on or after May 14, 2007 . . . complied as to form in all material respects with the requirements of the Securities Act and the Exchange Act, as the case may be, and, to the extent then applicable, SOX, including in each case, the rules and

regulations thereunder," and "did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading."

146.   The foregoing representation by the China Water Defendants was materially false and misleading when made.  Specifically, the quarterly and annual reports China Water filed with the SEC included false and misleading financial statements, and contained untrue statements of material fact and omitted material facts regarding, *inter alia*, the China Water Defendants' (i) knowing failure to pay all applicable VAT liabilities, (ii) the China Water Defendants' deliberate overstatement of China Water's operating results and financial position prior to the Merger (as set forth in ¶¶ 138, 139 and 143, above), and (iii) Defendant Xu's fraudulent misappropriation of China Water assets.

147.   China Water also made representations in the Merger Agreement regarding the accuracy of its financial statements, stating in Section 2.5 that "[e]ach of the financial statements (including, in each case, any notes thereto) contained or incorporated by reference in the Company SEC Reports . . . complied with the rules and regulations of the SEC (including Regulation S-X) as of the date of the filing of such reports, . . . was prepared in accordance with GAAP, . . . [and] fairly presents in all material respects the financial condition and the results of operations."  China Water made similar representations in Sections 4.3 and 4.4 of the Release Agreement.

148.   The foregoing statement was materially false and misleading when made, because, for the reasons set forth in ¶¶ 138 and 143, above, China Water's financial statements did not fairly present in all material respects, *inter alia*, China Water's financial condition, results of operations, and VAT liability.

149.    China Water also represented in Section 2.10 that it, and its subsidiaries, "paid . . .
all taxes that are due and payable," and that all tax returns filed by China Water were "in all
material respects true, complete and correct and filed on a timely basis."

150.    Lastly, China Water warranted in Section 2.12 that it was "in compliance with
each Legal Requirement that is or was applicable to any of them or to the conduct or operation of
their business or the ownership or use of any of their assets, except to the extent that any non-
compliance could not be reasonably be expected to have a Material Adverse Effect."

151.    The statements in ¶¶ 149-150 were materially false and misleading when made
because, in fact, the China Water Defendants admitted to evading their VAT obligations by
underreporting VAT and failing to pay required VAT amounts.  Additionally, the China Water
Defendants were engaged in an illegal and fraudulent course of conduct which included the
knowing evasion of China Water's VAT liabilities, the unlawful diversion of corporate assets
and the gross overstatement of China Water's receivables, operating results and financial
condition, as set forth in ¶¶ 138 and 143.

### 3.    June 5, 2008 Conference Call

152.    On June 5, 2008, Defendant Mr. Heckmann held another conference call with
investors and analysts to discuss the Merger.  During this call, Defendant Mr. Heckmann again
made materially false and misleading statements with respect to China Water's financial position
and growth prospects.  For example, touting China Water's impressive revenues and lack of
debt, he stated:

> *As you have seen from the public filings, and  -- the revenues have grown from
> 27 million to $57 million, from '05 to'07*, but you have to remember, that the '07
> number does not include the two acquisitions from – that were made towards the
> end of the year.  *There is no debt on the balance sheet.  The Company over the
> last several years has grown at 43% compounded annually on revenues, 67 on
> EPS.*  If you take same-store sales from the first quarter and adjust backwards to
> 2007 as if the Company has owned the acquisitions in the first quarter, *you would*

***have an organic growth rate in the first quarter over last first quarter of 65% in
revenues*** and doubling of – of net income subject to adjustments of some charges
that were part of this transaction.

153.    Additionally, when asked by an analyst about the company's expected future
organic growth rate, Defendant Mr. Heckmann responded: "***We think we can double it again, so
we're looking at 50%,*** could be higher or lower, depending on – the best way to get capacity."

154.    These statements were materially false and misleading for the reasons set forth in
¶¶ 138, 139 and 143.

### 4.    August 14, 2008 Press Release and Form 10-Q

155.    On August 14, 2008, the Company filed its quarterly report with the SEC on
Form 10-Q for the quarter ended June 30, 2008.   Defendant Mr. Heckmann signed the
August 14, 2008 Form 10-Q, which was incorporated into the Joint Proxy.

156.    The August 14, 2008 Form 10-Q discussed the Merger, providing an overview of
China Water's operations, the material terms of the Merger Agreement, and the conditions to
closing.

157.    The August 14, 2008 Form 10-Q omitted, however, material information
regarding the significant deficiencies related to China Water, including China Water's intentional
underpayment of its VAT obligations, its material understatement of its 2007 VAT liabilities,
and its need to restate its 2007 VAT.   Further, the August 14, 2008 Form 10-Q failed to disclose
material information regarding the fraudulent overstatement of China Water's receivables,
operating results and financial position, as set forth in ¶¶ 138 and 143.   These material omissions
rendered Heckmann's August 14, 2008 Form 10-Q materially misleading.

**5.      September 29, 2008 Press Release and September 30, 2008 Conference
Call Regarding Merger Renegotiation**

158.     On September 29, 2008, the Company filed a current report with the SEC on
Form 8-K stating that it, China Water, and certain China Water shareholders and bondholders
had renegotiated the terms of the Merger.

159.     The September 29, 2008 Form 8-K omitted material information regarding China
Water and the Merger, including, *inter alia*, (i) significant accounting discrepancies that
Heckmann uncovered related to China Water's VAT payments and accruals, (ii) Defendant Xu's
admission that China Water fraudulently evaded its VAT obligations, (iii) Heckmann's and
E&Y's failure to credit Defendant Xu's excuse for China Water's underreported VAT payments,
and (iv) China Water's grossly overstated operating results and financial position, as set forth in
¶¶ 138 and 143.  These omissions rendered the September 29, 2008 Form 8-K materially false
and misleading.

160.     Further, the September 2009 Form 8-K stated that due to the renegotiation,
Heckmann would reduce its cash payment for China Water from $165 million to $45 million.
The Form 8-K further stated:

> Heckmann will not be required to issue any additional shares of its stock to
> compensate for the cash reduction.  Instead, Mr. Xu, for the benefit of all of China
> Water's and Heckmann's stockholders, has agreed to transfer to certain
> stockholders, immediately prior to the effective time of the merger, 7.6 million of
> his remaining 30.6 million shares of China Water common stock.

161.     The foregoing statement was materially false and misleading when made because,
as Defendant Xu asserted in his complaint in the Delaware Litigation, Heckmann agreed to
compensate Defendant Xu for the 7.6 million shares he transferred to certain China Water
shareholders.  This agreement constituted a material increase in the consideration paid by

Heckmann in connection with the Merger that was not disclosed to the Company's shareholders and investors.

162.    In addition, on September 30, 2008, the Company held a conference call with investors and analysts to discuss the renegotiation.  During this conference call, Defendant Mr. Heckmann made affirmative misrepresentations regarding Defendant Xu's credentials, stating that Xu "is the Chinese partner who has been in the water business since 1996 and really knows the business."

163.    Additionally, when asked by an analyst about the managers, including Defendant Xu, who were presently working at China Water, Defendant Mr. Heckmann responded: "They want to see the company grow.  They understand the realities of what is going on here, ***and I had absolutely no issues with the insiders, none.***"

164.    These statements were materially misleading because they severely mischaracterized Mr. Xu's relationship with Heckmann and his professional experience.  While Mr. Heckmann represented that there were "no issues" between him and Defendant Xu, in reality, Heckmann had raised serious issues with Defendant Xu during the due diligence process regarding China Water's failure to pay all of the VAT it owed.  Indeed, E&Y and Heckmann had rejected Defendant Xu's "everybody does it" explanation for China Water's underpayment of VAT.  Notwithstanding Defendant Xu's proffered explanation, the Company insisted that China Water reserve for additional VAT payments, and China Water's auditor GHP Horwath purportedly caused China Water to restate its 2007 VAT.  Further, as the Heckmann Defendants later acknowledged, Defendant Xu's credentials were fundamentally misrepresented.  In reality, Defendant Xu was affiliated with criminal organizations in China after serving a prison term in Macau, and lied about his professional and educational background.  Lastly, these statements

were materially false and misleading for omitting the material information set forth in ¶¶ 138 and 143 above regarding Defendant Xu's gross overstatement of China Water's revenues, operating results and financial condition.

6.      **China Water's September 29, 2008 Restated Forms 10-Q and 10-K**

165.    On September 29, 2008, China Water filed formal restatements to its 2007 annual report, and to its quarterly reports for the quarters ended March 31, 2008 and June 30, 2008. China Water's restated Form 10-K and Forms 10-Q were incorporated by reference into the Joint Proxy.  Defendant Xu signed the amended 2007 Form 10-K and both amended 2008 Forms 10-Q.

166.    China Water's amended 2007 Form 10-K noted that a restatement was required to reflect a change for stock-based compensation relating to a separate compensatory arrangement between China Water and Xu, a change in the valuation of shares it issued in connection with its acquisition of Pilpol (HK) Biological Limited, and a change in the valuation of shares it issued in connection with its investment in China Bottles, Inc.  The amended 2007 Form 10-K failed to disclose, however, that China Water was required to, but did not, restate its 2007 VAT liability after Heckmann discovered a material discrepancy between the amount of VAT paid and the amount of VAT owed – and ascertained that the underpayment of VAT was intentional. Notwithstanding that Heckmann demanded such a restatement, the amount of VAT liability remained unchanged between China Water's original and amended 2007 Forms 10-K.

167.    China Water also included detailed financial statements and operating results for the fiscal year ended December 31, 2007 in its amended 2007 Form 10-K.  Additionally, China Water's restated Forms 10-Q for the quarters ended March 31, 2008 and June 30, 2008 contained detailed financial statements and operating results for each of the first two quarters of fiscal year 2008.  The detailed financial information and operating results contained in the amended 2007

Form 10-K and amended 2008 Forms 10-Q were materially false and misleading at the time of their issuance due to the China Water Defendants' gross inflation of China Water's revenues, operating results and financial position, as set forth in ¶¶ 138 and 143.   Indeed, in its counterclaim filed against Wu in the Delaware Litigation, Heckmann asserted that "the Amended Form 10-K . . . contained numerous false and misleading statements concerning China Water's financial condition, including 'phantom' receivables."

168.   The Amended 2007 Form 10-K and Forms 10-Q contained certifications from Defendant Xu pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, wherein Defendant Xu represented:

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

169.   Lastly, the Amended 2007 Form 10-K and Forms 10-Q also contained similar certifications from Defendant Xu pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, wherein Defendant Xu represented that the material contained in each document "fairly presents, in all material respects, the financial condition and results of operation of the Company."

170.    The foregoing representations by Defendant Xu were materially false and misleading because, for the reasons forth in ¶¶ 138, 143 and 167, China Water's financial statements contained materially false and misleading statements and did not fairly reflect, in all material respects, its financial condition and operating results.

7. **The Joint Proxy**

171.   On October 2, 2008, China Water and Heckmann filed the Joint Proxy with the SEC on Form 424B3, and mailed it to shareholders.  The Joint Proxy incorporated by reference, among other things, the Merger Agreement and related agreements, the Registration Statement filed by Heckmann on June 16, 2008 in connection with the Merger, and the financial statements issued by China Water and Heckmann prior to the shareholder vote.

172.   The Joint Proxy also included a copy of the Merger Agreement as Annex A, which was materially false and misleading at the time of its inclusion in the Joint Proxy for the same reasons set forth in ¶¶ 144-151, and "urge[d] [investors] to read the merger agreement carefully in its entirety, as well as the Proxy Statement, before making any decisions regarding the merger."

173.   In the Joint Proxy, Defendants were required to provide Heckmann shareholders with all material information related to the Merger.

174.   The Joint Proxy was materially misleading at the time it was filed because it omitted highly material information regarding, *inter alia*, (i) material discrepancies in the amount of China Water's VAT payments and accruals in relation to China Water's reported revenues; (ii) Defendant Xu's admission that China Water consciously evaded its tax obligations; (iii) Heckmann's refusal to credit Defendant Xu's rationale for such underpayment of VAT; (iv) Heckmann's complete failure to confirm the veracity of China Water's reported operating results; and (v) Defendant Xu's gross overstatement of China Water's revenues, financial statements and operating results, as set forth in ¶¶ 138 and 143.

175.   In addition, this omitted material information rendered numerous affirmative statements in the Joint Proxy materially false and misleading.  For example, the Joint Proxy stated that Heckmann engaged in "extensive due diligence covering a broad range of business

and legal issues on China Water" "[i]n order to meet its disclosure and financial reporting obligations under the federal securities laws." The Joint Proxy went on to state:

> As part of its due diligence, Heckmann became aware of what it believed to be material deficiencies in China Water's prior SEC filings and financial statements, and engaged its accountants and other financial advisers to understand these deficiencies and determine if they were material in the context of the acquisition and in valuing the China Water business. Ultimately, through its due diligence, Heckmann became comfortable with China Water's financial statements and the disclosed deficiencies, although Heckmann also determined, as part of the negotiations, to require China Water, in connection with the acquisition, to correct any material deficiencies its prior filings through the filing of a fulsome Form 10-K, and to require China Water's accountants to deliver a comfort letter at the closing of the transaction.

176. The Joint Proxy further stated that China Water "has material weaknesses in its internal control over financial reporting" and that "if Heckmann fails to develop or maintain an effective system of internal controls, it may not be able to accurately report its financial results or prevent fraud."

177. All of the foregoing statements in the Joint Proxy identified above were materially false and misleading when made. As set forth above, Heckmann's representations regarding material deficiencies in China Water's financial statements and internal controls were materially misleading because they failed to disclose that the Company had uncovered additional deficiencies that resulted from deliberate misconduct on the part of Defendant Xu, and that Defendant Xu, in fact, had admitted to fraudulently evading China Water's tax obligations. In addition, the Joint Proxy failed to disclose additional material deficiencies that Heckmann had uncovered, but were not included in China Water's restated financial statements, including its increased VAT liability for 2007.

178. Likewise, the Joint Proxy's risk warning regarding Heckmann's ability to "accurately report its financial results or prevent fraud" was materially false and misleading when made because Defendants had already uncovered the existence of fraud at China Water.

Specifically, during its due diligence investigation into China Water, Heckmann uncovered material discrepancies in the company's VAT payments and accruals, which suggested that China Water was either underpaying its VAT or artificially inflating its revenues.  Further, when Heckmann confronted Defendant Xu regarding this discrepancy, he admitted that China Water had evaded its VAT obligations.

179.    Further, Heckmann's due diligence efforts were plainly not "extensive," as the Heckmann Defendants admittedly failed to (i) confirm the accuracy of China Water's operating results and financial statements, which had been drastically overstated by Defendant Xu; (ii) investigate the cause of China Water's purported VAT discrepancy after admittedly refusing to credit Defendant Xu's explanation; and (iii) uncover glaring inconsistencies in Defendant Xu's professional and educational background, and his significant criminal ties.

180.    The Joint Proxy also contained a recommendation from the Heckmann Board that shareholders should vote in favor of the Merger.  The Joint Proxy stated that the Heckmann Board's recommendation was based in part upon "the fact that, based on its valuation of China Water, the transaction would exceed the 80% test requirement to be a qualifying business combination under Heckmann's certificate of incorporation."

181.    This statement was materially false and misleading when made because the value of China Water did not exceed 80% of Heckmann's net assets, and thus did not constitute a qualifying business combination.

182.    The Joint Proxy also included select restated China Water financial information, including a VAT liability of $5.762 million – the same amount originally reported in China Water's 2007 Form 10-K.  This figure was materially false and misleading because, as Heckmann later admitted, it required China Water to increase and restate its 2007 VAT liability

during the summer of 2008 after uncovering a material discrepancy between the amount of VAT paid and the amount of VAT owed.

183.   Further, while the Joint Proxy disclosed that China Water had restated its 2006 VAT liability to increase it by $2.6 million after a "detailed analysis of [China Water's] VAT accounts [] disclosed errors in the recording of VAT deductions as well as VAT liabilities."  The Joint Proxy failed to disclose, however, that a similar restatement was required – but not made – in fiscal year 2007, and that material discrepancies remained between the amount of VAT paid and the amount of VAT owed.

184.   Likewise, the Joint Proxy reported that China Water was required to restate its 2007 Form 10-K by "reflecting a change for stock-based compensation relating to a separate compensatory arrangement between China Water and Xu, and a change in the valuation of shares it issued in connection with its acquisition of Pilpol (HK) Biological Limited and the shares it issued in connection with its investment in China Bottles, Inc."  In addition, Note 16 to the Consolidated Financial Statements of China Water, included in the Joint Proxy, provided additional details regarding each basis for restatement.  The Joint Proxy failed to disclose, however, that China Water was required to, but did not, restate its 2007 VAT liability after Heckmann discovered a material discrepancy between the amount of VAT paid and the amount of VAT owed.

185.   Further, virtually all of the China Water financial information incorporated in the Joint Proxy, including its reported financial statements and operating results for the fiscal year-ended December 31, 2007 and for the six months ended June 30, 2007 and June 30, 2008, was materially false and misleading , as set forth in ¶¶ 138 and 143.  In addition, Defendant Xu admitted to fraudulently understating China Water's VAT and evading its tax obligations.

186.   The Joint Proxy also reiterated Heckmann's belief "that its projection of $70.0 million in pro forma annualized net income and $220.0 million in pro forma annualized revenue [for China Water] remains achievable," which was materially false and misleading for the reasons set forth in ¶¶ 138, 139 and 143 above.

187.   Finally, the purchase price allocation included in the Joint Proxy represented that China Water's goodwill was valued at $384.72 million, representing approximately two-thirds of the total purchase price.  This figure was materially false and misleading because, in fact, China Water had little, if any, value as a going concern.  China Water's purported going concern value was almost entirely the result of the China Water Defendants' gross overstatement of China Water's revenues, operating results and financial condition, as set forth in ¶¶ 138 and 143, which the Heckmann Defendants were at least negligent in failing to uncover prior to the shareholder vote.

## B.   Additional False and Misleading Statements In Violation Of Section 10(b) and Rule 10b-5

188.   In addition to false and misleading statements set forth in ¶¶ 135-187, above, which are expressly incorporated by reference into Lead Plaintiff's fraud-based claims, the following allegations relate solely to Lead Plaintiff's fraud-based claims, and do not relate to those claims in which Lead Plaintiff expressly disavows all averments that allege fraud or are found to sound in fraud.

### 1.   November 21, 2008 Presentation

189.   On November 21, 2008, Defendant Mr. Heckmann presented at the Roth Capital Partners China Conference in Las Vegas, Nevada.  Mr. Heckmann's presentation slides were subsequently filed with the SEC on November 24, 2008 as an exhibit to a current report filed on Form 8-K.

190.    The November 21, 2008 presentation slides characterized the Merger as a unique and compelling opportunity, and stated that China Water experienced a period of significant growth in the first half of 2008.  They further represented that the company possessed a strong balance sheet to fund further expansion, and touted Defendant Xu's experience in the bottled water industry.

191.    These statements were materially false and misleading when made for the reasons set forth above in ¶¶ 138, 139, 141 and 143.

**2.      March 16, 2009 Form 10-K and Conference Call**

192.    On March 16, 2009, the Company filed its annual report with the SEC on Form 10-K for the year ended December 31, 2008 (the "2008 Form 10-K").  The 2008 Form 10-K reported a $14.9 million loss for the year.  In addition, the 2008 Form 10-K disclosed that Heckmann and Defendant Xu had entered into the ERTA and, as a result, Defendant Xu would be resigning from the Company.  Specifically, the 2008 Form 10-K stated:

> On March 14, 2009, J. John Cheng was promoted to chief executive officer of China Water.  He had been serving as President of the Company's China division. On March 13, 2009, the Company and Xu Hong Bin entered into an agreement, pursuant to which Mr. Xu resigned as chief executive officer and president of China Water and as a director of the Company.  In connection with Mr. Xu's resignation, the Company agreed to return to Mr. Xu 3,500,000 shares of our common stock he had placed in escrow to secure various representations, warranties and covenants made in connection with the acquisition of China Water. Under the terms of the agreement, Mr. Xu will return the remaining 13,032,100 shares in escrow to the Company in exchange for a cash payment of $14 million and termination of his escrow obligations.

193.    These statements were materially false and misleading when made because they omitted material information regarding Defendant Xu's conduct and the circumstances leading up to the execution of the ERTA.  Specifically, the 2008 Form 10-K misrepresented the nature of Defendant Xu's departure from Heckmann, describing it as a resignation when, in fact, Heckmann later admitted in the Counterclaim that he was ousted from the Company in March

2009.  Additionally, the 2008 Form 10-K failed to disclose that, prior to entering into the ERTA, Heckmann had uncovered direct evidence of Defendant Xu's fraudulent conduct, as set forth in ¶¶ 138, 139 and 143, and had in fact confronted him in January 2009 regarding China Water's uncollectible receivables and plummeting sales.  Indeed, the pleadings in the Xu Action revealed that Defendant Xu raised the prospect of the ERTA after Defendant Mr. Heckmann accused him of fraud in February 2009.

194.    Additionally, the 2008 Form 10-K included detailed financial information concerning China Water's operating results and financial position for the 2007 and 2008 fiscal years.  This financial information was materially false and misleading because, as set forth in ¶¶ 138 and 143, above, China Water's revenue, operating results and financial condition were fraudulently overstated prior to the Merger closing in October 2008, and Defendant Xu had misappropriated millions of dollars in China Water assets, including the additional VAT accruals China Water purportedly reserved for in fiscal year 2007.  Indeed, China Water's revenues and operating results were overstated to such a severe extent that, within a year of the Merger closing, Heckmann recorded goodwill write-downs reflecting the fact that China Water had little, if any, value as a going concern.

195.    Also on March 16, 2009, Heckmann held a conference call for analysts and investors to discuss the Company's 2008 financial results.   During the call, Defendant Mr. Heckmann stated:

> For the 12 months pro forma, as if we had owned China Water for all of '08, as seen in the MD&A of our 10-K, sales grew 69%, from $56.8 million to $95.9 million.  Adjusted pretax income grew 43%, from $19.9 million to $28.4 million.  Adjusted operating income was flat year over year, largely due to the integration with the acquisitions and with Heckmann Corporation and all that we went through getting this Company acquired and closed.

196.    Defendant Mr. Heckmann also stated that after the Merger closed, China Water's "accounting systems were found to be inadequate to manage the kind of growth that they dealt with in '08 with 69% growth, and we found significant balance sheet and integration issues in costs. We then decided to settle the escrow."

197.    The foregoing statements regarding material deficiencies in China Water's accounting systems were materially false and misleading when made because Defendant Mr. Heckmann failed to disclose additional issues related to the accuracy of China Water's financial statements, including the fact that China Water's reported revenues and operating results were materially overstated due to Defendant Xu's fraudulent conduct, as set forth in ¶¶ 138 and 143. The Company has admitted in the Counterclaim that as early as December 2008, it became aware of China Water's declining revenues and the fact that its receivables were not collectible. Further, Defendant Mr. Heckmann accused Defendant Xu of misrepresenting China Water's financial position in February of 2009.

198.    Defendant Mr. Heckmann also discussed Defendant Xu's departure from the Company, stating:

> We obviously are concerned, we're concerned about the issues at the time of the acquisition, and that's why we demanded and got fairly unusual indemnities from the principals. We've always believed we had enough protection to warrant the transaction in case we ran into these weaknesses, and of course, we were right. Xu is retiring from the company with a noncompete clause, and the remaining shares in the indemnity are held by people not involved in the business.

199.    The Company's representation that Defendant Xu was retiring from Heckmann with a non-compete agreement was materially false and misleading because Heckmann has admitted that, in fact, Defendant Xu was ousted from the Company after the Company uncovered his fraud. Further, Defendant Mr. Heckmann's representation that the decision to escrow Xu's shares provided the Company with "enough protection" to warrant going through with Merger

was materially false and misleading because the extent of Defendant Xu's fraud – which was known to Heckmann at the time these statements were made – rendered China Water essentially worthless as a going concern, as evidenced by Heckmann's massive write-down of the value of China Water to a mere $21 million by February of 2010.

200.    Defendant Mr. Heckmann also discussed China Water's growth prospects, stating that its organic growth rate in 2008 was approximately 30%.  He also stated that "we don't know enough about how [2009] is going to play out in China, but we think we will continue to have a fairly robust organic growth rate."  This statement was materially false and misleading when made because Defendant Mr. Heckmann knew but failed to disclose that, in fact, China Water's operating results, and thus its organic growth rates, were grossly inflated due to Defendant Xu's fraudulent misrepresentation of China Water's revenues, operating results and financial condition, as set forth in ¶¶ 138, 139 and 143.  In addition, for these same reasons, Defendant Heckmann had no reasonable basis for representing that China Water's reported results were sustainable going forward.

201.    In response to an analyst question regarding Defendant Xu's resignation, Defendant Mr. Heckmann suggested that he believed Defendant Xu would continue to assist the Company as needed, stating:

> **Stefan Mykytiuk** - *Pike Place Capital - Analyst*
> Just, I was going to ask you, with Mr. Xu gone, whether that impacts your relationship at all with the government and government agencies and also with your OEMs?  It sounds like with the OEMs, you've answered that issue, but can you just talk about your relationship with the government and other agencies over there?
>
> **Dick Heckmann** - *Heckmann Corporation - Chairman and CEO*
> He remains a shareholder and will be a shareholder for years because of he's only, the agreement, as you'll see in the 10-K, only allows him to sell 150,000 shares a month.  So he's going to be a shareholder for several years. So it's certainly not in his – it's certainly in his best interest to help us where we need help, and I think he will.

202.    Defendant Mr. Heckmann's representation regarding Defendant Xu was materially misleading because, at the time this statement was made, Defendant Xu had disrupted Heckmann's operations to such a severe extent that he was ousted from the Company.  Indeed, as the Heckmann Defendants have since admitted, Defendant Xu withheld material information from the Company, including relevant tax documents, and engaged in other disruptive acts in order to obstruct Heckmann's efforts to uncover the full extent of his fraudulent conduct.  The Company has admitted in the Delaware Litigation that as early as December 2008, it became aware of China Water's plummeting revenues and the fact that its receivables were not collectible, which resulted from Defendant Xu's massive fraud, as set forth in ¶¶ 138 and 143.  Further, according to Defendant Xu, Defendant Mr. Heckmann accused him of misrepresenting China Water's financial position in February of 2009.

### 3.    March 16, 2009 Press Release

203.    Also on March 16, 2009, the Company issued a press release – attached as an exhibit to a March 17, 2009 current report Heckmann filed with the SEC on Form 8-K – discussing its 2008 financial performance.  In the press release, the Company again referenced Defendant Xu's departure and the ERTA.  Further, Defendant Mr. Heckmann discussed China Water's operations and growth prospects, stating:

> "By virtue of the acquisition of China Water at more favorable terms, we are in the unique position to grow in the largely fragmented bottled water and beverage market in China," said Mr. Richard J. Heckmann, Chairman and CEO of Heckmann Corporation.   "Operationally, we are expanding our seasoned management team at China Water, which in concert with the implementation of updated financial controls and systems, will allow us to prudently expand capacity to capture market share.  Furthermore, by reducing the purchase price for China Water and our outstanding share count via the settlement of the escrow, we believe we have adjusted to the new market reality and can now use our strong balance sheet to take advantage of opportunities and increase shareholder value."
>
> Mr. Heckmann continued, "Our acquisition of China Water mirrors recent announcements of significant investments made in China by global beverage

brands.  These announcements serve not only to validate the market and our strategy, but also to highlight our leadership position in the country.  Our agreement to expand in Xi'an, Nanning and Guangzhou builds upon a longstanding relationship that positions us today as a key supplier of bottled water in China, and now moves us into other non-carbonated beverage production.  China Water will also be the sole China-based hot fill bottler equipped with a new dual-filling technology for Coca-Cola China's new, enhanced non-carbonated beverage product.  We have reached an agreement in principle to expand the use of this technology to multiple operations in the Midwest and Southwest regions of China."

Concluded Mr. Heckmann, "The economic slowdown in China affords us an opportunity to build the infrastructure necessary to underpin our future growth.  In the near term, we remain focused on enhancing the management team, improving our financial controls, developing an operating team focused on organic growth and expansion and positioning China Water to take advantage of the changing markets in China.  We also believe the best use of our cash is in repurchasing our stock and warrants.  Longer term, as market valuations stabilize, we will have the management and financial strength with which to play a larger role in the consolidation of this fragmented market."

204.    The foregoing statements were materially false and misleading when made for the reasons set forth in ¶¶ 138, 143, 197 and 202, as they omitted material information regarding China Water's false and misleading financial statements, Defendant Xu's fraudulent overstatement of China Water's revenues and operating results, and Defendant Xu's ouster from Heckmann.  In addition, Heckmann materially misrepresented the Company's future prospects and characterized the settlement of Xu's escrowed shares as a positive development for the Company when in fact, due to Defendant Xu's fraudulent conduct, China Water possessed little, if any, value as a going concern.  As a result, Heckmann lacked a reasonable basis for making the representations set forth above regarding China Water's "future growth" and "financial strength" going forward.

## VII.   ALLEGATIONS OF SCIENTER IN SUPPORT OF SECTION 10(b) AND RULE 10b-5 CLAIMS

### A.   <u>Direct Evidence of Defendants' Scienter</u>

205.   First, Defendants Heckmann and Mr. Heckmann have admitted that during the pre-Merger due diligence process, they were made aware of certain discrepancies in China Water's operating results.   Specifically, E&Y had uncovered that China Water's recorded VAT payments were less than expected and Xu admitted that the nonpayment of VAT was intentional, *i.e.,* a crime.   E&Y did not accept Defendant Xu's "everybody does it" explanation for the VAT discrepancy and so informed the Heckmann Defendants.   Thus, by the summer of 2008, Defendants Heckmann and Mr. Heckmann knew or were reckless in not knowing that Defendant Xu had admitted to fraudulently understating China Water's tax liabilities.

206.   Second, by the summer of 2008, Defendant Mr. Heckmann and China Water's auditor had demanded that it restate its 2007 VAT liability, and increase its VAT accruals.   No such restatement was included in China Water's amended 2007 Form 10-K.   Thus, Defendants Heckmann and Mr. Heckmann knew or were reckless in not knowing that China Water's amended 2007 Form 10-K contained materially false and misleading statements at the time it was filed.

207.   Third, Defendants Heckmann and Mr. Heckmann admitted that after the Merger closed, they discovered that the amounts purportedly reserved for VAT payments had been transferred out of China Water's reserve account.   When Defendant Mr. Heckmann asked Defendant Xu for China Water's tax records to reconcile this discrepancy, Defendant Xu refused to make them available.   As a result, Defendants Heckmann and Mr. Heckmann knew or were reckless in not knowing that Defendant Xu was engaged in fraudulent conduct.

208.   Fourth, the Company has admitted in the Counterclaim that as early as December 2008, it became aware of China Water's plummeting revenues and the fact that its receivables were not collectible.

209.   Fifth, in January 2009, Defendant Mr. Heckmann was made aware of China Water's "extremely disappointing" fiscal-year 2008 operating results, and sought an explanation from Defendant Xu.   Rather than address China Water's financial results, according to Heckmann's counterclaim, Defendant Xu immediately requested that his escrowed Heckmann shares be liquidated, thus raising additional red flags to Defendants Heckmann and Mr. Heckmann regarding Defendant Xu's conduct and the accuracy of China Water's previous financial statements.

210.   Sixth, Defendant Xu has alleged that during a February 2009 meeting with Defendant Xu in Hong Kong (three months before Defendant Mr. Heckmann disclosed Defendant Xu's misconduct to Heckmann shareholders), Defendant Mr. Heckmann formally accused Defendant Xu of intentionally misrepresenting China Water's financial condition of China Water prior to the Merger.

211.   Seventh, Defendants Heckmann and Mr. Heckmann has also admitted that in the spring of 2009, they discovered that Defendant Xu had fraudulently overstated the true purchase price China Water paid to acquire Harbin Taoda by more than $12 million, and had transferred those excess monies to entities controlled by Defendant Xu.

212.   Eighth, Defendant Mr. Heckmann has admitted that the Company was made aware of additional material issues concerning Defendant Xu's background.   Specifically, Defendants Heckmann and Mr. Heckmann learned that Defendant Xu misrepresented his educational and professional background, as the university from which he claimed to have

graduated and the transportation company for which he claimed to have worked do not exist. Further, Defendant Mr. Heckmann learned that Defendant Xu had previously changed his name, was sentenced to prison in Macao, and remains tied to criminal organizations.

**B.** **Additional Scienter Allegations**

**1.** **The Heckmann Defendants' Motivation to Conceal Material Facts About the Merger**

213. As set forth above, in connection with Heckmann's IPO, the Founders of Heckmann, including Defendants Mr. Heckmann, Holtz, Quayle and Osborne, received 14,375,000 units (consisting of one Heckmann common share and one warrant to purchase a common share for $6.00) at the price of $71,875, or $0.005 per unit. In addition, the Founders received 7,000,000 warrants (each giving them the right to purchase one common share at $6.00) at $1 per warrant shortly after the Company's IPO, making their total investment in Heckmann $7,071,875.

214. The securities and warrants issued to the Founders – which possessed an immediate value of over $100 million as of the date of Heckmann's IPO – could only be monetized after the Company completed an initial business combination with an operating company whose fair market value exceeded 80% of Heckmann's net asset value.

215. Pursuant to the terms of the IPO, the proceeds from the Founders' purchases were placed in escrow along with the proceeds of the IPO (and as provided in the Company's certificate of incorporation), and this escrow fund was to be distributed to Heckmann shareholders in the event Heckmann failed to complete a business transaction within 24 months. Because the Founders waived their right to share in any distribution of funds resulting from Heckmann's failure to consummate an initial business combination, however, their $7,071,875

investment, together with their 14,375,000 units would be rendered worthless under these circumstances.

216.   If the Heckmann Defendants had disclosed, *inter alia*, the inconsistencies it uncovered related to China Water's VAT payments, Defendant Xu's admission that China Water evaded its tax obligations, or China Water's dramatic overstatement of its financial position, they risked having the Company's shareholders vote against the Merger on October 30, 2008. Further, if the Heckmann Defendants had valued China Water at its true fair market value, it plainly would not have satisfied Heckmann's 80% threshold and thus would not have constituted a qualifying initial business combination.  This would have left the Heckmann Defendants with only one year to identify, investigate and consummate a different qualifying business combination, or else risk losing their multi-million dollar investment in the Company.

217.   Because disclosure of the omitted facts alleged herein would have substantially increased the likelihood that the Founders' investment in Heckmann would be rendered worthless, Defendants were motivated to conceal these material facts and proceed with the acquisition of China Water.  Defendants' strong motive to close the Merger thus raises a strong inference of their scienter.

218.   Indeed, simultaneously with the Heckman Defendants first revealing the fraud on May 8, 2009, and the need to substantially write down the goodwill of China Water, Heckmann released the remainder of the IPO escrow.  This was despite the fact that the Heckmann Defendants knew that the value of China Water, which was written down as of May 8, 2009 by $184 million to under $200 million, from its acquisition price of $384.72 million, was substantially less than the 80% of Heckmann's net assets.

2.      **Defendants' Renegotiation Of The Merger Price**

219.    The circumstances surrounding the September 2008 renegotiation of the Merger price also raises a strong inference that Defendants knew or were reckless in not knowing of China Water's false and misleading financial statements long before they disclosed the same to Heckmann shareholders and investors.

220.    Heckmann announced on September 29, 2008 that the parties had reduced the cash consideration payable to China Water by $120 million.  This reduced the overall Merger price by more than 33%, from approximately $625 million to just over $400 million.   To effectuate this cash savings, Defendant Xu and other insider China Water shareholders, who held over 33 million shares of China Water stock, agreed to reduce the cash consideration they received in connection with the Merger from $5 to between $1.04 and $2.77 per share.  At the time the Merger was initially announced, shares of China Water common stock traded at over $9 per share.

221.    Defendants' stated rationale for renegotiating the Merger terms creates a strong inference that they were aware of the discrepancies in China Water's financial report.  Indeed, Heckmann's stated goal of reducing the cash consideration paid in connection with the Merger is belied by its secret agreement to reimburse Defendant Xu for the 7.6 million shares of Heckmann common stock that he transferred to certain China Water shareholders.   This secret reimbursement clearly constituted a material change in the Merger consideration that was not disclosed to Heckmann shareholders and investors.  Additionally, the restatements China Water made to its financial statements constituted one-time charges that would not have materially altered the company's purported long-term value.

222.     Moreover, absent any material change to China Water's long-term value, these stated reasons would not cause China Water's shareholders to willingly accept a 50%-75% discount in the cash consideration they received in connection with the Merger.

223.     The far more compelling inference raised by the decision to renegotiate the Merger terms is that, as set forth herein, Heckmann became aware of material discrepancies in China Water's reported operating results and financial statements suggesting that the long-term value of China Water had been misrepresented.   Heckmann also ascertained that Xu was engaged in intentional VAT fraud.   Heckmann then used that information as leverage to renegotiate the terms of its agreements with China Water's shareholders, who, as Defendant Mr. Heckmann stated, would have incurred significant expenses if Heckmann had decided instead to terminate the deal.

### 3.     Defendant Xu's Departure from Heckmann

224.     The circumstances surrounding Defendant Xu's departure from Heckmann also support a strong inference of scienter.   Publicly, the Company stated that Defendant Xu was "retiring from the company with a noncompete clause," and that it had released 3,500,000 of Defendant Xu's escrowed shares.   Further, Heckmann characterized the move as a positive one for the Company, representing that it "[s]ignificantly strengthened operational control of China Water with the appointment of J. John Cheng" as Defendant Xu's replacement.

225.     In reality, however, Defendants have since admitted that Defendant Xu was ushered out of Heckmann amidst accusations of fraudulent conduct.   Specifically, beginning in December of 2008, Heckmann was alerted to the fact that China Water's receivables were not being collected and that its revenues were declining dramatically.   In February 2009, Defendant Mr. Heckmann met with Defendant Xu in Hong Kong and privately accused him of misrepresenting the financial condition of China Water.   The following month, Heckmann

announced Defendant Xu's departure along with the ERTA.  Heckmann later admitted that Defendant Xu did not "retire," but instead was ousted from the Company due to his fraudulent conduct discussed herein.

226.    Defendant Xu's ouster from Heckmann, and Defendants' mischaracterization of his departure, thus raises a strong inference of scienter.

### 4.    The Magnitude of Heckmann's Goodwill Impairments Related to China Water

227.    As set forth above, in October of 2008, Heckmann allocated over two-thirds of $572.69 million purchase price for China Water, or $384.72 million, to goodwill (i.e., China Water's going concern value).  By March 31, 2009, China Water's goodwill had been reduced by $184 million, with an additional $100 million in impairments being recognized in connection with the cancellation of Defendant Xu's shares.

228.    By the end of the third quarter of 2009, the goodwill associated with China Water had been written down to only $6.3 million, representing a 98% reduction in the total goodwill associated with China Water.  Heckmann's goodwill write-downs reflected the fact that as of August 31, 2009, China Water possessed little, if any, value as a going concern.

229.    The magnitude of Heckmann's goodwill impairments related to China Water thus reflects the astonishing extent to which China Water's financial statements and operating results had been fraudulently overstated by the China Water Defendants, and raises a strong inference that Defendants knew of or were severely reckless in not discovering these overstatements – and China Water's virtual lack of value as a going concern – during the Class Period.

## VIII.  LOSS CAUSATION

230.    Defendants' unlawful conduct alleged herein directly caused the losses incurred by Lead Plaintiff and the Class.  Throughout the Class Period, the price of Heckmann common

stock was artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.  The false and misleading statements and omissions set forth above were widely disseminated to the securities markets, investment analysts, and the investing public.  The true facts were first revealed to investors and the market through Defendants' May 8, 2009 corrective disclosure.

231.    As the true facts became known, the price of Heckmann common stock and warrants declined, as the artificial inflation was removed from the market price of the securities, causing damage to Lead Plaintiff and members of the Class.

232.    On May 8, 2009, at least three months after Defendant Mr. Heckmann personally accused Defendant Xu of misrepresenting China Water's financial position – Defendants disclosed for the first time that the troubles Heckmann had encountered in connection with the Merger were the result of the China Water Defendants' fraudulent misconduct.  Specifically, the Company filed a quarterly report with the SEC on Form 10-Q which disclosed for the first time that "prior management misrepresented the strength of the China Water business, and may have diverted corporate assets."  Heckmann simultaneously recorded a massive $184 million goodwill write-down in connection with the acquisition of China Water, and disclosed that China Water's operations "appear[] to be less robust than anticipated and continue[] to present accounting and related problems."

233.    Heckmann further disclosed on May 8, 2009 that, due to Defendant Xu's misrepresentations and fraudulent misconduct, it "cancelled 15,527,900 common shares that were issued to former China Water management and insiders, and approximately 1.5 million shares underlying warrants issuable to them in connection with the acquisition of China Water."

234.    As a result, the Company wrote down the value of the China Water transaction to under $200 million, from an initial transaction price of approximately $625 million.

235.    Each of these disclosures corrected the false and misleading information previously made available to the market by Defendants.

236.    The price of Heckmann common shares dropped 13.2% in response to this news, falling from its May 7, 2009 closing price of $4.99 to close at $4.33 on May 8, 2009.

237.    Moreover, the price of Heckmann warrants fell 25.5% in response to this news, falling from their May 7, 2009 closing price of $0.90 to close at $0.7075 on May 8, 2009.

238.    It was foreseeable to Defendants that the failure to disclose certain irregularities in China Water's financial statements and direct evidence of the China Water Defendants' fraudulent misconduct would artificially inflate the price of Heckmann common stock, and that the ultimate disclosure of this information would cause the price of Heckmann securities to decline as the inflation caused by their earlier misstatements was removed from the stock.

239.    In addition to the decline in Heckmann's share price caused by the corrective disclosure alleged above, Heckmann's shareholders who were eligible to vote on the Merger, have also been damaged on account of Heckmann's failure to consummate a qualifying business combination within the time frame required by the terms of the IPO, and Heckmann's improper distribution and use of the IPO Escrow Fund.

240.    As required by the terms of the IPO (and Heckmann's certificate of incorporation), Heckmann's "initial business combination must be with one or more businesses having a fair market value of at least 80% of [Heckmann's] net assets (excluding the amount held in the trust account representing a portion of the underwriters' discount) at the time of such acquisition."   Heckmann's acquisition of China Water failed to meet this threshold and

Heckmann failed to meet the conditions of the IPO Escrow Fund within two years of the IPO. Therefore, all Class members who held Heckmann shares on the record date of the Merger vote, and were eligible to vote thereon, are entitled to the return of their initial investment in Heckmann.

241.    Accordingly, the conduct of the Defendants as alleged herein proximately caused foreseeable losses to Lead Plaintiff and the members of the Class.

## IX.    APPLICABILITY OF THE FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE

242.    The markets for Heckmann's common stock and warrants were open and efficient at all relevant times for the following reasons, among others:

a)    The Company's securities met the requirements for listing, and were listed and actively traded on the NYSE;

b)    As a regulated issuer, Heckmann filed periodic public reports with the SEC;

c)    Heckmann regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d)    The market reacted to public information disseminated by Heckmann;

e)    Heckmann was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public market place;

f)    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Heckmann's securities; and

g)    Without knowledge of the misrepresented or omitted material facts, Plaintiff and the other members of the Class purchased or

otherwise acquired Heckmann's registered securities between the time Defendants made the material misrepresentations and omissions, and the time the fraudulent scheme was being disclosed, during which time the price of Heckmann's securities was inflated by Defendants' misrepresentations and omissions.

243.    As a result of the foregoing, the market for Heckmann's common stock and warrants promptly digested current information regarding Heckmann from all publicly available sources and reflected such information in Heckmann's securities prices.    Under these circumstances, all purchasers and acquirers of Heckmann common stock and warrants during the Class Period suffered similar injury through their purchase or acquisition of Heckmann securities at artificially inflated prices, and a presumption of reliance applies.

## X.    INAPPLICABILITY OF SAFE HARBOR

244.    As alleged herein, the Defendants acted with scienter because at the time that they issued public documents and other statements in Heckmann's name, they knew or with extreme recklessness disregarded the fact that such statements were materially false and misleading or omitted material facts.    Moreover, the Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

245.    As set forth in detail throughout this Complaint, the Defendants, by virtue of their control over, and/or receipt of Heckmann's materially false and misleading statements and their positions with the Company that made them privy to confidential proprietary information, used such information to artificially inflate Heckmann's financial results.    The Defendants created, were informed of, participated in and knew of the scheme alleged herein to distort and suppress material information pertaining to China Water's operations, financial condition, profitability

and present and future prospects of the Company.   With respect to non-forward looking statements and omissions, the Defendants knew and recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

246.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint.   None of the statements pleaded herein are "forward-looking" statements and no such statement was identified as a "forward-looking statement" when made.   Rather, the statements alleged herein to be materially false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made.   Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

247.   In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because at the time each such statement was made, the speaker actually knew and/or with extreme recklessness disregarded the fact that forward-looking statements were materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of Heckmann who actually knew or with extreme recklessness disregarded the fact that each such statement was false and/or misleading when made.   None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating

to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## XI.   CLASS ACTION ALLEGATIONS

248.    Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who (i) purchased or otherwise acquired the common stock of Heckmann between May 20, 2008 and May 8, 2009, excluding any shares of Heckmann common stock acquired by exchanging the stock of China Water for Heckmann stock in connection with the merger between Heckmann and China Water, which was consummated on October 30, 2008; or (ii) held Heckmann common stock as of September 15, 2008, and were entitled to vote on the merger between Heckmann and China Water.  Excluded from the Class are the Heckmann Defendants (as defined herein) and their immediate family members, the China Water Defendants (as defined herein) and their immediate family members, present or former officers of Heckmann and China Water, the members of China Water's board of directors, and their immediate family members (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(2)).

249.    The members of the Class are so numerous that joinder of all members is impracticable.  As of the date of this Complaint, there were approximately 109 million shares of Heckmann common stock outstanding.  While Lead Plaintiff does not know the exact number of Class members, Lead Plaintiff believes that there are, at minimum, thousands of members of the Class who purchased Heckmann common stock during the Class Period.

250.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

251.   Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether the federal securities laws were violated by Defendants' conduct as alleged herein;

b)      whether the Proxy and other public statements disseminated to Heckmann's shareholders and investors during the Class Period contained material misstatements or omitted to state material information;

c)      whether and to what extent the market price of Heckmann common stock was artificially inflated during the Class Period due to the non-disclosures and/or misstatements complained of herein;

d)      whether, solely with respect to the claims under section 10(b) of the Exchange Act, Defendants acted with scienter;

e)      whether, solely with respect to the claims under section 10(b) of the Exchange Act, reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

f)      whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

252.   Lead Plaintiff's claims are typical of the claims of the members of the Class. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests that are adverse or antagonistic to the Class.

253.   A class action is superior to other available methods for fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members

individually to redress the Defendants' wrongful conduct.   Furthermore, there will be no difficulty in the management of this litigation as a class action.

## XII.   CLAIMS BROUGHT PURSUANT TO SECTIONS 14(a) AND 20(a) OF THE EXCHANGE ACT

254.   The claims in counts I, II and III below are brought under Sections 14(a) and 20(a) of the Exchange Act (the "Proxy Claims").   The Proxy Claims are brought on behalf of investors who held Heckmann common stock on the record date of September 15, 2008 and were entitled to vote on the merger between Heckmann and China Water.   The Proxy Claims are based solely on negligence.   They are not based on any knowing or reckless conduct by or on behalf of Defendants, and Lead Plaintiff specifically disclaims any allegations of fraud, scienter or recklessness in these non-fraud claims.

255.   The basis of the Proxy Claims is that Defendants' statements issued to solicit shareholder approval of the Merger, including the Merger Agreement, the Joint Proxy, the documents incorporated by reference into the Joint Proxy, China Water's restated financial statements, and statements made by Defendants on conference calls discussing the Merger, contained misstatements of material fact and omitted material facts.   Further, Defendants did not – as required by law – update and correct their previously-made statements prior to the shareholder vote.

256.   Defendants' proxy solicitations included all statements that served to color the market's view of the deal and encourage Heckmann shareholders to vote in favor of the Merger. The statements included the following (collectively referred to as the "Proxy Solicitations"):

a)   Heckmann's May 20, 2008 investor conference call and investor presentation, which was attached to a Form 8-K that was filed with the SEC, set forth above in ¶¶ 135-143;

b)      The Merger Agreement, which was attached to a Form 8-K that was filed with the SEC on May 20, 2008, set forth above in ¶¶ 144-151;

c)      Heckmann's June 5, 2008 investor conference call, set forth above in ¶¶ 152-154;

d)      Heckmann's August 14, 2008 press release and Form 10-Q, set forth above in ¶¶ 155-157;

e)      Heckmann's September 29, 2008 press release, which was attached to a Form 8-K that was filed with the SEC, set forth above in ¶¶ 158-161;

f)      Heckmann's September 30, 2008 investor conference call, set forth above in ¶¶ 162-164;

g)      China Water's September 29, 2008 amended Forms 10-Q and Form 10-K, set forth above in ¶¶ 165-171; and

h)      The Joint Proxy and attached Merger Agreement, set forth above in ¶¶ 171-187.

257.    All of the Proxy Solicitations were materially false and misleading.

258.    Specifically, the Proxy Solicitations failed to disclose, *inter alia*, the following highly material information prior to the shareholder vote on October 30, 2008:

a)      During the due diligence process, E&Y discovered that VAT payments made by China Water did not match the reported revenue figures in China Water's books. When confronted about the discrepancy, Xu attempted to justify the non-payment of VAT by indicating that it was a common practice among Chinese companies; however, E&Y "did not accept Mr. Xu's 'Everybody does it' explanation for the non-payment of VAT and so informed Heckmann."

b)      Although though Xu's proffered excuse was tantamount to an admission of intentional (and therefore criminal) tax evasion and not accepted by E&Y,

Heckmann failed to verify and reconcile the reported revenue and actual VAT liabilities. Heckmann instead simply required China Water to restate 2007 VAT and reserve for additional VAT payments. In reality, the discrepancy between China Water's revenues and VAT payments existed because China Water's "revenues were dramatically overstated."

c)    While China Water was reporting financial results in filings with the SEC, China Water insiders were "reporting a separate set of numbers to Chinese officials at the same time that these reports were made to the SEC."

d)    Virtually all of China Water's financial information was materially false and misleading, due in part to the fact that its sales and receivables had been overstated by millions of dollars;

e)    Xu Hong Bin is not Xu's real name, and his educational and employment history was completely fabricated, as was the college he supposedly attended and the transportation company he purportedly used to work for. Xu had no background in running a legitimate company and is, in fact, a convicted felon with ties to criminal organizations.

f)    Heckmann secretly promised to reimburse Xu for 7,600,000 shares of China Water stock that Xu agreed to transfer to certain China Water shareholders immediately prior to the Merger in order to induce such shareholders to agree, in September 2008, to amendments to the terms of the Merger that reduced the amount of cash Heckmann had to pay such shareholders for their China Water shares.

259.   In addition to the failure to disclose highly material facts to investors, the Proxy Solicitations contained numerous statements that were materially false and misleading when made.  These materially false and misleading statements included, *inter alia*, the following:

a)   China Water's revenues, operating results and other financial information, which were included in, *inter alia*, Heckmann's May 20, 2008 investor presentation and conference call, China Water's September 29, 2008 amended Forms 10-Q and Form 10-K, and the Joint Proxy.  China Water's financial statements were materially false and misleading at the time they were included in the foregoing Proxy Solicitations because China Water's revenues and financial position had been "grossly inflated" prior to the Merger, as set forth more fully above at ¶¶ 135-143, 165-170, and 182-187.

b)   Defendant Mr. Heckmann's statements during the May 20, 2008 investor conference call that China Water experienced a historic organic growth rate "in the 40% to 50% range," and that Heckmann expected China Water to earn "approximately $220 million in revenues with a net income of approximately $70 million" for fiscal year 2008.  These statements were materially false and misleading because they were based upon China Water's historic reported financial results, which had been "grossly inflated" prior to the Merger, as set forth more fully above at ¶¶ 135-139.

c)   Heckmann's statement in the May 20, 2008 press release that China Water possessed an "experienced management team," with Defendant Xu having "[m]ore than 10 years of experience in the bottled water industry" after graduating from the "Water Resource Institute of QingHai Province."  These statements were

materially false and misleading because Defendant Xu's professional and educational background contained material inaccuracies. In fact, Defendant Xu had been sentenced to prison in Macau and possessed ties to criminal organizations, as set forth more fully above at ¶¶ 140-141.

d)   The Merger Agreement's representations that: (a) China Water's SEC filings "complied as to form in all material respects with the requirements of the Securities Act and the Exchange Act" and "did not contain any untrue statement of a material fact or omit to state a material fact"; (b) China Water's financial statements "complied with the rules and regulations of the SEC (including Regulation S-X) as of the date of filing of such reports, . . . was prepared in accordance with GAAP, . . . [and] fairly presents in all material respects the financial condition and results of operations"; (c) China Water "paid . . . all taxes that are due and payable," and that its tax returns were "in all material respects true, complete and correct"; and (d) China Water was "in compliance with each Legal Requirement that is or was applicable to any of them or to the conduct or operation of their business or the ownership or use of an of their assets." These statements were materially false and misleading in light of E&Y's discovery that China Water failed to pay all required VAT in violation of applicable laws, and because its financial statements contained material misstatements due to the fact that China Water's revenues and financial position had been grossly inflated prior to the Merger, as set forth more fully above at ¶¶ 144-151.

e)   Heckmann's statements in the June 5, 2008 investor conference call that (a) China Water's revenues "have grown from 27 million to $57 million, from '05 to '07";

(b) China Water has grown "at 43% compounded annually on revenues, 67 on EPS"; (c) China Water has an implied "organic growth rate in the first quarter over last quarter of 65% in revenues"; and (d) Heckmann was "looking at [a] 50%" organic growth rate at China Water going forward.  These statements were materially false and misleading because they were based upon China Water's historic reported financial results, which had been grossly inflated prior to the Merger, as set forth more fully above at ¶¶ 152-154.

f)      Heckmann's statements during the September 30, 2008 investor conference call regarding Defendant Xu's experience in the bottled water business and the fact that Heckmann had "absolutely no issues with [China Water's] insiders."  These statements were materially false and misleading because, by the time this statement was made, Heckmann had reason to believe – by virtue of E&Y's discovery of a discrepancy between China Water's reported revenues and VAT payments and accruals – that Defendant Xu was causing China Water to evade its VAT obligations, as set forth more fully above at ¶¶ 158-164.

g)      The Joint Proxy's representations (a) that Heckmann undertook an "extensive due diligence" investigation into China Water; (b) that Heckmann "became comfortable with China Water's financial statements and the disclosed deficiencies"; and (c) regarding the reasons for China Water's issuance of amended financial statements.  These statements were materially false and misleading when made because Heckmann had reason to believe – by virtue of E&Y's discovery of a discrepancy between China Water's reported revenues and VAT payments and accruals – that Defendant Xu was causing China Water to

evade its VAT obligations, and had reason to believe that China Water's reported financial statements contained additional material inaccuracies, as set forth more fully above at ¶¶ 171-187.

h)      The Joint Proxy's representation that, based on the Heckmann Board's valuation of China Water, "the transaction would exceed the 80% test requirement to be a qualifying business combination under Heckmann's certificate of incorporation." This statement was materially false and misleading because, due to Defendant Xu's gross inflation of China Water's revenues and operating results, the value of China Water did not exceed 80% of Heckmann's net assets and thus did not constitute a qualifying business combination, as set forth in ¶¶ 176-177.

260.    Defendants were also under a continuing duty to update and/or correct these material omissions by disclosing the relevant facts, as well as update and/or correct any false or misleading statements they made.   In violation of this continuing duty, Defendants failed to disclose any of the omitted facts prior to the shareholder vote.

261.    The materially false and misleading statements and material omissions set forth above proximately caused foreseeable losses to Lead Plaintiff and members of the Class by causing the price of Heckmann common stock to fall from $4.99 on May 8, 2009 to $ 4.33 on May 9, 2009, as set forth more fully above.

262.    It was further foreseeable that the false and misleading statements set forth herein would cause China Water's value to be less than 80% of Heckmann's net assets, and therefore failed to satisfy the requirement that Heckmann enter into a "qualifying business combination" as set forth in its the IPO documents.  The Company failed to consummate such a "qualifying business combination."  But for the false and misleading statements set forth herein, Heckmann

would have been forced to dissolve and return to Heckmann shareholders their initial investment in the Company.  Accordingly, shareholders are entitled to the return of their initial investment in Heckmann.

## COUNT I

### For Violations Of Section 14(a) Of The Exchange Act
### Against Defendants Heckmann, Mr. Heckmann, Ezzell, Holtz, Osborne and Quayle

263.    Lead Plaintiff repeats and realleges the allegations in ¶¶ 1-187 and 230-262 as if set forth fully herein.  For purposes of this claim, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

264.    The Joint Proxy, the documents attached to the Joint Proxy and/or incorporated by reference therein, including the Merger Agreement, and other solicitations described above contained misstatements of material fact and omitted material facts required to be stated in order to make the statements contained therein not misleading.

265.    Defendants named in this count failed to update the Joint Proxy or its other solicitations when material information arose between the dissemination of these documents or statements and the October 30, 2008 shareholder vote.

266.    Defendants named in this count, jointly and severally, solicited and/or permitted the use of their names in solicitations contained in the Joint Proxy.

267.    Heckmann was an issuer of the Joint Proxy.  Heckmann also permitted the use of its name in the Joint Proxy by allowing the Joint Proxy to represent, among other things, the operating results and financial condition of China Water and the results of Heckmann's due diligence efforts.

268.    Defendant Mr. Heckmann signed the Registration Statement and subsequent amendments, signed the cover letter for the Joint Proxy and permitted the use of his name in connection with the Joint Proxy, and otherwise solicited the votes of shareholders in the Company's press releases and during the Company's conference calls, as set forth above.

269.    Defendants Ezzell, Holtz, Osborne and Quayle signed the Registration Statement and subsequent amendments, and permitted the use of their names in the Joint Proxy by, among other things, allowing the Joint Proxy to represent that they recommended a vote in favor of the Merger.

270.    By means of the Joint Proxy, the documents attached thereto or incorporated by reference therein, and other solicitations set forth above, Defendants sought to secure the approval of the Merger from Lead Plaintiff and other Class members, and solicited proxies from Lead Plaintiff and other Class members.

271.    Each Defendant named in this Count acted negligently in making false and misleading statements of material fact, omitting material facts required to be stated in order to make the statements contained in their solicitations not misleading, and failing to update statements that were rendered false and misleading by material information that arose after the dissemination of these statements and before the October 30, 2008 shareholder vote.

272.    The solicitations described herein were essential links in the accomplishment of the Merger.  As a result of these solicitations, the Heckmann shareholders approved the Merger.

273.    Lead Plaintiff and the Class members eligible to vote on the Merger were denied the opportunity to make an informed decision in voting on the Merger as a result, and were damaged as a direct and proximate cause of the materially false and misleading statements and omissions set forth herein.

274.     This claim is brought within the applicable statute of limitations.

275.     By reason of the foregoing, these Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 79n(a), and Rule 14(a) promulgated thereunder, 17 C.F.R. § 240.14a-9.

## COUNT II

### For Violations Of Section 14(a) Of The Exchange Act
### Against Defendants China Water and Xu

276.     Lead Plaintiff repeats and realleges the allegations in ¶¶ 1-187 and 230-275 as if set forth fully herein.

277.     The Joint Proxy, the documents attached to the Joint Proxy and/or incorporated by reference therein, including the Merger Agreement, and other solicitations described above contained misstatements of material fact and omitted material facts required to be stated in order to make the statements contained therein not misleading.

278.     Defendants named in this count failed to update the Joint Proxy or its other solicitations when material information arose between the dissemination of these documents or statements and the October 30, 2008 shareholder vote.

279.     Defendants named in this count, jointly and severally, solicited and/or permitted the use of their names in solicitations contained in the Joint Proxy.

280.     China Water was an issuer of the Joint Proxy.  China Water also permitted the use of its name in the Joint Proxy by allowing the Joint Proxy to represent, among other things, its operating results and financial condition.

281.     Defendant Xu signed the cover letter for the Joint Proxy and permitted the use of his name in connection with the Joint Proxy, and otherwise solicited the votes of shareholders in

China Water's restated Form 10-K, which was incorporated by reference into the Joint Proxy and which Defendant Xu signed.

282.    By means of the Joint Proxy, the documents attached thereto or incorporated by reference therein, and other solicitations set forth above, Defendants sought to secure the approval of the Merger from Lead Plaintiff and other Class members, and solicited proxies from Lead Plaintiff and other Class members.

283.    Each Defendant named in this Count was negligent in making false and misleading statements of material fact, omitted material facts required to be stated in order to make the statements contained in their solicitations not misleading, and failed to update statements that were rendered false and misleading by material information that arose after the dissemination of these statements and before the October 30, 2008 shareholder vote.

284.    The solicitations described herein were essential links in the accomplishment of the Merger.  As a result of these solicitations, the Heckmann shareholders approved the Merger.

285.    Lead Plaintiff and the Class members eligible to vote on the Merger were denied the opportunity to make an informed decision in voting on the Merger as a result, and were damaged as a direct and proximate cause of the materially untrue statements and omissions set forth herein.

286.    This claim is brought within the applicable statute of limitations.

287.    By reason of the foregoing, these Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 79n(a), and Rule 14(a) promulgated thereunder, 17 C.F.R. § 240.14a-9.

## COUNT III

### For Violations Of Section 20(a) Of The Exchange Act
### In Connection With The Proxy Claims
### Against Defendants Mr. Heckmann, Ezzell, Holtz, Osborne, Quayle and Xu

288.    Lead Plaintiff repeats and realleges the allegations in ¶¶ 1-187 and 230-287 as if set forth fully herein.

289.    During their tenures as officers and/or directors of Heckmann and/or China Water, each of the Defendants named in this Count were controlling persons of Heckmann and/or China Water within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Heckmann, these Defendants had the power and authority to cause Heckmann and/or China Water to engage in the wrongful conduct complained of herein.  These Defendants were able to, and did, control, directly and indirectly, the content of the Joint Proxy and the other solicitations described herein made by Heckmann, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

290.    Defendants Mr. Heckmann, Ezzell, Holtz, Osborne and Quayle participated in Heckmann board meetings and conference calls, reviewed the Merger Agreement and voted to approve the Merger, signed the Registration Statement and solicited approval of the Merger through the Heckmann board's recommendation to vote in favor of the Merger, which appeared in the Joint Proxy.

291.    In their capacities as senior corporate officers and/or directors of Heckmann, and as more fully described above, these Defendants participated in the misstatements and omissions set forth above.  Indeed, these Defendants had access to information regarding the circumstances surrounding the Merger, including the terms of the Merger, the renegotiation of the Merger, the valuation of China Water, the due diligence that had and had not been performed, and analyses

of China Water's operating results and financial condition.  As a result, these Defendants, individually and as a group, were control persons within the meaning of Section 20(a) of the Exchange Act.

292.   During his tenure as an officer of China Water, Xu was a controlling person of China Water within the meaning of Section 20(a) of the Exchange Act.  By reason of his position of control and authority as an officer of China Water, Xu had the authority to cause China Water to engage in the wrongful conduct complained of herein.  Xu was able to, and did, directly and indirectly control the contexts of the Joint Proxy and other solicitations described herein, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

293.   In his capacity as President of China Water, Xu had access to information regarding the circumstances surrounding the Merger, the renegotiation of the Merger, the due diligence that had and had not been performed, China Water's VAT liabilities and accruals, and the overall operating results and financial condition of China Water.  As a result of the foregoing, Xu was a control person within the meaning of Section 20(a) of the Exchange Act.

294.   As set forth above, Heckmann and China Water violated Section 14(a) of the Exchange Act by their acts and omissions as alleged above.  By virtue of their positions as controlling persons of Heckmann and China Water, and as a result of their aforementioned conduct, Defendants Mr. Heckmann, Ezzell, Holtz, Osborne, Quayle and Xu are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Heckmann and China Water are liable pursuant to Section 14(a) of the Exchange Act, to Lead Plaintiff and the other members of the Class.  These Defendants were culpable participants in the violations of Section 14(a) alleged herein because they failed to make a reasonable investigation

and did not possess reasonable grounds for the belief that the statements contained in Heckmann's proxy solicitations issued were true and free of any omissions of material fact.  As detailed above, during the respective times that these Defendants served as officers and/or directors of Heckmann and/or China Water, each is responsible for the material misstatements and omissions made by Heckmann and/or China Water.

295.    Lead Plaintiff and Class members eligible to vote on the Merger were denied the opportunity to make an informed decision in voting on the Merger and were damaged as a direct and proximate cause of the untrue statements and omissions in the Proxy and other solicitations described herein.

296.    This claim is brought within the applicable statute of limitations.

297.    By reason of the foregoing, these Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 79t(a).

## XIII.  CLAIMS BROUGHT PURSUANT TO SECTIONS 10(B) AND 20(a) OF THE EXCHANGE ACT

### COUNT IV

### For Violations Of Section 10(b) Of The Exchange Act Against Defendants Heckmann and Mr. Heckmann

298.    Lead Plaintiff repeats and realleges the allegations in ¶¶ 1-253 as if set forth fully herein.

299.    During the Class Period, Defendants Heckmann and Mr. Heckmann disseminated or approved the false statements and omissions set forth above, which they knew or recklessly disregarded were misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made not misleading.

300.    These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of

material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and members of the Class in connection with their purchase or acquisition of Heckmann common stock during the Class Period.

301.   As detailed herein, the misrepresentations contained in, or the material facts omitted from, Defendants' public statements included, but were not limited to, false and misleading representations and omissions regarding: (a) China Water's grossly inflated value, revenues, financial condition and operating results; (b) E&Y's discovery that VAT payments made by China Water did not match the reported revenue figures in China Water's books; (c) Defendant Xu's attempt to justify the non-payment of VAT by admitting that China Water intentionally evaded its taxes; (d) Heckmann's failure to verify and reconcile the reported revenue and actual VAT liabilities in light of such discrepancy; (e) Heckmann's mandate that China Water restate its VAT payments and accruals and its failure to do so; (f) China Water's submission of a separate set of financial figures to Chinese officials; (g) Heckmann's secret promise to reimburse Xu for 7,600,000 shares of China Water stock that Xu agreed to transfer to certain China Water shareholders immediately prior to the Merger; (h) Defendant Xu's fabricated educational and employment history and complete lack of experience running a legitimate company;   (i) Heckmann's discovery in December 2008 that China Water's receivables could not be collected and that its revenues were dramatically declining; (j) Mr. Heckmann's February 2009 accusation that Defendant Xu misrepresented the true financial condition of China Water prior to the Merger; (k) Defendant Xu's ouster from China Water in March 2009; and (l) Heckmann's payment of a grossly inflated purchase price for

China Water; and (m) Defendant Xu's gross overstatement of China Water's receivables, operating results and financial condition.

302.     These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the members of the Class; made numerous false and misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made these statements with knowledge or a reckless disregard for the truth; and employed devices, schemes and artifices to defraud in connection with the purchase or sale of securities, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiff and members of the Class, regarding, among other things, China Water's financial condition and operating results, China Water's VAT liabilities, the degree of due diligence performed by Heckmann and the material deficiencies uncovered during the due diligence process; (ii) artificially inflate and maintain the market price of Heckmann common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Heckmann common stock at artificially inflated prices.

303.     These Defendants had a duty to disclose the material information set forth in ¶ 301 before the Joint Proxy was filed, before the shareholder vote, and prior to the end of the Class Period.

304.     Defendants Heckmann and Mr. Heckmann are liable for the materially false and misleading statements and omissions contained in (a) Heckmann's May 20, 2008 investor conference call and investor presentation, which was attached to a Form 8-K that was filed with the SEC; (b) the Merger Agreement, which was attached to a Form 8-K that was filed with the

SEC on May 20, 2008; (c) Heckmann's June 5, 2008 investor conference call; Heckmann's August 14, 2008 press release and Form 10-Q; (d) Heckmann's September 29, 2008 press release, which was attached to a Form 8-K that was filed with the SEC; (e) Heckmann's September 30, 2008 investor conference call; (f) the Joint Proxy and attached Merger Agreement; (g) Heckmann's November 21, 2008 presentation at the Roth Capital Partners China Conference; (h) Heckmann's March 16, 2009 Form 10-K and conference call; and (i) Heckmann's March 16, 2009 press release, which was attached to a Form 8-K that was filed with the SEC on March 17, 2009.

305.    These statements were materially false and misleading because, among other things, they misrepresented China Water's revenues, operating results, financial position and growth potential, and omitted material information which rendered these statements materially false and misleading.

306.    As described above, these Defendants acted with scienter throughout the Class Period, in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.

307.    These Defendants engaged in this scheme in order to maintain and/or inflate the prices of Heckmann securities and induce Heckmann shareholders to approve the Merger.

308.    Lead Plaintiff and members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Heckmann securities.   Lead Plaintiff and the Class would not have purchased or otherwise acquired Heckmann securities at the prices they paid, or at all, if they had been aware that the market price

had been artificially and falsely inflated by these Defendants' materially false and misleading statements and/or omissions of material fact.

309.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Heckmann securities during the Class Period.

**COUNT V**

**For Violations Of Section 10(b) Of The Exchange Act**
**Against Defendants China Water and Xu**

310.    Lead Plaintiff repeats and realleges the allegations in ¶¶ 1-253 and 298-309 as if set forth fully herein.

311.    During the Class Period, Defendants China Water and Xu disseminated or approved the false statements and omissions set forth above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made not misleading.

312.    These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and members of the Class in connection with their purchase or acquisition of Heckmann common stock during the Class Period.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, Defendants' public statements included, but were not limited to, false and misleading representations and omissions regarding: (a) the gross inflation of China Water's value, revenues, financial condition and operating results; (b) Defendant Xu's and China

Water's intentional evasion of VAT; (c) China Water's submission of a separate set of financial figures to Chinese officials; (d) Defendant Xu's fabricated educational and employment history and complete lack of experience running a legitimate company; (e) misrepresented receivables and revenues; (f) Defendant Xu's misappropriation of large sums of money from China Water's treasury; and (g) Defendant Xu's employment of non-payroll employees to fabricate China Water's operating results and financial condition.

313.   These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the members of the Class; made numerous false and misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made these statements with knowledge or a reckless disregard for the truth; and employed devices, schemes and artifices to defraud in connection with the purchase or sale of securities, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiff and members of the Class, regarding, among other things, China Water's financial condition and operating results, China Water's VAT liabilities, the degree of due diligence performed by Heckmann and the material deficiencies uncovered during the due diligence process; (ii) artificially inflate and maintain the market price of Heckmann common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Heckmann common stock at artificially inflated prices.

314.   These Defendants had a duty to disclose the material information set forth in ¶ 312 before the Joint Proxy was filed, before the shareholder vote, and prior to the end of the Class Period.

315.    Defendants China Water and Xu are also liable for the false and misleading statements set forth in (a) the Merger Agreement; (b) the Joint Proxy and other Proxy Solicitations; (c) China Water's amended and restated financial statements filed with the SEC on September 29, 2008. These statements were materially false and misleading because, among other things, they misrepresented China Water's revenues, operating results, financial position and growth potential, and omitted material information which rendered these statements materially false and misleading.

316.    As described above, these Defendants acted with scienter throughout the Class Period, in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, including China Water's grossly inflated value, revenues, operating results and financial position, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.

317.    These Defendants engaged in this scheme in order to maintain and/or inflate the prices of Heckmann securities and induce Heckmann shareholders to approve the Merger.

318.    Lead Plaintiff and members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Heckmann securities.   Lead Plaintiff and the Class would not have purchased or otherwise acquired Heckmann securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially false and misleading statements and/or omissions of material fact.

319.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Heckmann securities during the Class Period.

## COUNT VI

### For Violations Of Section 20(a) Of The Exchange Act
### In Connection With The Section 10(b) Claim
### Against Defendants Mr. Heckmann, Ezzell, Holtz, Osborne, Quayle and Xu

320.    Lead Plaintiff repeats and realleges the allegations in ¶¶ 1-253 and 298-319 as if set forth fully herein.

321.    During their tenures as officers and/or directors of Heckmann and/or China Water, each of the Defendants named in this Count were controlling persons of Heckmann and/or China Water within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Heckmann, these Defendants had the power and authority to cause Heckmann and/or China Water to engage in the wrongful conduct complained of herein.  These Defendants were able to, and did, control, directly and indirectly, the content of the public statements made by Heckmann during the Class Period, including the materially false and misleading statements and omissions as alleged herein.

322.    In their capacities as senior corporate officers and/or directors of Heckmann, and as more fully described above, these Defendants participated in, and were made aware of, the misstatements and omissions set forth above.   Indeed, these Defendants had access to information regarding the circumstances surrounding the Merger, including the terms of the Merger, the renegotiation of the Merger, the valuation of China Water, the due diligence that had and had not been performed, and analyses of China Water's operating results and financial condition.  As a result, these Defendants, individually and as a group, were control persons within the meaning of Section 20(a) of the Exchange Act.

323.    During his tenure as an officer of China Water, Xu was a controlling person of China Water within the meaning of Section 20(a) of the Exchange Act.  By reason of his position of control and authority as an officer of China Water, Xu had the authority to cause China Water

to engage in the wrongful conduct complained of herein.  Xu was able to, and did, directly and

indirectly control the contents of China Water's public statements during the Class Period,

thereby causing the dissemination of the false and misleading statements and omissions of

material facts as alleged herein.  In addition, as a member of the Heckmann board after the

Merger closed, Defendant Xu was able to, and did, directly and indirectly control the contents of

Heckmann's public statements until his resignation on March 13, 2009.

324.    In his capacity as President and Chief Executive Officer of China Water, Xu had

access to information regarding the circumstances surrounding the Merger, the renegotiation of

the Merger, the due diligence that had and had not been performed, China Water's VAT

liabilities and accruals, and the overall operating results and financial condition of China Water.

In addition, Defendant Xu was aware of the inaccuracies in China Water's reported financial

position and operating results, as he was responsible for the fraudulent overstatement of such

figures.  As a result of the foregoing, Xu was a control person within the meaning of

Section 20(a) of the Exchange Act.

325.    As set forth above, Heckmann and China Water violated Section 10(b) of the

Exchange Act by their acts and omissions as alleged above.  By virtue of their positions as

controlling persons of Heckmann and China Water, and as a result of their aforementioned

conduct, Defendants Mr. Heckmann, Ezzell, Holtz, Osborne, Quayle and Xu are liable pursuant

to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as

Heckmann and China Water are liable pursuant to Section 10(b) of the Exchange Act, to Lead

Plaintiff and the other members of the Class.  The facts set forth above establish that Defendants

culpably participated in the fraudulent conduct alleged herein.  As detailed above, during the

respective times that these Defendants served as officers and/or directors of Heckmann and/or

China Water, each is responsible for the material misstatements and omissions made by Heckmann and/or China Water.

326.    As a direct and proximate cause of these Defendants' conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchase or acquisition of Heckmann securities at artificially inflated prices.

327.    This claim is brought within the applicable statute of limitations.

328.    By reason of the foregoing, these Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 79t(a).

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

a)      Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)      Awarding all damages and other remedies set forth in the Exchange Act in favor of Lead Plaintiff and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c)      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d)      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a jury trial.


Dated:   October 8, 2010                **ROSENTHAL, MONHAIT & GODDESS, P.A.**

                                        */s/ P. Bradford deLeeuw*
                                        Norman M. Monhait (Del. Bar No. 1040)
                                        P. Bradford deLeeuw (Del. Bar No. 3569)
                                        919 N. Market Street, Suite 1401
                                        P.O. Box 1070
                                        Wilmington, DE 19899
                                        Telephone: (302) 656-4433
                                        Facsimile: (302) 658-7567
                                        nmonhait@rmgglaw.com
                                        bdeleeuw@rmgglaw.com

                                        **BARROWAY TOPAZ KESSLER
                                        MELTZER & CHECK, LLP**
                                        Sharan Nirmul (Del. Bar. No. 4589)
                                        Richard A. Russo, Jr.
                                        280 King of Prussia Road
                                        Radnor, PA 19087
                                        Telephone: (610) 667-7706
                                        Facsimile: (610) 667-7056
                                        snirmul@btkmc.com
                                        rrusso@btkmc.com

                                        *Lead Counsel for Lead Plaintiff and the Class*