**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE HECKMANN CORPORATION | : | |
| SECURITIES LITIGATION | : | |
| | : | C. A. No. 10-378-LPS-MPT |
| | : | |
| | : | **CLASS ACTION** |

**REPORT AND RECOMMENDATIONS**

## I. INTRODUCTION

Lead plaintiff Matthew Haberkorn ("Haberkorn") and defendants[1] dispute over a shareholder-approved merger between the Heckmann Corporation ("Company") and China Water and Drinks, Inc. ("China Water").[2] The amended complaint, filed on October 8, 2010, asserts claims under §§ 10(b), 14(a), 20(a), and Rule 10b-5 of the Securities Exchange Act of 1934 ("Act") on behalf of all shareholders who held stock in the Company as of September 15, 2008, and were entitled to vote on the merger, and on behalf of investors who acquired securities in the Company during the class period, May 20, 2008 to May 8, 2009.[3] The allegations are of fraud, recklessness, and materially false and misleading statements.[4]

Prior to the filing of the amended complaint, defendants moved to transfer to the Central District of California,[5] which this court denied.[6] On November 12, 2010,

---

[1] Defendants are Richard J. Heckmann, James Danforth Quayle, Alfred E. Osborne, Jr., Lou L. Holtz, Donald G. Ezzell, Heckmann Corporation, and China Water and Drinks, Inc. D.I. 52 ¶¶ 30-37.

[2] *Id.* ¶ 1.

[3] *Id.*

[4] *See generally Id.* ¶¶ 135-229, 254-328.

[5] D.I. 15.

[6] D.I. 51 (finding that private and public interest factors of 28 U.S.C. § 1404(a) did not warrant transfer); *see also* D.I. 83 (affirming D.I. 51).

Haberkorn moved for partial modification of the Private Securities Litigation Reform Act ("PSLRA") discovery stay,[7] which this court also denied.[8]  Defendants presently move to dismiss pursuant to the Rules of Federal Civil Procedure 8(a), 9(b), 12(b)(2) and 12(b)(6).  For the reasons that follow, defendants' motions are denied.

## II. BACKGROUND

### A. Factual Background

*The Merger and Events Leading Thereto*

The Company is a publicly traded, "blank check company" that acquires or obtains control of operating entities through various business combinations, such as stock acquisitions and mergers.[9]  It is incorporated under Delaware law with its principle office in Palm Desert, California.[10]  In this particular instance, the Company raised funds from public investors through an initial public offering ("IPO") promising to acquire a "qualifying" operating company using the IPO proceeds, which were held in escrow.[11] The certificate of incorporation required the Company to be dissolved and the IPO proceeds to be returned to the shareholders if it failed to accomplish a business combination with an entity whose fair value was equal to at least 80% of the Company's net assets (a qualifying business combination) within twenty-four months of the IPO.[12] The founders of the Company, i.e., defendants, were not to receive any of the proceeds

---

[7] D.I. 57.
[8] D.I. 82 (finding that Haberkorn did not satisfy PSLRA requirements of necessity or undue prejudice and particularity to warrant modifying automatic stay).
[9] D.I. 52 ¶¶ 3, 41.
[10] *Id.* ¶ 31.
[11] *Id.* ¶ 3.
[12] *Id.* ¶¶ 3, 45.

upon the Company's dissolution.[13]

The IPO was completed on November 16, 2007, raising approximately $432.9 million through the issuance of 54.1 million units at $8.00 per unit.[14] Each unit consisted of one share and one warrant, allowing the holder to purchase one share for $6.00.[15] The founders awarded themselves 14,375,000 units, or 20% of the Company, at $0.005 per unit, for a total investment of $71,875.[16] The founders also agreed to invest seven million dollars in exchange for seven million warrants.[17] These funds were placed in escrow to be paid to shareholders if the Company failed to complete a qualifying business combination.[18] By October 30, 2008, the date of the shareholder vote, defendants would personally lose more than $287 million if the Company failed to acquire a qualifying business.[19]

On May 20, 2008, the Company publicized a merger agreement to acquire China Water and filed the agreement with the Securities and Exchange Commission ("SEC").[20] China Water, now incorporated under Delaware law, manufactures and distributes bottled water products in China.[21] The agreement contained statements, representations and warranties regarding China Water's operations and financial condition, expressing, *inter alia*, that its financial statements did not contain any

---

[13] *Id.* ¶ 46.
[14] *Id.* ¶¶ 5, 44.
[15] *Id.* ¶ 44.
[16] *Id.* ¶¶ 4, 46, 213.
[17] *Id.* ¶¶ 47, 213.
[18] *Id.* ¶ 47.
[19] *Id.* ¶¶ 46-47 (basing amount on value of securities, $280 million, and purchase of warrants, totaling $7 million).
[20] *Id.* ¶ 52.
[21] *Id.* ¶¶ 32, 48.

materially false or misleading statements or omissions.[22]  It also stated that China Water possessed no undisclosed liabilities, paid all required taxes, and was in compliance with all applicable laws.[23]  The purchase price was $625 million; $455 million in the Company's common stock and $170 million in cash.[24]  The Company praised China Water and the merger, stating that it was a "compelling" and "special opportunity."[25] Defendant Richard Heckmann, Chairman and CEO of the Company, projected $220 million in revenues and $70 million in net income for fiscal year 2008.[26]  The merger agreement required the Company to hold in escrow 90% of the Company's shares given to Xu Hong Bin ("Xu"), CEO and president of China Water and a director of the Company, in exchange for his China Water shares.[27]  The Company agreed to release 80% of Xu's escrowed shares on March 31, 2010, approximately eighteen months after the merger closing, and the remaining shares two years after the merger closing.[28]

On June 16, 2008, the Company filed a Form S-4 registration statement for the proposed merger with the SEC.[29]  The Form disclosed several risk factors that included China Water's failure to: maintain effective internal controls over its internal audit function because it lacked sufficient qualified persons; maintain effective internal controls over the financial closing process to ensure the accurate and timely preparation of local financial statements and financial data due to an insufficient number of qualified

---

[22] *Id.* ¶¶ 55-59.
[23] *Id.*
[24] *Id.* ¶¶ 6, 53.
[25] *Id.* ¶¶ 7, 111, 190.
[26] *Id.* ¶¶ 7, 12, 50, 136, 186.
[27] *Id.* ¶¶ 54, 62.
[28] *Id.* ¶ 62.
[29] *Id.* ¶ 171.

financial and accounting staff; and adequately design and operate internal controls in an effective manner to support the requirements of the financial reporting and period-end close process.[30]  The Form also described the due diligence conducted by Credit Suisse, one of the Company's financial advisors, which included weeks of meetings in China and inspections of China Water's plants.[31]  The Form stated that even though extensive due diligence was performed, it could not be sure that the diligence identified all material issues possibly present in China Water or its business, or that factors outside of China Water's control would not later arise.[32]  If such an issue arose, the Form noted that it may result in losses and the Company "may be forced to write-down or write-off assets, restructure operations, or incur impairment or other charges."[33]  It also stated that the acquisition of a company like China Water may negatively effect the Company's market perceptions or its common stock and cause it to violate net worth or other covenants as a result of obtaining post-combination debt financing.[34]  These disclosures were repeated in amendments to the Form filed on July 25, August 22, September 30, and October 1, 2008, and the Form S-1 registration statement filed on October 23, 2008, and an amendment filed on November 5, 2008.

The merger was renegotiated allegedly due to market instability, resulting in the September 29, 2008 purchase price reduction to just over $400 million; $120 million less in cash consideration.[35]  In addition, Xu agreed to reduce the cash proceeds he

---

[30] D.I. 71 Ex. A at 20-32.
[31] *Id.* at 34-36.
[32] *Id.* at 32.
[33] *Id.*
[34] *Id.*
[35] D.I. 52 ¶¶ 77, 80, 220.

was to receive from the merger from $5.00 per share to $2.77 per share for his 5.4 million shares of China Water.[36] To induce China Water shareholders to do the same, Xu agreed to transfer 7.6 million of his China Water shares to its shareholders.[37]

On October 2, 2008, the Company issued the joint proxy and filed it with the SEC, recommending its shareholders to approve the merger.[38] The joint proxy included, *inter alia*, the merger agreement, a registration statement filed with the SEC, and the financial statements of China Water and the Company.[39] The proxy listed risk factors and deficiencies in China Water's internal controls, and stated that its historical operating results may not provide a meaningful basis for evaluating its business, financial performance, and future prospects.[40] It also stated that it is more than a remote likelihood that a material misstatement of the financial statement will not be prevented or detected on a timely basis by employees in their normal course of work.[41] The proxy restated the risk factors and the due diligence results described in Form S-4.[42] The proxy showed that China Water had a net loss of $36.55 million in 2007 and a projected loss of $22.01 million for the first six months ending June 30, 2008.[43]

The Company nevertheless reassured investors in the proxy that it was comfortable with the stated deficiencies, that it expected China Water to achieve record

---

[36] *Id.* ¶¶ 78, 220.
[37] *Id.* ¶¶ 79, 220.
[38] *Id.* ¶¶ 10, 12, 94-95, 171-72.
[39] *Id.* ¶ 171.
[40] D.I. 71 Ex. B at 33-34.
[41] *Id.*
[42] *Id.* at 28-46.
[43] *Id.* at 140-41.

results,[44] and that China Water's operations and value would exceed the qualifying business combination requirement.[45] Based on these and other reasons, the board of directors encouraged shareholders to vote in favor of the merger and to amend the certificate of incorporation to provide for the Company's perpetual existence.[46] The change in the certificate would absolve the requirement that the Company dissolve and return the IPO funds if it failed to complete a qualifying business combination within twenty-four months of the IPO.[47] After soliciting votes through a joint Proxy/Prospectus, the stockholders secured the merger on October 30, 2008 at a special stockholder meeting where the required majority voted to approve the merger and amend the certificate of incorporation. The merger closed the same day.[48]

*Post-Merger*

Approximately five months after the merger, Xu resigned as president and CEO of China Water and from the Company's board of directors.[49] The agreement between Xu and the Company provided for the release of Xu's 3,500,000 shares in the Company and the Company's fourteen million dollar payment to Xu.[50] On May 8, 2009, the Company issued its financial results for the first quarter following the merger.[51] It disclosed financial results inconsistent with China Water's historical and projected

---

[44] D.I. 52 ¶¶ 11-12, 175.
[45] *Id.* ¶¶ 97, 180.
[46] *Id.* ¶¶ 12, 97, 180.
[47] *Id.* ¶ 100.
[48] *Id.*
[49] *Id.* ¶ 112.
[50] *Id.* ¶¶ 112, 224.
[51] *Id.* ¶¶ 116-17.

financial data, and China Water's value was written down by $184 million.[52]  It disclosed that China Water's prior management misrepresented the strength of its business, and may have diverted corporate assets.[53]  It also disclosed that the Company cancelled 15,527,900 common shares and approximately 1.5 million shares underlying warrants that were issued to former China Water management and insiders.[54]  The market reacted negatively to these disclosures, decreasing the price of the Company's common shares by 13.2%; $4.99 on May 7, 2009, to $4.33 the next day.[55]  The price of the Company's warrants fell 25.5%, from $0.90 to $0.7075 during the same time frame.[56] By the third quarter after the merger, China Water's goodwill had been written down from $384.72 million, the date of the joint proxy, to $6.3 million.[57]  On February 23, 2010, China Water's total value had been written down to $21 million, a 96% reduction from its $625 million initial price.[58]

### B. Parties' Contentions

*Haberkorn's Position*

While the Company's financial statements in May 2009 noted that China Water and Xu misrepresented the strength of China Water's business, in subsequent litigation in the Delaware Court of Chancery, defendants revealed the details of Xu's fraud and admitted that they knew of red flags and certain indicators of fraud prior to and after the

---

[52] *Id.* ¶¶ 117, 232.
[53] *Id.*
[54] *Id.* ¶¶ 118, 233.
[55] *Id.* ¶ 236.
[56] *Id.* ¶ 237.
[57] *Id.* ¶¶ 126, 128.
[58] *Id.* ¶¶ 18, 127.

shareholder vote as a result of the due diligence.  They confirmed that Xu intentionally overstated China Water's operating results and financial position prior to the merger, thereby artificially inflating the Company's operating results and reported financial position.[59]  They acknowledged that China Water's CFO was reporting a separate set of numbers to Chinese officials at the same time Xu was providing overstated financial reports to the SEC.[60]  Haberkorn argues that this constitutes as a concession to outright falsification of China Water's financial information.  Haberkorn asserts that defendants and the Company failed to verify the accuracy of China Water's reported revenue and value added tax ("VAT") liabilities, and simply requested that China Water reserve funds for additional VAT payments without disclosing these details and other falsifications in China Water's amended financial statements, which were filed prior to the vote on the merger.  Instead, defendants told shareholders that their due diligence was "extensive" and indisputably recommended the merger even though the fraud rendered China Water worthless as a going concern, as evidenced by the Company's goodwill write-downs.

Contrary to defendants' statements in their proxy solicitation applauding Xu's educational background and experience in the water business, Haberkorn avers defendants admitted in the Delaware litigation that the Company had not completed a basic background check on Xu prior to the merger closing.  When they did, according to Haberkorn, they discovered that:  Xu falsified his educational and employment history; Xu was not his real name; he was a convicted felon with ties to criminal organizations;

_____

[59] *Id.* ¶¶ 21, 23, 60, 74-75, 104-15, 124, 138, 141, 167, 178-79.
[60] *Id.* ¶¶ 21, 73, 258.

and stole millions of dollars from China Water.[61]  Haberkorn maintains that these are the true reasons for Xu's resignation.  Haberkorn argues the Delaware litigation revealed that the Company secretly agreed to reimburse Xu for the 7.6 million China Water shares he transferred to China Water shareholders during the merger renegotiation, thus undermining defendants' rationale of market instability for reducing the price.[62]  In disseminating the materially false and misleading joint proxy and other solicitation materials without confirming the veracity of China Water's reported operating results and financial positions, particularly after discovering Xu's background, Haberkorn argues that defendants breached their disclosure obligations to the Company's shareholders and deprived them of their right to cast an informed vote on the merger.

Lastly, Haberkorn argues defendants knew prior to the merger vote that the acquisition did not constitute a qualifying business combination, and that the Company failed to complete such a transaction within the twenty-four month time period. Haberkorn argues that disclosure of the undisclosed information would lead to the Company's dissolution, rendering defendants' investments worthless.  Thus, Haberkorn states, by misleading the shareholders to approve the merger and amending the certificate of incorporation, defendants improperly and simultaneously dissolved their personal liability to the shareholders for the Company's failure to complete a qualifying business combination and preserved their investment, thereby reaping windfall gains.

In sum, Haberkorn claims that defendants and the Company:  (1) acted negligently by making misleading statements and omitting information regarding China

---

[61] *Id.* ¶¶ 21, 63.
[62] *Id.* ¶¶ 21, 79, 221.

Water's past financial and operating results, its past and future growth prospects, the managers' experience, valuation of China Water, and the level of diligence performed by the Company; (2) employed devices, schemes, and artifices to defraud, made untrue statements of material facts or omitted material facts so the statements were misleading; (3) engaged in acts, practices and a course of business that operated as a fraud or deceit on the class in connection with its purchase of securities in the class period; (4) acted with scienter in that they had actual knowledge of the misrepresentation and omissions of material facts, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts when such facts were available to them; and (5) denied the class the option to make an informed decision in voting on the merger, resulting in damages as a direct and proximate cause of the misleading statements and omissions.  These claims constitute violations of §§ 10(b), 14(a), 20(a) of the Act.[63]

*Defendants' Position*

Defendants argue that Haberkorn's claims are a classic case of fraud by hindsight; the very type Congress sought to deter through the PSLRA.  Defendants argue that Haberkorn alleges, with no supporting facts, that the disclosed financial results in May 2009 corrected the false and misleading information, and the Company's stock price and warrants fell in response to the so-called corrective disclosures.  They aver that Haberkorn's arguments are conclusory in nature and assume that defendants had knowledge of the fraud prior to the merger.  Defendants assert that they did not

---

[63] *Id.* ¶¶ 1, 26.

learn of China Water and Xu's activities until after the merger, which Haberkorn admits and acknowledges in the amended complaint, and thus, there was no duty to disclose the purported fraud in the absence of any lack of awareness.

Defendants move to dismiss all claims alleged in the amended complaint pursuant to Rules 8, 9(b), 12(b)(2), and 12(b)(6) of the FED. R. CIV. P., and the PSLRA. First, defendants argue that the court lacks personal jurisdiction over individual defendants because none of them reside in Delaware and their only connection to Delaware is as officers and directors of a Delaware-incorporated company. Second, defendants contend that Haberkorn failed to raise a strong inference that each defendant acted negligently under § 14(a). Third, they note that Haberkorn has not alleged the requisite state of mind with particularity as required by the PSLRA and Rules 8 and 9. Fourth, defendants maintain that the securities prices declined for a reason unrelated to the alleged fraud; they declined due to the overall collapse of the stock market, and not as a result of any corrective disclosure. Because causation has not been proven, defendants purport that all claims under §§ 14(a) and 10(b) are foreclosed. Lastly, defendants argue that Haberkorn's failure to plead a primary violation of the securities laws precludes derivative control person liability under § 20 of the Act.

## III.  STANDARD OF REVIEW

### A. Motion to Dismiss Based on Lack of Personal Jurisdiction

Rule 12(b)(2) compels a court to dismiss a claim against a defendant for lack of

personal jurisdiction.[64]  When reviewing a motion to dismiss based upon this defense,

although plaintiff has the burden of presenting the facts "with reasonable particularity"[65]

to establish jurisdiction, "a court must accept as true all allegations of jurisdictional fact

made by the plaintiff and resolve all factual disputes in the plaintiff's favor."[66]  To meet

this burden, plaintiff "must produce 'sworn affidavits or other competent evidence,' since

a Rule 12(b)(2) motion 'requires resolution of factual issues outside the pleadings.'"[67]

### B. Motion to Dismiss for Failure to State a Claim for Which Relief Can Be Granted

Rule 8(a)(2) requires a pleading to contain "a short and plain statement of the

claim showing that the pleader is entitled to relief"[68] in order to survive a motion to

dismiss.  Rule 12(b)(6) compels a court to dismiss a claim for "failure to state a claim

upon which relief can be granted."[69]  The pleading need not describe in detail the factual

allegations supporting the claim;[70] all that is required is a short and plain statement that

"must simply 'give the defendant fair notice of what the plaintiff's claim is and the

---

[64] FED. R. CIV. P. 12(b)(2).

[65] *Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.*, 739 F. Supp. 2d 686, 698 (D. Del. 2010) (citing *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n.*, 819 F.2d 434, 437 (3d Cir. 1987)).

[66] *Snowstorm*, 739 F. Supp. 2d at 698 (citing *Traynor v. Liu*, 495 F. Supp. 2d 444, 448 (D. Del. 2007)); *see also Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002) (quoting *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992)).

[67] *Snowstorm*, 739 F. Supp. 2d at 700 (quoting *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 67 n.9 (3d Cir. 1984)).

[68] FED. R. CIV. P. 8(a)(2).

[69] FED. R. CIV. P. 12(b)(6).

[70] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

grounds upon which it rests.'"[71] A plaintiff, however, must "provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'"[72] The "allegations must 'raise a right to relief above the speculative level on the assumption that all of the complaint's allegations . . . are true (even if doubtful in fact).'"[73] In other words, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[74] This connotes that the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and it must provide "more than a sheer possibility that a defendant has acted unlawfully."[75]

## IV. DISCUSSION

### A. Personal Jurisdiction Over Defendants

A court must view the correlation between the defendant, the forum, and the litigation when deciding if personal jurisdiction exists.[76] Defendants argue that to establish personal jurisdiction, Haberkorn must first prove that the court has statutory authority to exercise jurisdiction over a nonresident of the forum state under that state's

---

[71] *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

[72] *Stubbs v. Bank of America Corp.*, C.A. No. 08-108-SLR-LPS, 2010 WL 659911, at *1 (D. Del. Feb. 23, 2010) (quoting *Lorah v. Dep't of Nat. Res. and Envtl. Control*, C.A. No. 06-539-SLR, 2007 WL 2049908, at *2 (D. Del. July 16, 2007)); *see also Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555).

[73] *Stubbs*, 2010 WL 659911, at *1 (quoting *Lorah*, 2007 WL 2049908, at *2); *see also Twombly*, 550 U.S. at 545, 555-56.

[74] *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).

[75] *Id.* (citing *Twombly*, 550 U.S. at 556).

[76] *Snowstorm*, 739 F. Supp. 2d at 699.

long-arm statute.[77]  Second, he must demonstrate that the nonresident defendant has

sufficient "minimum contacts"[78] with the forum state by establishing "either that the

particular cause of action sued upon arose from the defendant's activities within the

forum state ('specific jurisdiction') or that the defendant had 'continuous and systematic'

contacts with the forum state ('general jurisdiction')."[79]  In determining the sufficiency of

defendant's contact with the forum state in the context of specific jurisdiction in federal

court, a court should examine whether "the defendant purposefully avails itself of the

privilege of conducting activities within the forum [s]tate, thus invoking the benefits and

protections of its laws."[80]  Exercise of jurisdiction in federal court must comport with Fifth

Amendment requirements of Due Process[81] and must not "offend 'traditional notions of

fair play and substantial justice.'"[82]

Where a plaintiff's claim is based upon federal law, however, particularly the

Securities Exchange Act of 1934, jurisdiction is governed by § 27 of the Act,[83] which

states in relevant part that:

> The district courts of the United States . . . shall have exclusive jurisdiction
> of violations of this chapter or the rules and regulations thereunder, and of all
> suits in equity and actions at law brought to enforce any liability or duty
> created by this chapter or the rules and regulations thereunder.  Any criminal
> proceeding may be brought in the district wherein any act or transaction

---

[77] *Reach & Assocs., P.C. v. Dencer*, 269 F. Supp. 2d 497, 502 (D. Del. 2003) (citing FED. R. CIV. P. 4(e) and DEL. CODE ANN. tit.10 § 3104(c) (2011)).

[78] *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

[79] *Provident Nat'l Bank,* 819 F.2d at 437 (quoting *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414, 416 (1984)).

[80] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

[81] *See Pinker*, 292 F.3d at 369.

[82] *Int'l Shoe*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

[83] 15 U.S.C. § 78aa (2010).

constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in [the district wherein any act or transaction constituting the violation occurred] or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.[84]

Section 27 authorizes nationwide service of process for claims based on violations of the Act,[85] which in turn permits a "nationwide contacts analysis."[86] Under this analysis, "the jurisdiction of a federal court need not be confined by the defendant's contacts with the state in which the federal court sits" and "the relevant forum for analyzing the extent of the defendant's contacts is the United States as a whole."[87] Thus, neither the forum state's long-arm statutes nor Fourteenth Amendment Due Process concerns are applicable to the analysis of sufficient minimum contacts under this federal question.[88] The Third Circuit has applied the nationwide contacts test in cases involving foreign defendants.[89] Neither the Third Circuit nor this court have prohibited the application of the nationwide contacts test to domestic defendants.[90] Indeed, this court has recently

---

[84] *Id.*

[85] *Id.*

[86] *Snowstorm*, 739 F. Supp. 2d at 699.

[87] *Pinker*, 292 F.3d at 369.

[88] *See Snowstorm*, 739 F. Supp. 2d at 700.

[89] *See In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 298 (3d Cir. 2004); *see also Pinker*, 292 F.3d at 369.

[90] *See Pinker*, 292 F.3d at 368-70 (sanctioning standard of authorizing personal jurisdiction over nonresident of forum state based on nationwide contacts test without limiting its application only to foreign defendants); *see also Howard Hess Dental Labs. Inc. v. Dentsply Intern., Inc.*, 516 F. Supp. 2d 324, 337 (D. Del. 2007) (acknowledging that holding in *In re Auto. Refinishing Paint*, 358 F.3d at 305-06 is not "limited to jurisdiction over foreign corporations").

applied the nationwide contacts test to a domestic defendant.[91]

Defendants reply that Fifth Amendment Due Process concerns must still apply in cases involving federal statues that authorize nationwide service of process.[92] Defendants rely on outside jurisdictions as well as past decisions from this jurisdiction for the proposition that sufficient minimum contacts must still be established within the forum state to comport with due process.[93]  Defendants' argument, however, is unpersuasive.  A federal court in a § 27 federal question case is not constrained to the normal personal jurisdiction requirements of "minimum contacts" within certain districts or states.[94]  "Due process concerns under the Fifth Amendment are satisfied if a federal statute provides for nationwide service of process in federal court for federal question cases."[95]  Thus, the only issue left to determine is whether defendants had minimum contacts with the United States, which is undisputed by both sides.  Even if nation-wide contacts were not the proper standard employed in this securities dispute, defendants would be hard-pressed to prove that they had not purposefully availed themselves to the privileges of conducting activities within this forum.  The subsequent litigation in the Chancery Court of Delaware ("the Delaware Litigation") not only involved the Company, its private shareholders, and former employees of China Water, but also involved a

---

[91] *See Snowstorm*, 739 F. Supp. 2d at 699-700.

[92] D.I. 80 at 5-7.

[93] *See In re Auto. Refinishing Paint*, 358 F.3d at 298-99; *Pinker*, 292 F.3d at 370-71; *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1210 (10th Cir. 2000); *ESAB Group, Inc. v. Centritcut, Inc.*, 126 F.3d 617, 627 (4th Cir. 1997); *Republic of Panama v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997); *D'Addario v. Geller*, 264 F. Supp. 2d 367, 387 (E.D. Va. 2003).

[94] *Snowstorm*, 739 F. Supp. 2d at 700.

[95] *Id.* (citing *FS Photo, Inc. v. PictureVision, Inc.*, 48 F. Supp. 2d 442, 445 (D. Del. 1999)).

counterclaim by the Company.[96]  Thus, defendants are subject to personal jurisdiction with respect to Haberkorn's claims.

### B. Haberkorn's Securities Claim Under §§ 10(b) and 14(a) of the Act

Defendants also move to dismiss Haberkorn's §§ 10(b) and 14(a) claims for failure to state a claim upon which relief may be granted.  When alleging claims of fraud or mistake, Rule 9(b) requires a party to plead "with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[97]  "Although a plaintiff is not required to allege every material detail - such as date, location, or time - a plaintiff must plead the circumstances of the fraud with sufficient particularity 'to place defendants on notice of the precise misconduct with which they are charged.'"[98]  Plaintiff must at least "support [his] allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story' - that is, the 'who, what, when, where, and how of the events at issue."[99]  Rule 8(a) controls the second sentence in Rule 9(b).[100]  Complaints that allege a violation of § 10(b) of the Act must meet the

---

[96] *See generally Xu v. Heckann Corp.*, C.A. No. 4637-CC, 2009 WL 3440004 (Del. Ch. Oct. 26, 2009).

[97] FED. R. CIV. P. 9(b) (2011).

[98] *Stubbs v. Bank of America Corp.*, C.A. No. 08-108-SLR-LPS, 2010 WL 659911, at *1 (D. Del. Feb. 23, 2010) (quoting *Eames v. Nationwide Mut. Ins. Co.*, C.A. No. 04-1324-JJF-LPS, 2008 WL 4455743, at *13 (D. Del. Sept. 30, 2008), *aff'd* C.A. No. 08-4125, 2009 WL 3041997 (3d Cir. Sept. 24, 2009)); *see also Seville Indus. Mack Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984).

[99] *Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.*, 739 F. Supp. 2d 686, 701 (D. Del. 2010) (quoting *In re Suprema Specialities, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006)).

[100] *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1954 (2009).

[A] rigid rule requiring the detailed pleading of a condition of mind would be undesirable because, absent overriding considerations pressing for a

higher pleading standard of 9(b).[101] "In contrast to § 10(b) and Rule 10(b)(5), scienter is not a necessary element in alleging a section 14(a) claim."[102] The Third Circuit has recognized, however, that when security claims "sound in fraud," the enhanced requirements of Rule 9(b) will still apply.[103]

The PSLRA was enacted by Congress to prevent misuse of securities class actions and to protect all parties associated with the capital markets from abusive securities litigation practices.[104] In effectuating this objective, the Act requires a heightened pleading standard in order to survive a motion to dismiss. First, when a plaintiff in a private action "alleges that the defendant made [a false] statement of a material fact[] or omitted to state a material fact necessary in order to make the statements made . . . not misleading[,]" the pleading must "specify each statement

---

specificity requirement, as in the case of averments of fraud or mistake, the general 'short and plain statement of the claim' mandate in Rule 8(a) . . . should control the second sentence of Rule 9(b).

*Id.* (citations omitted).

[101] *Snowstorm*, 739 F. Supp. 2d at 701.

[102] *Cal. Pub. Employees' Ret. Sys. v. Chubb*, 394 F.3d 126, 143-44 (3rd Cir. 2004).

[103] *In re Suprema Specialties*, 438 F.3d at 270.

[104] H.R. REP. NO. 104-369, at 31 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730, 730. The abusive practices in which Congress was concerned included:

(1) the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action; (2) the targeting of deep pocket defendants, including accountants, underwriters, and individuals who may be covered by insurance, without regard to their actual culpability; (3) the abuse of the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle; and (4) the manipulation by class action lawyers of the clients whom they purportedly represent.

*Id.*

alleged to have been misleading, the reason[s] why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."[105] Secondly, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" whenever a plaintiff may recover money damages based solely on evidence that defendant acted with the scienter.[106]

### Section 14(a) of the Exchange Act and Rule 14a-9

Section 14(a) makes it "unlawful for any person . . . to solicit or to permit the use of his name to solicit any proxy or consent or authorization" in contravention of SEC rules and regulations.[107]  Rule 14a-9 states that no proxy solicitation shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is [materially] false or misleading . . . , or which omits to state any material fact necessary" to render "the statements . . . not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."[108]  To defeat a motion to dismiss, plaintiff must show that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials,

---

[105] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (quoting 15 U.S.C. § 78u-4(b)(1) (2010)).
[106] 15 U.S.C. § 78u-4(b)(2) & (3)(A) (2010).
[107] 15 U.S.C. § 78n(a) (2010).
[108] 17 C.F.R. § 240.14a-9 (2010).

was an essential link in the accomplishment of the transaction."[109]  Information is
material "if there is a substantial likelihood that a reasonable shareholder would
consider it important in deciding how to vote."[110]  Determination of materiality, however,
is a mixed question of fact and law.[111]

Defendants first argue that the § 14(a) claims should be dismissed because
Haberkorn has impermissibly relied on group pleading in naming individual defendants.
Defendants' arguments, however, are unpersuasive.  The plain text of the statute
applies to "any person" that "permits[s] the use of his name to solicit any proxy."[112]  The
Third Circuit has held that the PSLRA abolished the group pleading doctrine, which
"allows a plaintiff to plead that defendants made a misstatement or omission of a
material fact without pleading particular facts associating the defendants to the alleged
fraud."[113]  Claims must be pleaded with specificity with respect to "the role of each
defendant, demonstrating each defendant's involvement in misstatements and
omissions."[114]  Including individual defendants solely because of their status as officers
and directors of the company is group pleading and thus not allowed.[115]

Here, the amended complaint does not rest solely on an individual defendant's
relationship to the Company.  Instead, it alleges that each defendant specifically

---

[109] *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007)
(citing *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992) (citing *Mills v. Elec.
Auto-Lite Co.*, 396 U.S. 375, 385 (1970))).
[110] *Id.* (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).
[111] *Gen. Elec.*, 980 F.2d at 932 (citing *TSC Indus.*, 426 U.S. at 450).
[112] 15 U.S.C. § 78n(a) (2010).
[113] *Snowstorm*, 739 F. Supp. 2d at 702-03 (citing *Winer Family Trust v. Queen*,
503 F.3d 319, 334-37 (3d Cir. 2007)).
[114] *Winer Family Trust*, 503 F.3d at 335-37.
[115] *Id.*

indicated in the Joint Proxy that they approved the merger.[116]  Further, the

recommendations for the merger were formulated after reviewing China Water's

operation and business and financial results.[117]  Unless a director formally dissents and

disassociates himself from the proxy solicitation, that director is considered to be

soliciting proxies on behalf of management and thus, is liable for misstatements

contained in the proxy materials.[118]  The amended complaint therefore, passed the

threshold of group pleading because individual defendants allowed their names to be

used in connection with the proxy solicitations.

Second, defendants argue Haberkorn has not alleged defendants' negligence

with the requisite particularity.  The standard of culpability under § 14(a) is one of

negligence.[119]  This court has declined to apply the PSLRA's heightened pleading

requirements that a plaintiff "state with particularity facts giving rise to a strong inference

that the defendant acted with the required state of mind" to claims brought under         §

14(a).[120]  "Thus, an individual who participates in a solicitation which utilizes materially

false or misleading statements is liable if he knew or should have known that the

statements were false or misleading."[121]  Defendants argue that "fraud by hindsight," the

implication that bad results mean that statements or actions at the time of the incident

---

[116] D.I. 52 ¶ 19

[117] *Id.* ¶¶ 12, 97

[118] *Gould v. American Hawaiian Co. S.S.*, 351 F. Supp. 853, 860 (D. Del. 1972), *aff'd*, 535 F.2d 761, 777-78 (3d Cir. 1976).

[119] *Id.*; *see also Chubb*, 394 F.3d at 168.

[120] *In re U.S. W. Sec. Litig.*, 201 F. Supp. 2d 302, 305-06 (D. Del. 2002) (citing *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 729 (D. Del. 2002) (citing 15 U.S.C. § 78u-4(b)(2) (2010))).

[121] *Gould*, 351 F. Supp. at 860.

must have been untrue or misleading, is present here and is grounds for failing to state a claim.[122]

In this case, however, hindsight has not been used as the sole factor in indicating negligence or fraud on behalf of defendants. Instead, the amended complaint relies on the Delaware Litigation, which involved both companies and their officers.[123] It alleged that during the Delaware Litigation, defendants admitted that Ernst & Young LLP informed the Company that Xu justified China Water's inconsistent VAT payments by claiming it was common practice in China.[124] The Delaware Litigation also indicated that the Company promised to reimburse Xu for 7,600,00 shares of China Water stock used to induce shareholders to approve a merger amendment that reduced the amount of cash the Company had to pay.[125] Both of these events occurred prior to the merger, yet they were not disclosed to the shareholders via the proxy solicitation. Instead, the amended complaint alleges that these facts were not revealed until the Delaware Litigation, which occurred over seven months after the deal was approved.[126] These admissions alone show that defendants were aware, and chose not to disclose, information that a reasonable shareholder would like to know when determining whether to approve the pending merger. Even if the heightened pleading requirements applied to this dispute, these admissions still create a "strong inference" that defendants knew or should have known this information was material to the shareholders. Viewing all

---

[122] *In re Suprema Specialties*, 334 F. Supp. 2d at 647, *rev'd* on other grounds, 438 F.3d 256 (3d Cir. 2006).
[123] D.I. 52 ¶ 2.
[124] *Id.* ¶ 21.
[125] *Id.*
[126] *Id.*

facts and inferences in the most favorable light, Haberkorn has plead sufficient facts to indicate that defendants knew or should have known that material information was omitted from the proxy solicitation in violation of §14(a) of the Act.

### Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) prohibits any person from using or employing "any manipulative or deceptive device or contrivance in contravention of" SEC rules and regulations "in connection with the purchase or sale of any security."[127]  Rule 10b-5 creates a private cause of action for investors making it unlawful for any person, in connection with the purchase or sale of any security, "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary" to render "the statements made . . . not misleading, or © [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."[128]  To state a claim under Rule 9(b), a plaintiff must plead "(1) a specific false representation or omission of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage."[129]  To defeat a motion to dismiss under §10(b) and Rule 10b-5 in respect to the PSLRA's heightened pleading requirements, a plaintiff must allege that each defendant (1) made a misstatement or an omission of material fact; (2) with scienter; (3) in connection with the purchase or the sale of a security; (4) upon which the

---

[127] 15 U.S.C. § 78j(b) (2010).
[128] 17 C.F.R. § 240.10b-5 (1951).
[129] *Snowstorm*, 739 F. Supp. at 701 (citing *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006)).

plaintiff reasonably relied and; (5) that the plaintiff suffered an economic loss; (6) which was proximately caused by its reliance on the misstatement or omission.[130]  To the extent that Rule 9(b) conflicts with the PSLRA, the PSLRA supersedes in §10(b) and Rule 10b-5 actions.[131]

Here, the only element in dispute is whether defendants acted with scienter.  The requisite scienter is defined as the intent to deceive, manipulate, or defraud[132] and necessitates a "knowing or reckless state of mind."[133]  The Third Circuit has defined recklessness as "highly unreasonable conduct, involving not . . . simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."[134]  In analyzing whether an inference is "strong," a court must consider both those inferences presented by plaintiff and "competing [nonculpable] inferences rationally drawn from the facts alleged.[135]

"To qualify as 'strong' . . . , an inference of scienter must be more than merely

---

[130] *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 341-42 (2005); *Snowstorm*, 739 F. Supp. 2d at 702 (citing *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir. 2009)).

[131] *Snowstorm*, 739 F. Supp. 2d at 701 (citing *In re Suprema Specialties*, 438 F.3d at 277).

[132] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)); *Avaya*, 564 F.3d at 252 (quoting *Hochfelder*, 425 U.S. at 193).

[133] *Avaya*, 564 F.3d at 252 (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534-35 (3d Cir.1999)).

[134] *In re Suprema Specialties*, 438 F.3d at 276 (quoting *SEC v. Infinity Group Co.*, 212 F.3d 180, 192 (3d Cir. 2000)).

[135] *Tellabs*, 551 U.S. at 314, 323-24.

plausible or reasonable,"[136] however, it need not be "irrefutable" or "even the most plausible."[137] "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[138] "Omissions and ambiguities count against inferring scienter"[139] and a motive of personal financial gain is a relevant consideration because it "weigh[s] heavily in favor of a scienter inference, [although] the absence of a motive allegation is not fatal."[140] The relevant inquiry, however, is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."[141]

Defendants argue that Haberkorn's evidence of scienter is not as compelling as any opposing direct evidence of non-fraudulent intent. One particular argument defendants make is that the Company's reliance on China Water accountants infers non-fraudulent intent. Additionally, defendants argue that Haberkorn's allegations of motive and opportunity, the scope of the goodwill impairment, the renegotiation of the purchase price, and Xu's departure from China Water collectively do not raise an inference of scienter, but instead are a "puzzle-style approach."

Taking all facts alleged in the amended complaint as true, however, indicates that the Company was aware that China Water had been intentionally understating their

---

[136] *Id.* at 314.
[137] *Id.* at 324.
[138] *Id.*
[139] *Avaya*, 564 F.3d at 268 (quoting *Tellabs*, 551 U.S. at 326).
[140] *Tellabs*, 551 U.S. at 325; *see also Snowstorm*, 739 F. Supp. 2d at 705 ("motive may be a factor in analyzing the defendant's state of mind").
[141] *Tellabs*, 551 U.S. at 322-23.

tax liabilities.   In addition, the Company demanded that China Water restate its 2007 VAT liability, thus further confirming that defendants were aware of reporting discrepancies.  Finally, although China Water never restated its 2007 VAT liability, defendants failed to disclose these discrepancies in the Joint Proxy.  Thus, the Company allowed the Joint Proxy to contain information it was aware of as being incorrect, yet failed to inform the shareholders of the inaccuracies.  Based on these allegations alone, one can make a strong inference that these disclosures were withheld from shareholders in order to mislead or deceive them and were done so knowingly or recklessly.

Defendants claim of a "puzzle-style approach" is also misguided.  As indicated by prior case law, an inquiry into scienter is not an individualized critique of each "puzzle" piece, but instead a view of the entire picture and whether the pieces together make a "strong inference" of scienter.  Not only does the aforementioned information that defendants possessed about China Water's VAT liabilities rise to the level of "strong inference," but the other alleged facts pertaining to defendant's motive and the resignation of Xu only strengthen this already strong inference of scienter.  Although pieces on their own may not be sufficient, looking at these facts collectively and all reasonable inferences in the most favorable light yields the conclusion that Haberkorn has plead the required level of scienter for a §10(b) claim.

**Loss Causation**

Additionally, plaintiff must establish economic loss and proximate causation

under the requirements of Rule 8(a) to state a claim under §§ 14(a) and 10(b).[142]  Loss

causation is defined as the causal connection between the misrepresentation and the

loss.[143]  A plaintiff must at minimum show the subsequently revealed information

demonstrates that "the defendant misrepresented or omitted the very facts that were a

substantial factor in causing the plaintiff's economic loss,"[144] that is, the decline in the

security price.  "An inflated purchase price will not itself constitute or proximately cause

the relevant economic loss" because a subsequent lower price may be the result of

"changed economic circumstances, changed investor expectations, new industry-

specific or firm-specific facts, conditions, or other events, which taken separately or

together account for some or all of that lower price."[145]  A plaintiff "may include loss of a

possible profit or benefit, an addition to the value of one's investment, unless the loss is

---

[142] *See Dutton v. Harris Stratex Networks, Inc.*, 270 F.R.D. 171, 181 (D. Del. 2010) (citing *Dura Pharm.*, 544 U.S. at 346 ("[T]he Federal Rules of Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' . . . [N]either the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss.") (citations omitted)); see also *In re DaimlerChrysler AG Sec. Litig.*, 294 F. Supp. 2d 616, 626, 629 (D. Del. 2003).

[143] *Dutton*, 270 F.R.D. at 181 (quoting *Dura Pharm.*, 544 U.S. at 342).

[144] *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007); *see also In re DaimlerChrysler*, 294 F. Supp. at 626 (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 181 n.24 (3d Cir. 2001) (plaintiff must prove that "fraudulent conduct proximately caused or substantially contributed to causing its economic loss")).

[145] *Dura Pharm.*, 544 U.S. at 342-43; *see also McCabe*, 494 F.3d at 428-29.
    [L]osses due to a subsequent decline in the market, or insolvency of the corporation brought about by business conditions or other factors in no way related to the representations will not afford any basis for recovery. It [i]s only where the fact misstated was of a nature calculated to bring about such a result that damages for it can be recovered.

*Id.* (citations omitted).

wholly speculative."[146]

Haberkorn first relies on the chain of events that occurred on May 8, 2009 to allege proper causation.   On that day, the Company reported a $184 million goodwill impairment on China Water and revealed that China Water "misrepresented the strength" of its operations and "may have diverted corporate assets."[147]  In light of these announcements, the price of the Company's common shares and warrants fell on that day by 13.2% and 25.5%, respectively.[148]  Defendants argue that causation cannot be adequately established because the economy had been experiencing a general economic downturn.  They relied on the fact that the Company's stock had been substantially declining, from $7.24 on the day of the merger vote to $4.99 the day before the corrective disclosure, to argue that the chain of causation was broken.  Haberkorn responds that the influence of market factors is not an issue that should be resolved at the pleading stage.[149]  Instead, "[s]o long as the alleged misrepresentations were a substantial cause of the inflation in the price of a security and in its subsequent decline in value, other contributing forces will not bar recovery."[150]  Viewing all facts and inferences in the light most favorable to plaintiff, Haberkorn has pled with sufficient particularity that once the disclosures and all the corresponding misrepresentations were made public to the shareholders, the stock price, warrants and value of China

---

[146] *Tse v. Ventana Med. Sys., Inc.*, 297 F.3d 210, 220 (3d Cir. 2002) (citing *Gould v. American Hawaiian Co. S.S.*, 535 F.2d 761, 781 (3d Cir. 1976)).
[147] D.I. 52 at ¶ 232.
[148] *Id.* ¶¶ 236-37.
[149] *Semerenko v. Cendant Corp.*, 223 F.3d 165,186-87 (3d Cir. 2000).
[150] *Id.*

Water adjusted to adequately reflect the new disposition of the Company.

Regarding the loss causation required to satisfy § 14(a) of the Act, Haberkorn additionally alleges that the eligible Company shareholders were denied the IPO proceeds they would have received once the Company failed to complete a qualifying business transaction within the required twenty-four months.[151]  Defendants argue that this lost opportunity argument should fail because the alleged loss is wholly speculative. They argue that no facts have been alleged to show that, assuming a qualifying business was not met with the China Water purchase, the Company would not be able to complete a qualifying transaction within the remaining thirteen months.  These claims, again, are overlooking the minimal hurdle that Haberkorn must allege at this initial stage.  Accepting all the facts and inferences in the most favorable light, Haberkorn has plead with particularity that the omitted material facts about China Water were a substantial factor in the approval of the merger and the satisfaction of a qualifying business transaction.

## C.  Section 20(a) of the Exchange Act

Section 20(a) states that "[e]very person who, directly or indirectly, controls any person liable [under the Act is] jointly and severally liable to the same extent  . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."[152]  The term "control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the

---

[151] D.I. 52 at ¶¶ 239-41.
[152] 15 U.S.C. § 78t(a) (2010).

management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."[153]  A plaintiff "must prove not only that one person controlled another person [or entity], but also that the 'controlled person' [or entity] is liable under the Act."[154]  For secondary liability to exist, a defendant must be a culpable participant in the fraud.[155]  To state a claim under the PSLRA, a plaintiff must plead with particularity "the circumstances of both the defendant's control of the primary violator, as well as of the defendant's culpability as a controlling person."[156]  A director is not automatically liable as a controlling person.[157]  Lastly, secondary liability under § 20(a) establishes personal jurisdiction over a defendant when a federal statute provides for nationwide service of process.[158]  Thus, a defendant cannot assert the fiduciary shield doctrine to argue lack of personal jurisdiction because jurisdiction under the Exchange Act renders this doctrine inapplicable.[159]

Defendants only argument for why Haberkorn's § 20(a) claim should fail is that "[p]laintiff must first adequately plead an independent violation of the Act by some

---

[153] *Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.*, 739 F. Supp. 2d 686, 707 (D. Del. 2010) (quoting 17 C.F.R. § 240.12b-2 (2010)).

[154] *Id.* (quoting *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004)).

[155] *Id.* (citing *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 294 n.16 (3d Cir. 2006)).

[156] *Id.* (quoting *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 561 (D. Del. 2002) *aff'd*, 357 F.3d 322 (3d Cir. 2004)).

[157] *Id.* at 707-08 n.15 (quoting *In re Digital Island*, 223 F. Supp. 2d at 561).

[158] *Id.* 700-01 n.8 (citations omitted).

[159] *Id.* (citations omitted).  The doctrine states that a forum does not have jurisdiction over a defendants merely "because they are agents or employees of organizations which presumably are amenable to jurisdiction" in that particular forum. *Id.*

person controlled by the Individual Defendants."[160]  As noted previously herein, Haberkorn has propounded sufficient facts to support claims under both §§ 10(b) and 14(a).  Thus, at this stage, Haberkorn has plead with particularity that individual defendants were in control of the Company at the time of the alleged fraud.

**ORDER AND RECOMMENDED DISPOSITION**

For the reasons contained herein, I recommend that:

(1) Defendants motion to dismiss for lack of personal jurisdiction (D.I. 63) be DENIED.

(2) Defendants motion to dismiss for a failure to state a claim (D.I. 63) under § 14(a) of the Securities Act of 1934  be DENIED.

(3) Defendants motion to dismiss for a failure to state a claim (D.I. 63) under § 10(b) of the Securities Act of 1934  be DENIED.

(4) Defendants motion to dismiss for a failure to state a claim (D.I. 63) under § 20(a) of the Securities Act of 1934  be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72(b)(1), and D.DEL.LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  FED. R. CIV. P. 72(b).

The parties are directed to the Court's standing Order in Non-Pro Se matters for Objections Filed under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is

---

[160]  D.I. 70 at 20.

available on the Court's website, www.ded.uscourts.gov.


Dated: June 16, 2011                    /s/ Mary Pat Thynge
                                        UNITED STATES MAGISTRATE JUDGE