**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

IN RE HECKMANN CORPORATION        :
SECURITIES LITIGATION             :
                                  :    C. A. No. 10-378-LPS-MPT
                                  :
                                  :

## REPORT AND RECOMMENDATIONS

I.      **INTRODUCTION**

Lead plaintiff Matthew Haberkorn ("Haberkorn") and defendants[1] dispute over a

shareholder-approved merger between the Heckmann Corporation ("Company") and

China Water and Drinks, Inc. ("China Water").[2]  The amended complaint, filed on

October 8, 2010, asserts claims under §§ 10(b), 14(a), 20(a), and Rule 10b-5 of the

Securities Exchange Act of 1934 ("Securities Exchange Act") on behalf of all

shareholders who held stock in the Company as of September 15, 2008, and were

entitled to vote on the merger, and on behalf of investors who acquired securities in the

Company during the class period, May 20, 2008 to May 8, 2009.[3]  The allegations are of

fraud, recklessness, and materially false and misleading statements.[4]

Prior to the filing of the amended complaint, defendants moved to transfer to the

Central District of California,[5] which this court denied.[6]  On November 12, 2010,

_____

[1] Defendants are Richard J. Heckmann, James Danforth Quayle, Alfred E.
Osborne, Jr., Lou L. Holtz, Donald G. Ezzell, Heckmann Corporation, and China Water
and Drinks, Inc.  D.I. 52 ¶¶ 30-37.

[2] *Id.* ¶ 1.

[3] *Id.*

[4] *See generally id.* ¶¶ 135-229, 254-328.

[5] D.I. 15.

[6] D.I. 51 (finding that private and public interest factors of 28 U.S.C. § 1404(a) did
not warrant transfer); *see also* C.A. No. 10-378 LPS-MPT, 2011 WL 1219230 (D. Del.
Mar. 31, 2011) (affirming D.I. 51).

Haberkorn moved for partial modification of the Private Securities Litigation Reform Act ("PSLRA") discovery stay,[7] which this court also denied.[8]  Defendants moved to dismiss pursuant to the Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(2) and 12(b)(6); this motion was denied.[9]

On October 19, 2012, plaintiff filed a motion to certify the class.[10]  Defendants filed its answer brief in opposition of the motion on January 1, 2013.[11]  Further, defendants filed a motion to exclude the declaration of plaintiff's expert witness Zachary Nye, Ph.D.[12]  Both of these issues are now before the court.

## II.    BACKGROUND

### A.    The Merger and Events Leading Thereto

The Company is a publicly traded, "blank check company" that acquires or obtains control of operating entities through various business combinations, such as stock acquisitions and mergers.[13]  It is incorporated under Delaware law with its principle office in Palm Desert, California.[14]  In this particular instance, the Company raised funds from public investors through an initial public offering ("IPO") promising to acquire a "qualifying" operating company using the IPO proceeds, which were held in

---

[7] D.I. 57.
[8] *See* C.A. No. 10-378 LPS-MPT, 2010 WL 5887794 (D. Del. Feb. 28, 2010). (finding Haberkorn did not satisfy PSLRA requirements of necessity or undue prejudice and particularity to warrant modifying automatic stay).
[9] *See* 869 F. Supp. 2d 519 (D. Del. 2012).
[10] D.I. 184.
[11] D.I. 215.
[12] D.I. 217.
[13] D.I. 52 ¶¶ 3, 41.
[14] *Id.* ¶ 31.

escrow.[15]  The certificate of incorporation required the Company be dissolved and the IPO proceeds returned to the shareholders if it failed to accomplish a business combination with an entity whose fair value was equal to at least 80% of the Company's net assets (a qualifying business combination) within twenty-four months of the IPO.[16] The founders of the Company, i.e., defendants, were not to receive any of the proceeds upon the Company's dissolution.[17]

The IPO was completed on November 16, 2007, raising approximately $432.9 million through the issuance of 54.1 million units at $8.00 per unit.[18]  Each unit consisted of one share and one warrant, allowing the holder to purchase one share for $6.00.[19] The founders awarded themselves 14,375,000 units, or 20% of the Company, at $0.005 per unit, for a total investment of $71,875.[20]  The founders also agreed to invest $7 million in exchange for 7,000,000 warrants.[21]  These funds were placed in escrow to be paid to shareholders if the Company failed to complete a qualifying business combination.[22]  By October 30, 2008, the date of the shareholder vote, defendants would personally lose more than $287 million if the Company failed to acquire a qualifying business.[23]

---

[15] *Id.* ¶ 3.

[16] *Id.* ¶¶ 3, 45.

[17] *Id.* ¶ 46.

[18] *Id.* ¶¶ 5, 44.

[19] *Id.* ¶ 44.

[20] *Id.* ¶¶ 4, 46, 213.

[21] *Id.* ¶¶ 47, 213.

[22] *Id.* ¶ 47.

[23] *Id.* ¶¶ 46-47 (basing amount on value of securities, $280 million, and purchase of warrants, totaling $7 million).

On May 20, 2008, the Company publicized a merger agreement to acquire China Water and filed the agreement with the Securities and Exchange Commission ("SEC").[24] China Water, now incorporated under Delaware law, manufactures and distributes bottled water products in China.[25]  The agreement contained statements, representations, and warranties regarding China Water's operations and financial condition, expressing, *inter alia*, that its financial statements did not contain any materially false or misleading statements or omissions.[26]  It also stated that China Water possessed no undisclosed liabilities, paid all required taxes, and was in compliance with all applicable laws.[27]  The purchase price was $625 million; $455 million in the Company's common stock and $170 million in cash.[28]

The Company praised China Water and the merger, stating that it was a "compelling" and "special opportunity."[29]  Defendant Richard Heckmann, Chairman and CEO of the Company, projected $220 million in revenues and $70 million in net income for fiscal year 2008.[30]  The merger agreement required the Company to hold in escrow 90% of the Company's shares given to Xu Hong Bin ("Xu"), CEO and president of China Water and a director of the Company, in exchange for his China Water shares.[31]  The Company agreed to release 80% of Xu's escrowed shares on March 31, 2010, approximately eighteen months after the merger closing, and the remaining shares two

---

[24] *Id.* ¶ 52.
[25] *Id.* ¶¶ 32, 48.
[26] *Id.* ¶¶ 55-59.
[27] *Id.*
[28] *Id.* ¶¶ 6, 53.
[29] *Id.* ¶¶ 7, 111, 190.
[30] *Id.* ¶¶ 7, 12, 50, 136, 186.
[31] *Id.* ¶¶ 54, 62.

4

years after the merger closing.[32]

On June 16, 2008, the Company filed a Form S-4 registration statement for the proposed merger with the SEC.[33]  The Form disclosed several risk factors that included China Water's failure to:  (1) maintain effective internal controls over its internal audit function because it lacked sufficient qualified personnel; (2) maintain effective internal controls over the financial closing process to ensure the accurate and timely preparation of local financial statements and financial data due to an insufficient number of qualified financial and accounting staff; and (3) adequately design and operate internal controls to support the requirements of the financial reporting and period-end closing process.[34]

The Form also described the due diligence conducted by Credit Suisse, one of the Company's financial advisors, which involved weeks of meetings in China and inspections of China Water's plants.[35]  The Form acknowledged that even though extensive due diligence was performed, it could not assure that such diligence identified all material issues possibly existing in China Water or its business, or that factors outside of China Water's control would not later arise.[36]  If such an issue arose, the Form noted it may result in losses, and the Company "may be forced to write-down or write-off assets, restructure operations, or incur impairment or other charges."[37]

The Form also stated the acquisition of China Water may negatively effect

---

[32] *Id.* ¶ 62.
[33] *Id.* ¶ 171.
[34] D.I. 71 Ex. A at 20-32.
[35] *Id.* at 34-36.
[36] *Id.* at 32.
[37] *Id.*

5

market perceptions of the Company or its common stock, and potentially cause violations of net worth requirements or other covenants due to post-combination debt financing.[38]  These disclosures were repeated in amendments to the Form filed on July 25, August 22, September 30, and October 1, 2008, and the Form S-1 registration statement of October 23, 2008, and an amendment filed on November 5, 2008.

The merger was renegotiated allegedly due to market instability, resulting in the September 29, 2008 purchase price reduction to slightly over $400 million with $120 million less in cash consideration.[39]  In addition, Xu agreed to reduce the cash proceeds he was to receive from the merger from $5.00 per share to $2.77 per share for his 5.4 million shares of China Water.[40]  To induce China Water shareholders to do the same, Xu agreed to transfer 7.6 million of his China Water shares to its shareholders.[41]

On October 2, 2008, the Company issued the joint proxy and filed it with the SEC, recommending its shareholders to approve the merger.[42]  The joint proxy included, *inter alia*, the merger agreement, a registration statement filed with the SEC, and the financial statements of China Water and the Company.[43]  The proxy listed risk factors and deficiencies in China Water's internal controls, and stated its historical operating results may not provide a meaningful basis for evaluating its business, financial performance, and future prospects.[44]  It also advised it was more than a remote

---

[38] *Id.*
[39] D.I. 52 ¶¶ 77, 80, 220.
[40] *Id.* ¶¶ 78, 220.
[41] *Id.* ¶¶ 79, 220.
[42] *Id.* ¶¶ 10, 12, 94-95, 171-72.
[43] *Id.* ¶ 171.
[44] D.I. 71 Ex. B at 33-34.

likelihood that a material misstatement of the financial statement would not be prevented or detected on a timely basis by employees in their normal course of work.[45] The proxy restated the risk factors and the due diligence results described in Form S-4.[46]  The proxy showed China Water had a net loss of $36.55 million in 2007 and a projected loss of $22.01 million for the first six months ending June 30, 2008.[47]

The Company nevertheless reassured investors in the proxy that it was comfortable with the stated deficiencies, that it expected China Water to achieve record results,[48] and that China Water's operations and value would exceed the qualifying business combination requirement.[49]  Based on these and other reasons, the board of directors encouraged shareholders to vote in favor of the merger, and to amend the certificate of incorporation to provide for the Company's perpetual existence.[50]  The change in the certificate would absolve the requirement that the Company dissolve and return the IPO funds if it failed to complete a qualifying business combination within twenty-four months of the IPO.[51]  After soliciting votes through a joint Proxy/Prospectus, the merger was secured on October 30, 2008 at a special stockholder meeting, where the required majority voted to approve the merger and amend the certificate of incorporation.[52]  The merger closed the same day.[53]

---

[45] *Id.*
[46] *Id.* at 28-46.
[47] *Id.* at 140-41.
[48] D.I. 52 ¶¶ 11-12, 175.
[49] *Id.* ¶¶ 97, 180.
[50] *Id.* ¶¶ 12, 97, 180.
[51] *Id.* ¶ 100.
[52] *Id.*
[53] *Id.*

### B.    Post-Merger

Approximately five months after the merger, Xu resigned as president and CEO of China Water and from the Company's board of directors.[54] The agreement between Xu and the Company provided for the release of Xu's 3,500,000 shares in the Company and the Company's $14 million payment to Xu.[55]

On May 8, 2009, the Company issued its financial results for the first quarter following the merger.[56] It disclosed financial results inconsistent with China Water's historical and projected financial data, and China Water's value was written down by $184 million.[57] The Company revealed that China Water's prior management misrepresented the strength of its business, and may have diverted corporate assets.[58] It also advised 15,527,900 common shares and approximately 1.5 million shares underlying warrants issued to former China Water management and insiders were cancelled.[59]

The market reacted negatively to these disclosures by decreasing the price of the Company's common shares by 13.2%; $4.99 on May 7, 2009, to $4.33 the next day.[60] The price of the Company's warrants fell 25.5%, from $0.90 to $0.7075 during the same time frame.[61] By the third quarter after the merger, China Water's goodwill had been

---

[54] *Id.* ¶ 112.
[55] *Id.* ¶¶ 112, 224.
[56] *Id.* ¶¶ 116-17.
[57] *Id.* ¶¶ 117, 232.
[58] *Id.*
[59] *Id.* ¶¶ 118, 233.
[60] *Id.* ¶ 236.
[61] *Id.* ¶ 237.

written down from $384.72 million, the date of the joint proxy, to $6.3 million.[62]  On

February 23, 2010, China Water's total value had been written down to $21 million, a

96% reduction from its $625 million initial price.

## III.   STANDARD FOR EXPERT TESTIMONY

The admissibility of expert testimony is governed by Federal Rule of Evidence

("FED. R. EVID.") 702, which states in pertinent part:

> If scientific, technical or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training or
> education, may testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the testimony is
> the product of reliable principles and methods, and (3) the witness has
> applied the principles and methods reliably to the facts of the case.[63]

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court interpreted

FED. R. EVID. 702 "confides to the judges some gatekeeping responsibility in deciding

questions of the admissibility of proffered expert testimony."[64]  The Third Circuit has

analyzed Rule 702 as "embodying three distinct substantive restrictions on the

admission of expert testimony:  qualifications, reliability, and fit."[65]  Important facts to

consider in evaluating the reliability of a particular scientific or technical methodology

include:

> (1) whether a method consists of a testable hypothesis; (2) whether the
> method has been subject to peer review; (3) known or potential rate of

---

[62] *Id.* ¶¶ 126, 128.
[63] FED. R. EVID. 702.
[64] 509 U.S. 579, 600 (1993) (Rehnquist, J., concurring in part and dissenting in part).
[65] *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (explaining *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741-43 (3d Cir. 1994)).

error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.[66]

"In *Paoli*, [the Third Circuit] explained that even if the judge believes 'there are better grounds for some alternative conclusion,' and that there are some flaws in the scientist methods, if there are 'good grounds' for the expert's conclusions, it should be admitted."[67]  The question of whether an expert's testimony is admissible based on his qualifications, reliability, and fit is committed to the court's discretion.[68]

The trial judge has broad latitude in determining whether the *Daubert* factors are reasonable measures of reliability.[69]  In *Paoli*, the Third Circuit found that proffers of expert testimony do not have to "demonstrate . . . by a preponderance of evidence that the assessments of their experts are *correct*, they [need] only . . . demonstrate by a preponderance of evidence that their opinions are reliable."[70]  *Daubert* recognized "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[71]  *Daubert* emphasized the trial court must "focus" solely on principles and methodology, and not on the conclusions generated.[72]  A trial judge,

---

[66] *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1996).
[67] *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152-53 (3d Cir. 1999) (quoting *In re Paoli*, 35 F.3d at 744).
[68] *In re Paoli*, 35 F.3d at 749.
[69] *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 139 (1999).
[70] *In re Paoli*, 35 F.3d at 744.
[71] *Daubert*, 509 U.S. at 596.
[72] *Id.* at 580.

however, is to scrutinize whether such methods have been properly applied to the facts of the case.[73]

As previously stated, the determination of whether to exclude expert evidence is at the court's discretion.[74]  The Third Circuit has noted, however:

> While evidentiary rulings are generally subject to a particularly high level of deference because the trial court has a superior vantage point to assess the evidence . . . , evaluating the reliability of scientific methodologies and data does not generally involve assessing the truthfulness of the expert witness and thus is often not significantly more difficult on a cold record. Moreover, here there are factors that counsel in favor of a hard look at (more stringent review of) the district court's exercise of discretion.  For example, because the reliability standard of  702 and 703 is somewhat amorphous, there is significant risk that district judges will set the threshold too high and will in fact force plaintiffs to prove their case twice. Reducing this risk is particularly important because the Federal Rules of Evidence display a preference for admissibility.[75]

The Third Circuit has identified several factors for the court to consider in determining whether to exclude expert testimony:[76]

> (1) the prejudice or surprise in fact of the party against whom the excluded witness would have testified, (2) the ability of the party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's order.[77]

Additionally, the "'importance of the excluded testimony' should be considered."[78]

---

[73] *See id.*

[74] *In re Paoli*, 35 F.3d at 749.

[75] *Id.* at 749-50.

[76] *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F. Supp. 2d 435, 438 (D. Del. 2007).

[77] *In re Paoli*, 35 F.3d at 791.

[78] *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904 (3d Cir. 1977)).

IV.    **DR. NYE'S EXPERT TESTIMONY/REPORT**

Under Rule 702, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."[79]  Defendants argue Dr. Nye's expert opinion is not reliable, because it is not "based upon generally accepted scientific methodologies and principles."[80]  While defendants concede an event study is a "widely accepted methodology for determining whether unexpected corporate news has caused stock price movement," they claim Dr. Nye's application of this method is flawed.[81] Defendants assert an event study generally includes:  "(1) identifying and defining the event to be studied; (2) defining the length of the event window; (3) controlling for industry or market effects; and (4) estimating the effects of the event on the company's stock price."[82]

Defendants contend Dr. Nye used a subjective and non-random selection of dates to test for market efficiency, and such a methodology is not a generally accepted scientific method.[83]  Further, defendants assert plaintiff's expert did not offer a definition or "objective criteria" for determining what constituted an "earnings-related" event.[84]  In addition, Dr. Nye admitted to omitting earnings-related announcements by China Water, which were relevant to the Company's earnings.[85]  Defendants further suggest objective criteria Dr. Nye could have used instead, such as the Company and China Water's

---

[79] *Daubert*, 509 U.S. at 595.
[80] D.I. 218 at 1.
[81] *Id.* at 6.
[82] *Id.*
[83] *Id.* at 7.
[84] *Id.* at 7-8.
[85] *Id.* at 8.

announcements or all SEC filings for either company.[86]  Finally, defendants argue Dr.

Nye "cherry picked" a date from his random selection of events, where there was

statistically significant movement in the Company's stock price in response to news, and

concludes the stock price thus promptly responded to such news.[87]

While being a generally accepted method is one factor analyzed under Rule 702,

it is not the sole factor applied by the Third Circuit in a *Daubert* analysis.[88]  The court in

*Pineda* noted, "[w]e have interpreted the second requirement to mean that 'an expert's

testimony is admissible so long as the process or technique the expert used in

formulating the opinion is reliable.'"[89]  Defendants argue Dr. Nye failed to use "generally

accepted scientific and economic practices in his analysis," but defendants' argument

fails to consider any other reliability factors, such as his qualifications or relevance of his

opinion.[90]  The court in *Paoli* held, "[t]he grounds for the expert's opinion merely have to

be good, they do not have to be perfect," and even if the "scientist's methodology has

some flaws" or there are "better grounds," the expert opinion may still be admissible.[91]

The "ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability,

helpfulness turns on whether the expert's 'technique or principle [is] sufficiently reliable

so that it will aid the jury in reaching accurate results.'"[92]

Here, Dr. Nye selected "earnings-related announcements" by the Company,

---

[86] *Id.*

[87] *Id.*

[88] *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008).

[89] *Id.* (quoting *In re Paoli*, 35 F.3d at 741-42).

[90] D.I. 218 at 1.

[91] *In re Paoli*, 35 F.3d at 744.

[92] *Id.*

which included quarterly and year-end financial results.[93]  Further, he constructed a regression analysis with a "Control Period" based on dates where the company was restructured.[94]  Thus, his event study methodology meets the relatively low standard established in this circuit.

Although defendants challenge Dr. Nye's methodology, they do not provide "generally accepted scientific or economic practices" for determining market efficiency.[95] Moreover, defendants and their expert, Dr. Cox, admit Dr. Nye used an "event study" to show the stock's reaction to information in the market, which they both concede is "commonly used in securities class actions."[96]  Plaintiff highlights that Dr. Cox adopted Dr. Nye's market model as his own, further demonstrating the reliability of Dr. Nye's approach.[97]

Moreover, Dr. Cox admits the competing analysis he proffered has never been adopted by a federal court in assessing market efficiency for federal securities litigation, and thus, according to plaintiff, does not appear to be a generally accepted standard.[98] Finally, plaintiff argues that Dr. Cox admitted to not reviewing any of the information he identified as "news" to determine whether new information was being disseminated to the market, which is a "fundamental requirement of an econometric analysis of market efficiency."[99]

---

[93] D.I. 186 at 22.
[94] *Id.* at 23-24.
[95] D.I. 218 at 1.
[96] D.I. 223 at 28.
[97] *Id.*
[98] *Id.*
[99] *Id.* at 29.

Plaintiff points out defendants' critique of Dr. Nye's methodology relies heavily on the First Circuit case *In re PolyMedica Corp. Securities Litigation*.[100]  Defendants note the *PolyMedica* court excluded the opinion of an expert for determining market-efficiency for establishing the fraud-on-the-market presumption.[101]  However, in *PolyMedica*, the First Circuit established a different standard for defining an efficient market, stating that:  "[f]or application of the fraud-on-the-market theory, we conclude that an efficient market is one in which the market price of the stock *fully reflects all* publicly available information."[102]  "By 'fully reflect,' [the court] means that market price responds so quickly to new information that ordinary investors cannot make trading profits on the basis of such information."[103]

The Third Circuit, however, affirmatively declined to define "open and developed market" in *Peil v. Speiser*,[104] stating "[a]s the case at bar involves a *widely traded and established stock*, we need not consider whether we would apply the 'fraud on the market' theory in other instances."[105]  In *In re DVI, Inc. Securities Litigation*,[106] the Third Circuit noted "a perfectly efficient market is not attainable," and the court does not require "public information [to] be absorbed 'instantaneously.'"[107]  Therefore, referencing *PolyMedica* for the determination of an efficient market is not particularly enlightening, and the court will look to Third Circuit precedent for guidance.

---

[100] 432 F.3d 1 (1st Cir. 2005).
[101] D.I. 218 at 7-8.
[102] *PolyMedica*, 432 F.3d at 14.
[103] *Id.* at 19.
[104] 806 F.2d 1154 (3d Cir. 1986).
[105] *Id.* at 1161 n.10.
[106] 639 F.3d 623 (2011).
[107] *Id.* at 635.

Defendants also rely on *Cammer v. Bloom*[108] for establishing the test for market efficiency, but unlike the instant matter, defendants' stock in *Cammer* did not trade on a national stock exchange.[109]  The court in *Cammer* identified five factors for establishing an efficient market, all of which are addressed in Dr. Nye's analysis, but defendants focus solely on the cause-and-effect factor.[110]  In *Cammer*, the court recognized "it would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price," but stops short of identifying it as the "most important" factor.[111]

The *Cammer* court also distinguished the defendants in *Basic Inc. v. Levinson*[112] and *Peil* as companies who traded on a national stock exchange, and acknowledged these decisions "depended entirely upon the empirical market studies."[113]  In *Basic*, the Supreme Court recognized "[n]early every court that has considered the proposition has concluded that where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed."[114]  Furthermore, "[r]ecent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence,

---

[108] 711 F. Supp. 1264 (D.N.J. 1989).
[109] *Id.* at 1280.
[110] *Id.* at 1286.
[111] *Id.* at 1287.
[112] 485 U.S. 224 (1988).
[113] *Cammer*, 711 F. Supp. at 1280.
[114] *Basic*, 485 U.S. at 247.

any material misrepresentations."[115]  Here, the stock of the Company trades on the New York Stock Exchange, and Dr. Nye's analysis constitutes an empirical study.[116]

The Third Circuit has noted the FED. R. EVID. "display a preference for admissibility," and thus, the threshold applied by district court judges cannot be set "too high," causing plaintiffs "to prove their case twice."[117]  The significance of the evidence must be considered when determining admissibility because "[t]he exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence."[118]

As defendants readily assert, plaintiff must demonstrate a cause-and-effect relationship between the Company's stock price and its news, in order to establish an efficient market for the fraud-on-the-market theory.[119]  Dr. Nye executed an event study, which is a generally accepted practice in determining market efficiency in securities litigation.[120]  He also constructed a regression analysis, a proper control period, and selected relevant dates to demonstrate the requisite cause and effect.[121]  While defendants suggest other dates to include in his event study, none are necessary for the study to be admissible.  Dr. Nye's study included earnings-related announcements, which, in his opinion, would impact the market, and thus demonstrate market efficiency.

---

[115] *Id.* at 246.
[116] D.I. 185 at 15.
[117] *In re Paoli*, 35 F.3d at 750.
[118] *Konstantopoulos*, 112 F.3d at 719 (quoting *Dudley v. South Jersey Metal, Inc.*, 555 F.2d 96, 99 (3d Cir. 1977)).
[119] D.I. 218 at 6.
[120] D.I. 186 Ex. 3 at 21-23, 28-29.
[121] *Id.* at 23-28.

Defendants argument that these dates were not objective go to weight.[122]  Their critique

attacks Dr. Nye's conclusions, rather than his application of the accepted methodology.

While Dr. Nye's study may not be perfect, it is not unreliable.  Defendants may

challenge Dr. Nye's conclusions in the appropriate forum, that is, at trial.  Therefore,

defendants' motion to exclude Dr. Nye's testimony is denied.

## V.    STANDARD FOR CLASS CERTIFICATION

"To obtain certification of a class action for money damages under Rule  23(b)(3),

a plaintiff must satisfy Rule 23(a)."[123]  The plaintiff bears the burden of proving that the

action should be certified as a class action.[124]  First, to satisfy Rule 23(a), a plaintiff must

establish:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.[125]

These four prerequisites are commonly referred to as (1) numerosity, (2) commonality,

(3) typicality, and (4) adequacy of representation.[126]

"Second, the proposed class must satisfy at least one of the three requirements

listed in Rule 23(b)."[127]  In this case, plaintiff relies on Rule 23(b)(3), which requires a

---

[122] *Id.* at 28-29.
[123] *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013).
[124] *See id.*
[125] FED. R. CIV. P. 23(a).
[126] *See e.g.*, *Amgen*, 133 S. Ct. at 1191.
[127] *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2548 (2011).

plaintiff to establish, "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[128]

This prerequisite is commonly broken into a two-part analysis:  (1) predominance, and (2) superiority.[129]  To meet the predominance requirement, a plaintiff must demonstrate:  "(1) that the existence of individual injury . . . was 'capable of proof at trial through evidence that [was] common to the class rather than individual to its members;' and (2) that the damages resulting from that injury were measurable 'on a class-wide basis' through use of a 'common methodology.'"[130]  In general, the superiority requirement is easily satisfied in securities fraud cases where "there are many individual plaintiffs who suffer damages too small to justify a suit against a large corporate defendant."[131]

The United States Supreme Court has cautioned, "a court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."[132]  "Merits questions may be considered to the extent–but only to the extent–that they are relevant to determining whether the Rule 23

---

[128] FED. R. CIV. P. 23(b)(3).

[129] *See e.g.*, *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 374 (D. Del. 1990).

[130] *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1430 (2013) (quoting *Comcast Corp. v. Behrend*, 264 F.R.D. 150, 154 (E.D. Pa. 2010)).

[131] *See e.g.*, *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 300 (D. Del. 2003).

[132] *Amgen*, 133 S. Ct. at 1194-95 (citations omitted).

prerequisites for class certification are satisfied."[133]

"To recover damages in a private securities-fraud action under § 10(b) of the

Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5,

a plaintiff must prove:  '(1) a material misrepresentation or omission by the defendant;

(2) scienter; (3) a connection between the misrepresentation or omission and the

purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5)

economic loss; and (6) loss causation.'"[134]

To demonstrate reliance in securities actions, a plaintiff may rely on the "fraud-

on-the-market" theory, which permits "invok[ing] a rebuttable presumption of reliance on

material misrepresentations aired to the general public."[135]  This theory requires a

plaintiff to demonstrate that the company's shares traded on an efficient market during

the period of alleged misrepresentation.[136]  "[I]f a market is shown to be efficient, courts

may presume that investors who traded securities in that market relied on public,

material misrepresentations regarding those securities."[137]  This concept evolves from

the common sense notion that if a market is deemed to be efficient, "it is reasonable to

presume that a particular public, material misrepresentation will be reflected in the

security's price."[138]

A market will be efficient if "the 'market price of shares' will 'reflec[t] all publicly

---

[133] *Id.* at 1195.
[134] *Id.* at 1191-92 (internal citations omitted) (citing *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011)).
[135] *Amgen*, 133 S. Ct. at 1192.
[136] *Id.*
[137] *Id.*
[138] *Id.*

available information.'"[139]  To determine whether a market is efficient, courts look at a

number of factors.[140]  This circuit commonly looks at the *Cammer* factors.[141]  The

*Cammer* factors include:  "(1) whether the security trades at a large weekly volume; (2)

whether analysts follow and report on the security; (3) whether the security has market

makers and whether there is a potential for arbitrage activity; (4) whether the company

is eligible to file SEC Form S-3; and (5) whether there are empirical facts showing a

cause-and-effect relationship between unexpected corporate events or financial

information releases, and an immediate response in the security's price."[142]  To

determine market efficiency, the court engages in a "rigorous" analysis.[143]  This analysis

involves resolving disputes among conflicting expert opinions.[144]

While the fraud-on-the-market theory can be rebutted by proof that "the news of

the [truth] credibly entered the market and dissipated the effects of [prior]

misstatements," the rebuttal argument is one reserved for trial or summary judgment.[145]

Relevant to the court's analysis is the United States Supreme Court's recently

decided *Amgen, Inc. v. Connecticut Retirement Plans and Trust Funds*,[146] holding that

while a plaintiff "must prove materiality to prevail on the merits . . . such proof is not a

---

[139] *Amgen*, 133 S. Ct. at 1192 (quoting *Basic*, 485 U.S. at 246).

[140] *Cammer*, 711 F. Supp. at 1285-87.

[141] *Id.*

[142] D.I. 185 at 14-15 (citing *Cammer*, 711 F. Supp. at 1285-87).

[143] *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2009).

[144] *Id.* at 323 ("Weighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands.").

[145] *Amgen*, 133 S. Ct. at 1204 (quoting *Basic*, 485 U.S. at 248-49) (providing examples of successful methods to rebut the fraud-on-the-market presumption).

[146] 133 S. Ct. 1184 (2013).

prerequisite of class certification."[147]  In the instant matter, this case was initially argued

in the party's briefs; however, in light of *Amgen*, an analysis of this element is not

necessary at the class certification stage of litigation.[148]

Unlike a claim for a violation under § 10(b), to recover damages under § 14(a) of

the Securities Exchange Act, plaintiff need not prove reliance because it is not an

element of the claim.[149]  Instead, "to prevail on a Section 14(a) claim, a plaintiff must

show that (1) a proxy statement contained a material misrepresentation or omission

which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than

the particular defect in the solicitation materials, was an 'essential link in the

accomplishment of the transaction.'"[150]  "At the class certification stage, plaintiffs are not

required to prove damages by calculating specific damages figures for each member of

the class. Instead, they need only show that a 'viable method' is available to prove

damages on a class-wide basis."[151]

Finally, the Third Circuit has observed, "[c]lass actions are a particularly

appropriate and desirable means to resolve claims based on the securities laws, 'since

the effectiveness of the securities laws may depend in large measure on the application

---

[147] *Id.* at 1191.  For a scholarly analysis of *Amgen*, the fraud-on-the-market theory, and its effect on materiality in securities fraud litigation, see Richard A. Booth, *The Two Faces of Materiality*, 39 DEL. J. CORP. L. (forthcoming 2013) (arguing that the two distinct definitions of a material fact can be reconciled as alternatives to prove materiality).

[148] *See Amgen*, 133 S. Ct. at 1191.

[149] *See DaimlerChrysler AG*, 216 F.R.D. at 300.

[150] *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992) (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970)).

[151] *In re Neurontin Antitrust Litig.*, No. 02-1390, 2011 WL 286118, at *9 (D.N.J. Jan. 25, 2011).

of the class action device.'"[152]

## VI.  ANALYSIS

### A.    Rule 23(a) Requirements

#### 1.    Numerosity

Numerosity requires the members of the class to be "so numerous that joinder of all members is impracticable."[153]  In *Deutschman*, the court held that numerosity was satisfied where "36,000 shares of Beneficial common stock were purchased by an estimated 2000 investors during the proposed Class Period."[154]

Here, plaintiff has clearly met the numerosity prerequisite.  Plaintiff demonstrates that during the period in question, there were between 69 million and 128 million shares of Heckmann stock outstanding, with an average of 3.4 million common shares traded on a weekly basis.[155]  In addition, roughly 73 to 77 million warrants were outstanding, with nearly 2.1 million warrants trading weekly.[156]  Those numbers indicate potentially substantial class members, absent a precise number, satisfying numerosity. Defendants do not challenge numerosity in their brief.[157]

#### 2.    Commonality

Commonality requires that a plaintiff must establish "there are questions of law or

---

[152] *See e.g.*, *Eisenburg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) (quoting *Kahan v. Rosenstiel*, 424 F.2d 161, 169 (3d Cir. 1970)).
[153] FED. R. CIV. P. 23(a)(1).
[154] *Deutschman*, 132 F.R.D. at 372.
[155] D.I. 185 at 6.
[156] *Id.*
[157] *See* D.I. 215.

fact common to the class."[158]  In security fraud class actions, the commonality

requirement is permissively applied.[159]  "The requirement is satisfied by a showing that

'the questions of law or fact linking the class members are substantially related to the

resolution of the litigation, even though the individuals are not identically situated.'"[160]  In

*DaimlerChrysler*, the court held that commonality was satisfied where the matter

involved alleged violations of Sections 10(b), 14(a), and 20(a) of the Securities

Exchange Act.[161]

Here, plaintiff has clearly met the commonality prerequisite.  Similar to plaintiff's

allegations in *DaimlerChrysler*, the common legal and factual issues in this matter

include:  (1) whether defendants violated sections 10(b), 14(a), and 20(a) of the

Securities Exchange Act; (2) whether material facts were misrepresented or omitted in

the proxy, SEC filings, press releases, or other statements to the public; and (3)

whether defendants' misrepresentations or omissions caused the alleged losses.[162]

Therefore, the commonality requirement is easily satisfied.  Defendants also do not

challenge commonality.[163]

### 3.    Typicality

Typicality requires that a plaintiff must establish that "claims or defenses of the

---

[158] FED. R. CIV. P. 23(a)(2).
[159] *Deutschman*, 132 F.R.D. at 372.
[160] *Id.* (quoting *In re Gulf Oil/Cities Servs. Tender Offer Litig.*, 112 F.R.D. 383, 386 (S.D.N.Y. 1986)).
[161] *See DaimlerChrysler AG*, 216 F.R.D. at 296.  *See also In re Tyson Foods, Inc.*, Civ. A. No. 01-425-SLR, 2003 WL 22316548, at *3 (D. Del. Oct. 6, 2003).
[162] D.I. 185 at 7-8.
[163] *See* D.I. 215.

representative parties are typical of the claims or defenses of the class."[164]  The

typicality requirement "is intended as a safeguard to insure that the named plaintiff's

interests are substantially coextensive with the interests of the class."[165]  The Third

Circuit has identified three factors for determining whether typicality is satisfied:

> (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced, and (b) the factual circumstances underlying the theory; (2) the class representative must not be subject to a defense that is both inapplicable to many class members and likely to become a major focus of the litigation; and (3) the interests and incentives of the class representative must be sufficiently aligned with those of the class.[166]

Here, the typicality requirement is satisfied because:  (1) the factual

circumstances and legal arguments supporting plaintiff's claims are equally shared by

the class, since all arose from the Company's merger with China Water; (2) lead plaintiff

purchased his shares on the open market at artificially inflated prices, and is not subject

to any unique defenses that are likely to become a major focus of litigation.[167]  Thus,

any asserted defense will equally apply to the claims by all class members; and (3) all

the class members share a common interest in obtaining recovery from defendants for

the harm sustained due to defendants' misrepresentations.[168]  The claims of the putative

class representative are generally similar and sufficiently aligned with the potential class

members.  To be sure, defendants do not challenge typicality.[169]

---

[164] FED. R. CIV. P. 23(a)(3).
[165] *Deutschman*, 132 F.R.D. at 373.
[166] *Yarger v. ING Bank, FSB*, 285 F.R.D. 308, 318 (D. Del. 2012).
[167] D.I. 185 at 9-10.
[168] *Id.*
[169] *See* D.I. 215.

4.      *Adequate and Fair Representation*

Lastly, a plaintiff must establish that "the representative parties will fairly and adequately protect the interests of the class."[170] "The courts in this circuit have applied a two-prong test to determine whether the named plaintiff has satisfied Rule 23(a)(4)."[171] "A named plaintiff is an adequate representative if (1) he has no interest antagonistic to the interests of the members of the class; and (2) his attorney is capable of prosecuting the claim with some degree of expertise."[172]

Here, plaintiff argues that the class representative will "fairly and adequately represent the interests of the class," because there are no conflicts of interest between plaintiff and the class, and lead counsel is qualified and capable, and has a wealth of experience prosecuting federal securities law claims.[173] The court agrees with plaintiff that all class members were injured by the same alleged misrepresentation on behalf of Heckmann and China Water, and thus lead plaintiff will fairly and adequately represent the interests of the entire class. Again, defendants do not challenge adequate and fair representation in their brief.[174]

**B.     Rule 23(b)(3) Requirements**

Since plaintiff has satisfied the requirements under Rule 23(a), plaintiff must now satisfy both requirements under Rule 23(b)(3): "(1) the questions of law or fact common

---

[170] FED. R. CIV. P. 23(a)(4).
[171] *Deutschman*, 132 F.R.D. at 374.
[172] *Id.*
[173] D.I. 185 at 10-11.
[174] *See* D.I. 215.

to class members predominate over any questions affecting only individual members, and (2) that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[175]   Pertinent to the court's analysis is:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.[176]

### 1.   Predominance

Here, defendants contend plaintiff fails to meet the predominance standard of Rule 23(b)(3).[177]   While defendants concede the Supreme Court has recognized "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws," the Third Circuit in *Hydrogen* notes the more liberal application of predominance does not permit a court to "relax its certification analysis, or presume a requirement for certification is met, merely because a plaintiff's claims fall within one of those substantive categories."[178]   Defendants make two separate arguments against class certification of plaintiff's Section 10(b) and Section 14(a) claims, discussed below.

### a.   Section 10(b) Claim

---

[175] *Amgen*, 133 S. Ct. at 1191.
[176] FED. R. CIV. P. 23(b)(3).
[177] D.I. 215 at 3.
[178] *Id.* at 5.

Plaintiff invokes the rebuttable presumption of reliance on material misrepresentation aired to the general public under the fraud-on-the-market theory.[179] Plaintiff's argument is twofold. First, plaintiff argues the market is efficient because Heckmann's stock trades on the New York Stock Exchange (NYSE).[180] Second, plaintiff relies upon Dr. Nye's expert report to further demonstrate market efficiency.[181] Dr. Nye's expert report examines the efficiency of the Heckmann stock based on the *Cammer* factors plus three additional factors.[182]

It is undisputed that Heckman's securities traded on the NYSE during the class period.[183] The Third Circuit has described the NYSE as "one of the most efficient capital markets in the world."[184] Further, the Third Circuit has stated that "[s]ecurities markets like the NYSE . . . are open and developed, and are therefore well suited for application of the fraud on the market theory."[185] In *In re Merck & Co.*, the court held the mere fact that the stock traded on the NYSE was enough to determine efficiency.[186] The *Merck* court felt it unnecessary to continue the analysis by discussing the *Cammer* factors.[187] Both party's experts in this case base their efficiency study on the *Cammer* factors;

---

[179] *Id.* at 13.
[180] D.I. 223 at 11-13.
[181] *Id.* at 13-26.
[182] *Id.*
[183] D.I. 149 at 130 ¶ 242(a).
[184] *In re PHP Healthcare Corp.*, 128 F. App'x 839, 848 (3d Cir. 2005).
[185] *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) abrogated by *Amgen*, 133 S. Ct. at 1184 (abrogating *DVI*'s holding that proof of materiality is a prerequisite for class certification). *See Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (describing the New York Stock Exchange as open, developed, and efficient).
[186] No. 1658 (SRC), 2013 WL 396117, at *11 (D.N.J. Jan. 30, 2013).
[187] *Id.*

however, an analysis of the *Cammer* factors is more stringent where the market is less open and developed than the NYSE, such as the over-the-counter market.[188]

However, this fact does not deter defendants from challenging efficiency. Defendants urge plaintiff's individual issues concerning reliance dominate the common issues for a Section 10(b) Class.[189]  Defendants contend plaintiff does not qualify for the fraud-on-the-market theory, and thus the presumption of reliance does not apply.[190] First, defendants attempt to prove inefficiency by their motion to exclude plaintiff's expert who determined the market to be efficient.[191]  However, as this court held, plaintiff's expert report is not excluded, and defendants can challenge the credibility of the expert's findings at trial.[192]

Second, defendants argue that although the Company's stock trades on the NYSE, they maintain the market for its stock is not efficient through the use of their expert.[193]  However, defendants do not cite to any case where a court has held that stock traded on the NYSE is not efficient.[194]

Specifically at dispute between the parties is the cause-and-effect relationship between defendants' misrepresentations and the price of the securities.[195]  Plaintiff's

---

[188] *Id.*
[189] D.I. 215 at 16.
[190] *Id.* at 17.
[191] *See supra* Part II & III.
[192] *See id.*
[193] D.I. 215 at 19-24.
[194] *See* D.I. 215.
[195] *Compare* D.I. 185 at 15-16, *with* D.I. 215 at 19-21.

expert, Dr. Nye, opines that based on his event study, the Heckmann common shares "responded to new, material, company-specific news."[196]   In contrast, defendants' expert, Dr. Cox, concludes that based on his event study, the Heckmann common shares "did *not* respond differently on news days versus no-news days and thus did not trade in an efficient market."[197]

However, the court does not need to conduct an analysis of which expert is more credible at the class certification stage; instead, this argument may be proper at trial or on a motion for summary judgment.[198]   Further, if the court were to determine which expert was more credible, it would engage in an analysis of the merits of plaintiff's claim.  Even though a merits analysis often overlaps with a class certification motion, a court only needs to conduct an analysis of the merits when necessary.[199]

Even if the NYSE was not presumed to be efficient, plaintiff meets his burden that the market for the Company's stock was efficient during the class period.  As discussed *supra*, Dr. Cox admits to using a methodology not adopted by a federal court in assessing market efficiency,[200] while plaintiff's expert, Dr. Nye, uses a methodology established in this circuit.[201]   Since the stock undisputably traded on the NYSE during the class period, and plaintiff's expert uses methodology consistent with Third Circuit precedent, the market is efficient.  Therefore, the common issues predominate over the

---

[196] D.I. 185 at 15-16.
[197] D.I. 215 at 20.
[198] *See Merck*, 2013 WL 396117, at *11.
[199] *See Amgen*, 133 S. Ct. at 1195.
[200] D.I. 223 at 28.
[201] *See supra* Part IV.

individual issues as to plaintiff's Section 10(b) claim.

      b.     Section 14(a) Claim

"At the class certification stage, plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class.  Instead, they need only show that a 'viable method' is available to prove damages on a class-wide basis."[202]

Plaintiff argues the common issues predominate as to the Section 14(a) claim because reliance is not an element, and the claim is solely based on "falsity, materiality and loss causation," which arises out of the same misstatements and omissions in the proxy and the proxy materials, and can be resolved on a class-wide basis.[203]

Defendants argue plaintiff lacks a viable damage theory, which prohibits recovery under Section 14(a).[204]  Noting that proof of damages is an essential element to a Section 14(a) claim, defendants maintain plaintiff fails to show what the damages to the class are, or how they may be established through a judicially recognized and commonly accepted method.[205]  In support, defendants cite *Comcast Corp. v. Behrend*,[206] where the Supreme Court denied class certification to over 2 million Comcast customers in an antitrust action, because the Court only accepted one of plaintiff's expert's four theories regarding damages on the antitrust impact.[207]  However,

---

[202] *Neurontin*, 2011 WL 286118, at *9.
[203] *Id.* at *12.
[204] *Id.* at *6.
[205] *Id.*
[206] 133 S. Ct. 1426 (2013).
[207] *Id.* at 1430-31.

plaintiff correctly points out that while *Comcast* addresses class action certification, it was not in regard to a securities fraud litigation, which have generally been certified for class status.[208]   Instead, *Comcast* addresses antitrust litigation.[209]

Here, plaintiff's damage theory is consistent with Section 14(a) precedent because it is "based on the diminution in the value of their shares caused by the false and misleading statements in the Proxy."[210]   This theory is consistent with *Mills* and *Gould* where the courts recognized that a plaintiff may state a claim for a diminution in the value of stock; the claim is not limited to out-of-pocket loss.[211]   Defendants concede that a plaintiff may seek recovery of damages for more than out-of-pocket damages.[212]   Therefore, the common issues predominate over the individual issues as to plaintiff's Section 14(a) claim.

### 2.   Superiority

"In addition to common questions of law and fact, Rule 23(b)(3) requires the class action to be superior to other available methods for litigating the claims."[213]   This inquiry requires analysis of subsections (A) through (D) of the rule.[214]

---

[208] *See e.g.*, *Eisenburg*, 766 F.2d at 785.

[209] *Comcast*, 133 S. Ct. at 1430-31.

[210] D.I. 223 at 10.

[211] *See Mills*, 396 U.S. at 389.  *See also Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 781 (3d Cir. 1976).

[212] D.I. 215 at 14 ("Courts have recognized that in some cases, a Section 14(a) claim can allow a plaintiff to recover damages other than out of pocket damages measured by the difference between the promised value and the actual value of a stock.").

[213] *DaimlerChrysler AG*, 216 F.R.D. at 300.

[214] *See* FED. R. CIV. P. 23(b)(3).

This circuit favors allowing class certification in securities fraud cases,[215] recognizing, "the interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action."[216]  In particular, class actions are "especially appropriate in securities fraud cases wherein there are many individual plaintiffs who suffer damages too small to justify a suit against a large corporate defendant."[217]

Here, "the Class consists of a large number of geographically dispersed investors in Heckmann common stock and warrants, along with all holders of Heckmann common stock as of September 15, 2008."[218]  The class action method is superior to alternative methods of litigating the case.  Therefore, plaintiff's motion for class certification is granted.

## VII.  ORDER AND RECOMMENDED DISPOSITION

Consistent with the findings contained in the Report and Recommendation,

IT IS RECOMMENDED that:

(1) Defendants' Motion to Exclude Declaration of Zachary Nye, Ph.D. (D.I. 217) is DENIED.

(2) Plaintiff's Motion for Class Certification and Appointment of Class Representatives and Class Counsel (D.I. 184) is GRANTED.

Pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72(a) and D. DEL. LR 72.1, any objections to the Report and Recommendation shall be filed within fourteen (14)

---

[215] *See e.g.*, *DaimlerChrysler AG*, 216 F.R.D. at 300.
[216] *Deutschman*, 132 F.R.D. at 374 (quoting *Kahan*, 424 F.2d at 169).
[217] *DaimlerChrysler AG*, 216 F.R.D. at 300.
[218] D.I. 185 at 19.

days limited to ten (10) pages after being served with the same.  Any response is limited to ten (10) pages.

The parties are directed to the Court's Standing Order in Non-Pro Se matters for Objections Filed under FED. R. CIV. P. 72 dated November 16, 2009, a copy of which is available on the court's website, www.ded.uscourts.gov.

Date:  June 6, 2013                    /s/  Mary Pat Thynge_____
                                       UNITED STATES MAGISTRATE JUDGE